# EXHIBIT A

## (Part 1)

$20,000,000 REVOLVING CREDIT FACILITY

$17,500,000 TERM LOAN A FACILITY

$12,500,000 TERM LOAN B FACILITY

CREDIT AGREEMENT

by and among

ALARM ONE, INC.,

OTHER LOAN PARTIES HERETO,

LENDERS PARTY HERETO

and

FORTRESS CREDIT CORP., As Agent

Dated as of February 11, 2005

## TABLE OF CONTENTS

Section                                                                                                          Page

1.    CERTAIN DEFINITIONS.................................................................................1
      1.1   Certain Definitions.............................................................................1
      1.2   Construction....................................................................................23
            1.2.1   Number; Inclusion....................................................24
            1.2.2   Determination.........................................................24
            1.2.3   Discretion and Consent...........................................24
            1.2.4   Documents Taken as a Whole..................................24
            1.2.5   Headings.................................................................24
            1.2.6   Implied References..................................................24
            1.2.7   Persons...................................................................24
            1.2.8   Modifications to Documents....................................24
            1.2.9   From, To and Through.............................................25
            1.2.10  Shall; Will...............................................................25
      1.3   Accounting Principles......................................................................25

2.    REVOLVING CREDIT FACILITY.................................................................25
      2.1   Revolving Credit Commitments........................................................25
      2.2   Nature of Lenders' Obligations with Respect to Revolving Credit Loans............25
      2.3   Commitment Fees...........................................................................26
      2.4   Revolving Credit Facility Fee...........................................................26
      2.5   Revolving Credit Loan Requests......................................................26
      2.6   Making Revolving Credit Loans........................................................26
      2.7   Revolving Credit Notes...................................................................27
      2.8   Use of Proceeds............................................................................27

3.    TERM LOANS..........................................................................................27
      3.1   Term Loan Commitments.................................................................27
            3.1.1   Term Loan A..........................................................27
            3.1.2   Term Loan B..........................................................27
      3.2   Nature of Lenders' Obligations with Respect to Term Loans...................28
            3.2.1   Term Loan A..........................................................28
            3.2.2   Term Loan B..........................................................28
      3.3   Term Loan Facility Fee....................................................................28
      3.4   Term Notes...................................................................................28
      3.5   Use of Proceeds............................................................................28

4.    INTEREST RATES....................................................................................29
      4.1   Interest Rates................................................................................29
            4.1.1   Revolving Credit Interest Rate..................................29
            4.1.2   Term Loan A Interest Rate........................................29
            4.1.3   Term Loan B Interest Rate........................................29
            4.1.4   Rate Quotations.....................................................29

TABLE OF CONTENTS

| Section | | | Page |
|---|---|---|---|

| 4.2 | Interest Periods. | 29 |
| | 4.2.1 | Amount of Borrowing Tranche. | 30 |
| | 4.2.2 | Renewals. | 30 |
| 4.3 | Interest After Default. | 30 |
| | 4.3.1 | Interest Rate. | 30 |
| | 4.3.2 | Other Obligations. | 30 |
| | 4.3.3 | Acknowledgment. | 30 |
| 4.4 | Euro-Rate Unascertainable; Illegality; Increased Costs; Deposits Not Available. | 30 |
| | 4.4.1 | Unascertainable. | 30 |
| | 4.4.2 | Illegality; Increased Costs; Deposits Not Available. | 31 |
| | 4.4.3 | Agent's and Lender's Rights. | 31 |
| 4.5 | Failure to Select an Interest Period. | 32 |

| 5. | PAYMENTS | 32 |
| 5.1 | Payments. | 32 |
| 5.2 | Pro Rata Treatment of Lenders. | 32 |
| 5.3 | Interest Payment Dates. | 33 |
| 5.4 | Voluntary Prepayments. | 33 |
| | 5.4.1 | Right to Prepay. | 33 |
| | 5.4.2 | Replacement of a Lender. | 33 |
| | 5.4.3 | Prepayment Fee. | 34 |
| | 5.4.4 | Change of Lending Office. | 34 |
| 5.5 | Mandatory Prepayments. | 35 |
| | 5.5.1 | Excess Cash Flow. | 35 |
| | 5.5.2 | Sale of Assets. | 35 |
| | 5.5.3 | Euro-Rate. | 36 |
| | 5.5.4 | Borrowing Base Exceeded. | 36 |
| | 5.5.5 | Prepayment Fee. | 36 |
| 5.6 | Additional Compensation in Certain Circumstances. | 36 |
| | 5.6.1 | Increased Costs or Reduced Return Resulting from Taxes, Reserves, Capital Adequacy Requirements, Expenses, Etc. | 36 |
| | 5.6.2 | Indemnity. | 37 |
| 5.7 | Interbank Market Presumption. | 38 |
| 5.8 | Taxes. | 38 |
| | 5.8.1 | No Deductions. | 38 |
| | 5.8.2 | Stamp Taxes. | 38 |
| | 5.8.3 | Indemnification for Taxes Paid by a Lender. | 38 |
| | 5.8.4 | Certificate. | 39 |
| | 5.8.5 | Survival. | 39 |
| 5.9 | Judgment Currency. | 39 |
| | 5.9.1 | Currency Conversion Procedures for Judgments. | 39 |
| | 5.9.2 | Indemnity in Certain Events. | 39 |
| 5.10 | Exit Fee. | 39 |

TABLE OF CONTENTS

Section                                                                                      Page

6.   REPRESENTATIONS AND WARRANTIES...................................................40
     6.1   Representations and Warranties.....................................................40
           6.1.1   Organization and Qualification...........................................40
           6.1.2   Capitalization and Ownership.............................................40
           6.1.3   Subsidiaries.........................................................................40
           6.1.4   Power and Authority..........................................................40
           6.1.5   Validity and Binding Effect...............................................41
           6.1.6   No Conflict..........................................................................41
           6.1.7   Litigation.............................................................................41
           6.1.8   Title to Properties..............................................................41
           6.1.9   Financial Statements...........................................................42
           6.1.10  Use of Proceeds; Margin Stock; Section 20 Subsidiaries...........42
           6.1.11  Full Disclosure...................................................................43
           6.1.12  Taxes. 43
           6.1.13  Consents and Approvals.....................................................43
           6.1.14  No Event of Default; Compliance with Instruments................43
           6.1.15  Patents, Trademarks, Copyrights, Licenses, Etc....................44
           6.1.16  Security Interests................................................................44
           6.1.17  Anti-Terrorism Laws..........................................................44
           6.1.18  Status of the Pledged Collateral..........................................45
           6.1.19  Insurance.............................................................................45
           6.1.20  Compliance with Laws.......................................................46
           6.1.21  Material Contracts; Burdensome Restrictions.......................46
           6.1.22  Investment Companies; Regulated Entities............................46
           6.1.23  Plans and Benefit Arrangements.........................................46
           6.1.24  Employment Matters...........................................................47
           6.1.25  Environmental Matters........................................................48
           6.1.26  Security Alarm Contracts....................................................49
           6.1.27  Alarm Systems....................................................................50
           6.1.28  Telephone Numbers.............................................................50
           6.1.29  Account Sales......................................................................50
           6.1.30  Seasonal Customers.............................................................51
           6.1.31  Alarm Licenses...................................................................51
     6.2   Updates to Schedules..................................................................51

7.   CONDITIONS OF LENDING.................................................................51
     7.1   First Loans..................................................................................51
           7.1.1   Officer's Certificate...........................................................51
           7.1.2   Secretary's Certificate.........................................................52
           7.1.3   Delivery of Loan Documents...............................................52
           7.1.4   Opinion of Counsel.............................................................52
           7.1.5   Legal Details.......................................................................52
           7.1.6   Payment of Fees..................................................................53
           7.1.7   Background Checks..............................................................53

TABLE OF CONTENTS

Section                                                                                                    Page

      7.1.8    Average Eligible RMR...................................................................53
      7.1.9    Consents.......................................................................................53
      7.1.10   Officer's Certificate Regarding No Material Adverse Changes. ...............53
      7.1.11   No Violation of Laws.....................................................................53
      7.1.12   No Actions or Proceedings. ............................................................53
      7.1.13   Insurance Policies; Certificates of Insurance; Endorsements. ...............53
      7.1.14   [Intentionally Omitted]. .................................................................54
      7.1.15   Filing Receipts..............................................................................54
      7.1.16   Landlord's Waiver. ........................................................................54
      7.1.17   [Intentionally Omitted]. .................................................................54
      7.1.18   Subordinated Debt Documents. .......................................................54
      7.1.19   Due Diligence. ..............................................................................54
      7.1.20   Account Control Agreements...........................................................54
      7.1.21   Closing Date Compliance Certificate. ..............................................54
  7.2    Each Additional Loan. ............................................................................55

8.    COVENANTS ...................................................................................................55
  8.1    Affirmative Covenants............................................................................55
      8.1.1    Preservation of Existence, Etc. .......................................................55
      8.1.2    Payment of Liabilities, Including Taxes, Etc. ....................................55
      8.1.3    Maintenance of Insurance...............................................................56
      8.1.4    Maintenance of Properties and Leases. .............................................57
      8.1.5    Maintenance of Patents, Trademarks, Etc..........................................57
      8.1.6    Visitation Rights. ..........................................................................57
      8.1.7    Keeping of Records and Books of Account........................................57
      8.1.8    Plans and Benefit Arrangements. .....................................................57
      8.1.9    Compliance with Laws...................................................................58
      8.1.10   Use of Proceeds.............................................................................58
      8.1.11   Further Assurances.........................................................................58
      8.1.12   Subordination of Intercompany Loans. .............................................58
      8.1.13   Anti-Terrorism Laws......................................................................58
      8.1.14   Account Control Agreements...........................................................59
      8.1.15   Trade Payables..............................................................................59
      8.1.16   Storage of Security Alarm Contract Documents..................................59
      8.1.17   Landlords' Waivers. .......................................................................59
  8.2    Negative Covenants. ..............................................................................59
      8.2.1    Indebtedness.................................................................................59
      8.2.2    Liens.  60
      8.2.3    Guaranties. ..................................................................................60
      8.2.4    Loans and Investments...................................................................60
      8.2.5    Dividends and Related Distributions. ...............................................61
      8.2.6    Liquidations, Mergers, Consolidations, Acquisitions. .........................61
      8.2.7    Dispositions of Assets or Subsidiaries. .............................................62
      8.2.8    Affiliate Transactions.....................................................................63

- iv -

TABLE OF CONTENTS

Section                                                                                                    Page

      8.2.9  Subsidiaries, Partnerships and Joint Ventures. ...........................................63
      8.2.10  Continuation of or Change in Business. .................................................64
      8.2.11  Plans and Benefit Arrangements. ..........................................................64
      8.2.12  Fiscal Year. ...........................................................................................65
      8.2.13  Issuance of Stock. .................................................................................65
      8.2.14  Changes in Documents. .........................................................................65
      8.2.15  Capital Expenditures and Leases. ..........................................................65
      8.2.16  Minimum Fixed Charge Coverage Ratio. ..............................................66
      8.2.17  Maximum Funded Debt. ........................................................................66
      8.2.18  Maximum Senior Debt............................................................................67
      8.2.19  Minimum Liquidity. ..............................................................................67
      8.2.20  Maximum Attrition Rate. .......................................................................67
      8.2.21  Maximum Creation Multiple. .................................................................69
      8.2.22  Dealer Programs. ...................................................................................69
      8.2.23  Underwriting Guidelines. .......................................................................69
      8.2.24  Certain Restrictions Regarding Subordinated Debt. ...............................69
      8.2.25  Alarm Licenses. .....................................................................................69
      8.2.26  Compensation. .......................................................................................69
      8.2.27  Sale-Leasebacks. ...................................................................................70
      8.2.28  Cancellation of Indebtedness. ................................................................70
  8.3  Reporting Requirements. ....................................................................................70
      8.3.1  Monthly Financial Statements. ..............................................................70
      8.3.2  Quarterly Financial Statements. .............................................................70
      8.3.3  Annual Financial Statements. ................................................................71
      8.3.4  Certificate of Borrower. .........................................................................71
      8.3.5  Borrowing Base Certificate.....................................................................72
      8.3.6  Notice of Default.....................................................................................72
      8.3.7  Notice of Litigation. ...............................................................................72
      8.3.8  Certain Events. .......................................................................................72
      8.3.9  Budgets, Forecasts, Other Reports and Information. ..............................73
      8.3.10  Notices Regarding Plans and Benefit Arrangements. ............................73

9.  DEFAULT ..............................................................................................................74
  9.1  Events of Default. ...............................................................................................74
      9.1.1  Payments Under Loan Documents.........................................................74
      9.1.2  Breach of Warranty. ...............................................................................75
      9.1.3  Breach of Negative Covenants or Visitation Rights or Account Control
            Agreements. ...........................................................................................75
      9.1.4  Breach of Other Covenants.....................................................................75
      9.1.5  Defaults in Other Agreements or Indebtedness. ....................................75
      9.1.6  Final Judgments or Orders. ....................................................................75
      9.1.7  Loan Document Unenforceable. .............................................................76
      9.1.8  Uninsured Losses; Proceedings Against Assets......................................76
      9.1.9  Notice of Lien or Assessment. ...............................................................76

# TABLE OF CONTENTS

| Section | | | Page |
|---|---|---|---|

9.1.10  Insolvency. ...................................................................76
9.1.11  Events Relating to Plans and Benefit Arrangements. ...............76
9.1.12  Cessation of Business. ......................................................77
9.1.13  Change of Control. ..........................................................77
9.1.14  Involuntary Proceedings. ..................................................77
9.1.15  Voluntary Proceedings. ....................................................77

9.2  Consequences of Event of Default. ....................................................78
    9.2.1  Events of Default Other Than Bankruptcy, Insolvency or Reorganization Proceedings. ...........78
    9.2.2  Bankruptcy, Insolvency or Reorganization Proceedings. ...........78
    9.2.3  Set-off. .....................................................................78
    9.2.4  Suits, Actions, Proceedings. ..........................................79
    9.2.5  Application of Proceeds; Collateral Sharing. .....................79
    9.2.6  Other Rights and Remedies. ...........................................80
9.3  Notice of Sale. ..........................................................................80

10.  AGENT .............................................................................80
10.1  Appointment. .......................................................................80
10.2  Delegation of Duties. .............................................................81
10.3  Nature of Duties; Independent Credit Investigation. ..........................81
10.4  Actions in Discretion of Agent; Instructions From Lenders. .................81
10.5  Reimbursement and Indemnification of Agent by Borrower. ..................82
10.6  Exculpatory Provisions; Limitation of Liability. ............................82
10.7  Reimbursement and Indemnification of Agent by Lenders. ...................83
10.8  Reliance by Agent. ...............................................................84
10.9  Notice of Default. .................................................................84
10.10  Notices. ...........................................................................84
10.11  Lenders in Their Individual Capacities; Agent in its Individual Capacity. ......84
10.12  Holders of Notes. ................................................................85
10.13  Equalization of Lenders. .......................................................85
10.14  Successor Agent. .................................................................85
10.15  Agent's Fee. ......................................................................86
10.16  Availability of Funds. ...........................................................86
10.17  Calculations. ......................................................................86
10.18  No Reliance on Agent's Customer Identification Program. ..................86
10.19  Beneficiaries. .....................................................................87
10.20  Exit Fee. ...........................................................................87

11.  MISCELLANEOUS ...............................................................87
11.1  Modifications, Amendments or Waivers. ........................................87
    11.1.1  Increase of Commitment; Extension of Expiration Date. .........87
    11.1.2  Extension of Payment; Reduction of Principal Interest or Fees; Modification of Terms of Payment. ...............87
    11.1.3  Release of Collateral or Guarantor. .................................88

## TABLE OF CONTENTS

<u>Section</u>                                                                 <u>Page</u>

          11.1.4  Miscellaneous. ................................................................88
11.2    No Implied Waivers; Cumulative Remedies; Writing Required. ...........................88
11.3    Reimbursement and Indemnification of Lenders by Borrower; Taxes. ................88
11.4    Holidays. ........................................................................89
11.5    Funding by Branch, Subsidiary or Affiliate. ...............................89
          11.5.1  Notional Funding. ................................................89
          11.5.2  Actual Funding. ..................................................90
11.6    Notices. .........................................................................90
11.7    Severability. ...................................................................91
11.8    Governing Law. ..................................................................91
11.9    Prior Understanding. ............................................................91
11.10   Duration; Survival. .............................................................91
11.11   Successors and Assigns. .........................................................91
11.12   Confidentiality. ................................................................93
          11.12.1      General. ....................................................93
          11.12.2      Sharing Information With Affiliates of Lenders. .........93
11.13   Counterparts. ...................................................................93
11.14   Agent's or Lender's Consent. ....................................................93
11.15   Exceptions. .....................................................................94
11.16   **CONSENT TO FORUM; WAIVER OF JURY TRIAL.** ......................................94
11.17   Certifications From Lenders and Participants. ...................................94
          11.17.1      Tax Withholding. ............................................94
          11.17.2      USA Patriot Act. ............................................95
11.18   Joinder of Guarantors. ..........................................................95

## LIST OF SCHEDULES AND EXHIBITS

**SCHEDULES**

| | | |
|---|---|---|
| SCHEDULE 1.1(B) | - | COMMITMENTS OF LENDERS AND ADDRESSES FOR NOTICES |
| SCHEDULE 1.1(P) | - | PERMITTED LIENS |
| SCHEDULE 6.1.1 | - | QUALIFICATIONS TO DO BUSINESS |
| SCHEDULE 6.1.2 | - | CAPITALIZATION |
| SCHEDULE 6.1.3 | - | SUBSIDIARIES |
| SCHEDULE 6.1.7 | - | LITIGATION |
| SCHEDULE 6.1.8 | - | OWNED AND LEASED REAL PROPERTY |
| SCHEDULE 6.1.13 | - | CONSENTS AND APPROVALS |
| SCHEDULE 6.1.15 | - | PATENTS, TRADEMARKS, COPYRIGHTS, LICENSES, ETC. |
| SCHEDULE 6.1.18 | - | PARTNERSHIP AGREEMENTS; LLC AGREEMENTS |
| SCHEDULE 6.1.19 | - | INSURANCE POLICIES |
| SCHEDULE 6.1.21 | - | MATERIAL CONTRACTS |
| SCHEDULE 6.1.23 | - | EMPLOYEE BENEFIT PLAN DISCLOSURES |
| SCHEDULE 6.1.25 | - | ENVIRONMENTAL DISCLOSURES |
| SCHEDULE 6.1.28 | - | TELEPHONE NUMBERS |
| SCHEDULE 6.1.29 | - | ACCOUNT SALES |
| SCHEDULE 8.2.1 | - | PERMITTED INDEBTEDNESS |

**EXHIBITS**

| | | |
|---|---|---|
| EXHIBIT 1.1(A)(1) | - | ASSIGNMENT AND ASSUMPTION AGREEMENT |
| EXHIBIT 1.1(A)(2) | - | ASSIGNMENT AND MODIFICATION AGREEMENT |
| EXHIBIT 1.1(C)(1) | - | COLLATERAL ASSIGNMENT OF CONTRACTS |
| EXHIBIT 1.1(C)(2) | - | COLLATERAL ASSIGNMENT OF TELEPHONE NUMBERS |
| EXHIBIT 1.1(G)(1) | - | GUARANTOR JOINDER |
| EXHIBIT 1.1(G)(2) | - | GUARANTY AGREEMENT |
| EXHIBIT 1.1(N)(1) | - | NONSOLICITATION AGREEMENT (LOAN PARTY) |
| EXHIBIT 1.1(N)(2) | - | NONSOLICITATION AGREEMENT (SENIOR MANAGEMENT TEAM AND ROBERT MOE) |
| EXHIBIT 1.1(P)(1) | - | PLEDGE AGREEMENT |
| EXHIBIT 1.1(P)(2) | - | PLEDGE AGREEMENT (SUBSIDIARIES) |
| EXHIBIT 1.1(R) | - | REVOLVING CREDIT NOTE |
| EXHIBIT 1.1(S)(1) | - | SECURITY AGREEMENT |
| EXHIBIT 1.1(S)(2) | - | SUBORDINATION AGREEMENT |
| EXHIBIT 1.1(T-A) | - | TERM NOTE A |
| EXHIBIT 1.1(T-B) | - | TERM NOTE B |
| EXHIBIT 2.5 | - | LOAN REQUEST |
| EXHIBIT 7.1.4 | - | OPINION OF COUNSEL |
| EXHIBIT 7.1.16 | - | LANDLORD'S WAIVER |
| EXHIBIT 8.2.6 | - | ACQUISITION COMPLIANCE CERTIFICATE |
| EXHIBIT 8.2.23 | - | LOAN PARTIES' UNDERWRITING GUIDELINES |
| EXHIBIT 8.3.4 | - | QUARTERLY COMPLIANCE CERTIFICATE |
| EXHIBIT 8.3.5 | - | BORROWING BASE CERTIFICATE |
| EXHIBIT 8.3.9 | - | MONTHLY REPORTING PACKAGE |

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT is dated as of February 11, 2005, and is made by and among **ALARM ONE, INC.**, an Illinois corporation ("Borrower"), other LOAN PARTIES (as hereinafter defined), LENDERS (as hereinafter defined), and **FORTRESS CREDIT CORP.**, a Delaware corporation, in its capacity as agent for Lenders under this Agreement (hereinafter referred to in such capacity as "Agent").

### WITNESSETH:

WHEREAS, Borrower has requested Lenders to provide:  (a) a revolving credit facility in a principal amount not to exceed $20,000,000, (b) a $17,500,000 term loan A facility, and (c) a $12,500,000 term loan B facility; and

WHEREAS, the revolving credit and term loan A and B facilities shall be used:  (a) to repay all of Borrower's existing senior and subordinated Indebtedness under that certain amended and restated loan agreement dated as of December 30, 2002, among Borrower, SAFE Financial LLC, and General Electric Capital Corporation, (b) to finance Permitted Acquisitions, and (c) for general corporate purposes and for working capital; and

WHEREAS, Lenders are willing to provide such credit upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, the parties, in consideration of their mutual covenants and agreements hereinafter set forth, and intending to be legally bound hereby, covenant and agree as follows:

### 1.   CERTAIN DEFINITIONS

1.1    Certain Definitions.

In addition to words and terms defined elsewhere in this Agreement, the following words and terms shall have the following meanings, respectively, unless the context clearly requires otherwise:

Affiliate as to any Person shall mean any other Person:  (a) which directly or indirectly controls, is controlled by, or is under common control with such Person, (b) which beneficially owns or holds 5% or more of any class of the voting or other equity interests of such Person, or (c) 5% or more of any class of voting interests or other equity interests of which is beneficially owned or held, directly or indirectly, by such Person.  Control, as used in this definition, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case may be.

Agent shall mean Fortress Credit Corp. and its successors and assigns.

Agent's Fee shall have the meaning assigned to that term in Section 10.15 [Agent's Fee].

Agent's Letter shall have the meaning assigned to that term in Section 10.15 [Agent's Fee].

Aggregate Ratable Share shall mean as to any Lender the proportion that such Lender's Commitment bears to the Commitments of all Lenders.

Agreement shall mean this Credit Agreement, including all schedules and exhibits.

Alarm System shall mean all electronic or other wiring, sensors, detectors, relays, controls, transmitters, sirens and other equipment or machinery provided to a customer by any Loan Party.

Annual Statements shall have the meaning assigned to that term in Section 6.1.9(a) [Historical Statements].

Anti-Terrorism Laws shall mean any Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Laws may from time to time be amended, renewed, extended or replaced).

Applicable Margin shall mean 4.75% per annum for each quarter in which the ratio of Indebtedness of Loan Parties to Eligible RMR is equal to or greater than 29/1, and for each quarter in which the ratio of Indebtedness of Loan Parties to Eligible RMR is equal to or greater than 28/1 but less than 29/1, the Applicable Margin shall be 4.25%, and for each quarter in which the ratio of Indebtedness of Loan Parties to Eligible RMR is less than 28/1, the Applicable Margin shall be 3.75%. The Applicable Margin shall be determined: (a) on the Closing Date, based on the ratio of Indebtedness of Loan Parties to Eligible RMR computed on such date pursuant to a Compliance Certificate, and (b) as of the end of each fiscal quarter ending after the Closing Date, based on the ratio of Indebtedness of Loan Parties to Eligible RMR computed as of such date pursuant to a Compliance Certificate. Any increase or decrease in the Applicable Margin computed as of a quarter end shall be effective on the date on which the Compliance Certificate evidencing such computation is due to be delivered under Section 8.3.4 [Certificate of Borrower].

Approved Central Stations shall mean the central monitoring stations acceptable to Agent in its reasonable discretion as evidenced in writing, provided that each central station has delivered a fully-executed Assignment and Modification Agreement to Agent.

Approved Credit Score shall mean a credit score provided by a Credit Bureau Provider.

Approved States shall mean the states of California, Illinois and those states approved from time to time in writing by Agent, in its reasonable discretion, for the

location of the Security Alarm Contract customers. At such time as each of Arizona, Michigan, Missouri, Nevada, Utah, and/or Wisconsin exceed $5,000 of Eligible RMR (without respect to clause (e) of the definition of Eligible RMR), such state or states shall be deemed to be an Approved State.

Assignment and Assumption Agreement shall mean an Assignment and Assumption Agreement by and among a Purchasing Lender, a Transferor Lender and Agent, as Agent and on behalf of the remaining Lenders, substantially in the form of Exhibit 1.1(A)(1).

Assignment and Modification Agreement shall mean an Assignment and Modification Agreement by and among Agent, Borrower and an Approved Central Station, substantially in the form of Exhibit 1.1(A)(2).

Attrition Rate shall mean the annualized ratio of (a) to (b), expressed as a percentage, each without duplication:

(a)  (i)   all RMR that cancelled or failed to renew, plus,

(ii)  all RMR with balances more than  90 days past Due Date, minus the previous month's RMR with balances more than 90 days past invoice date, plus

(iii) the positive difference, if any, of all RMR rate decreases minus all RMR rate increases, minus

(iv)  all RMR generated within 30 days with a new customer for the same premises as were covered by another cancelled contract with any Loan Party, minus

(v)   all RMR that cancelled or failed to renew, but which was subject to an account guaranty to the extent the RMR thereof was actually replaced contemporaneously with suitable RMR or  any Loan Party actually and contemporaneously received its negotiated adjustment from the seller of such lost RMR, divided by

(b)  all RMR with balances 90 days or less past Due Date.

Attrition Rate shall be calculated as of the last day of each calendar month for the 6 months then ended and reported as a monthly average commencing on the Closing Date.  For example, if the Attrition Rate for each of the first 3 months is 0.5% and the Attrition Rate for each of the next 3 months is 1.5%, then the average for such six-month period is 1.0% and the Attrition Rate on an annualized basis will be 12%.

Authorized Officer shall mean those individuals, designated by written notice to Agent from Borrower, authorized to execute notices, reports and other documents on behalf of Loan Parties required hereunder.  Borrower may amend such list of individuals from time to time by giving written notice of such amendment to Agent.

Availability shall mean, as of any date of determination, (a) the lesser of: (i) the Revolving Credit Commitments or (ii) the Borrowing Base, minus (b) the Revolving Facility Usage.

Base Rate shall mean a fluctuating interest rate per annum equal at all times to the rate of interest announced publicly from time to time as the "prime rate" by The Wall Street Journal, which rate may not be the lowest rate offered to commercial customers, and, should Agent be unable to determine such rate, such other indication of the prevailing prime rate of interest as may reasonably be chosen by Agent; provided, that each change in the fluctuating interest rate shall take effect simultaneously with the corresponding change in the prime rate.

Benefit Arrangement shall mean at any time an "employee benefit plan," within the meaning of Section 3(3) of ERISA, which is neither a Plan nor a Multiemployer Plan and which is maintained, sponsored or otherwise contributed to by any member of the ERISA Group.

Blocked Person shall have the meaning assigned to such term in Section 6.1.17 [Anti-Terrorism Laws].

Borrower shall mean Alarm One, Inc., a corporation organized and existing under the laws of the State of Illinois.

Borrowing Base shall mean, as of any date of determination, the amount equal to the product of 12 multiplied by the Eligible RMR, as calculated with reference to the most recent Borrowing Base Certificate acceptable to Agent and otherwise in accordance with this Agreement.

Borrowing Base Certificate shall mean the certificate to be delivered by Borrower in accordance with Section 8.3.5 [Borrowing Base Certificate].

Borrowing Date shall mean, with respect to any Loan, the date for the making thereof or the renewal thereof, which shall be a Business Day.

Borrowing Tranche shall mean specified portions of Loans outstanding as follows: (a) any Revolving Credit Loans and Term Loan A to which the Euro-Rate applies under the same Loan Request by Borrower and which have the same Interest Period shall constitute one Borrowing Tranche, and (b) any Term Loans B shall constitute one Borrowing Tranche.

Business Day shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required to be closed for business in New York, New York, and if the applicable Business Day relates to any Loan to which the Euro-Rate applies, such day must also be a day on which dealings are conducted in the London interbank market.

Capitalized Creation Multiple shall mean, for any period of determination, the capitalized portion of expenses relating to the installation of new internally created RMR plus the capitalized portion of expenses relating to the acquisition of acquired RMR divided by new internally created and acquired RMR.

- 4 -

Closing Date shall mean February 11, 2005.

Collateral shall mean the Pledged Collateral and the UCC Collateral.

Collateral Assignment of Contracts shall mean the Collateral Assignment of Contracts in the form of Exhibit 1.1(C)(1).

Collateral Assignment of Telephone Numbers shall mean the Collateral Assignment of Telephone Numbers substantially in the form of Exhibit 1.1(C)(2).

Commercial Contract Guarantor shall mean the individual owner of the commercial customer of such Commercial Security Alarm Contract who shall have guaranteed the performance of such contract.

Commercial Security Alarm Contract shall mean a Security Alarm Contract where the customer is a business or other legal entity and the alarm monitoring service to be provided thereunder is for commercial, not residential, use.

Commitment shall mean as to any Lender the aggregate of its Revolving Credit Commitment and Term Loan Commitments, and Commitments shall mean the aggregate of the Revolving Credit Commitments and Term Loan Commitments of all Lenders.

Commitment Fee shall have the meaning assigned to that term in Section 2.3 [Commitment Fees].

Compliance Certificate shall have the meaning assigned to such term in Section 8.3.4 [Certificate of Borrower].

Consideration shall mean with respect to any Permitted Acquisition, the aggregate of: (a) the cash paid by any Loan Party, directly or indirectly, to the seller in connection therewith, (b) the Indebtedness incurred or assumed by any Loan Party, whether in favor of the seller or otherwise and whether fixed or contingent, (c) any Guaranty given or incurred by any Loan Party in connection therewith, and (d) any other consideration given or obligation incurred by any Loan Party in connection therewith.

Consolidated Cash Flow from Operations for any period of determination shall mean, without duplication: (a) the sum of net income and, to the extent deducted in determining net income, depreciation, amortization, interest expense and income tax expense, minus (b) the sum of non-cash credits to net income, plus (c) Creation Costs, in each case of Loan Parties consolidated in accordance with GAAP.

Consolidated Tangible Net Worth shall mean as of any date of determination total stockholders' equity less intangible assets of Loan Parties determined and consolidated in accordance with GAAP.

Consumer Affairs Litigation shall mean the action entitled "Roy Gatan and Jeaneth Boholst, on behalf of themselves and on behalf of the general public, plaintiffs v. Alarm One, Inc. and DOES 1 - 100 inclusive", Case No. RG0384325, pending as of the Closing Date in the Superior Court of Alameda County, California, as described further on Schedule 6.1.7.

- 5 -

Contamination shall mean the presence or release or threat of release of Regulated Substances in, on, under or emanating to or from the Property, which pursuant to Environmental Laws requires notification or reporting to an Official Body, or which pursuant to Environmental Laws requires the investigation, cleanup, removal, remediation, containment, abatement of or other response action or which otherwise constitutes a violation of Environmental Laws.

Creation Costs shall mean, for any period of determination, the product of: (a) new internally created and acquired RMR and (b) the difference between the Creation Multiple and the Capitalized Creation Multiple.

Creation Multiple shall mean, for any period of determination, the sum of: (a) all sales and marketing expenses (including all related general and administrative expenses), (b) installation expenses, and (c) acquisition expenses, minus all installation revenue, divided by new internally created and acquired RMR. (The foregoing calculation includes capitalized expenses.) The Creation Multiple may also be expressed by the following formula:

$$\text{Creation Multiple} = \frac{\text{(The sum of all sales and marketing expenses + installation expenses + acquisition expenses) - installation revenue}}{\text{new internally created + acquired RMR}}$$

Credit Bureau Provider shall mean a company reasonably acceptable to Agent that maintains an accessible database to Agent for monitoring the credit activity of Persons and provides a numerical credit score using the credit risk assessment system developed by: (a) Equifax Beacon ranging from 500 to 850 for residential customers, (b) Dun & Bradstreet ranging from 0 to 5 for commercial customers, and (c) any other credit bureau reasonably acceptable to Agent.

Dealer Program shall mean a program pursuant to which Loan Parties acquire from third parties on a regular periodic basis Security Alarm Contracts in Approved States.

Dollar, Dollars, U.S. Dollars and the symbol $ shall mean lawful money of the United States of America.

Due Date shall mean the first day of the month in which the service being billed is to be rendered. In the case of customer accounts paid by automated clearing house, electronic funds transfer, or credit card, the "Due Date" is assumed to be the first day of each month.

Eligible RMR shall mean, as of the date of determination, the RMR attributable to each customer of Loan Parties that is party to a Security Alarm Contract, is subject to a first priority security interest in favor of Agent, is deemed acceptable by Agent, in its reasonable discretion, and satisfies each of the following minimum criteria:

(a)     no RMR shall be more than 90 days past any Due Date;

(b)    each customer evidenced by a Residential Security Alarm Contract and each Commercial Contract Guarantor must have an Approved Credit Score greater than or equal to 625, provided, however, that from and after the Closing Date through April 30, 2005, 12% of Eligible RMR can be, on an aggregate basis, from customers evidenced by Residential Security Alarm Contracts or Commercial Contract Guarantors that have an Approved Credit Score greater than or equal to 600 and below 625, which amount shall be decreased to 10% for the period commencing on May 1, 2005, until the first anniversary of the Closing Date, which amount shall be increased to 12.5% for the period commencing on the first anniversary of the Closing Date until the second anniversary of the Closing Date, and further increased to 14.0% for the period commencing on the second anniversary of the Closing Date and thereafter; provided, further, that, from the Closing Date through April 30, 2005, 6% of Eligible RMR can be, on an aggregate basis, from customers evidenced by Residential Security Alarm Contracts or Commercial Contract Guarantors that, in each case, existed as of 6 months prior to the Closing Date and had an Approved Credit Score greater than or equal to 575 and below 600 at the time of origination, which amount shall be decreased to 5% for the period commencing on May 1, 2005, until the first anniversary of the Closing Date, which amount shall be decreased to 2.5% for the period commencing on the first anniversary of the Closing Date until the second anniversary of the Closing Date, and further decreased to 1.0% for the period commencing on the second anniversary of the Closing Date and thereafter;

(c)    no more than 5% of Eligible RMR may consist of RMR attributable to customers evidenced by Commercial Security Alarm Contracts;

(d)    for any Residential Security Alarm Contract, (i) the customer is the owner of the protected premises and is personally liable thereunder and (ii) the RMR for any Residential Security Alarm Contract shall not be less than $19.95 nor more than $50, provided, however, that 7.5% of Eligible RMR may consist of RMR for Residential Security Alarm Contracts equal to or greater than $50 but less than $80 individually, and provided further that RMR from Security Alarm Contracts that existed as of 6 months prior to the Closing Date need not meet the criteria set forth in clause (ii);

(e)    the location of the customer's site protected by Loan Parties is in an Approved State;

(f)    neither the customer nor any guarantor thereof is employed by, related to or an Affiliate of any Loan Party;

(g)    neither the customer nor any guarantor thereof is subject to or restricted by any receivership, insolvency or bankruptcy proceeding;

(h)    all RMR associated with the customer shall be clearly described in the underlying Security Alarm Contract, excluding only subsequent price increases and additional services which have been disclosed to Agent;

(i)    all amounts and information appearing in the underlying Security Alarm Contract or furnished to Agent in connection therewith are true and correct and undisputed by the customer or any guarantor thereof;

(j)    Loan Parties and the customer and any guarantor thereof are not engaged in any litigation regarding nonpayment by the customer;

(k)    no condition exists that materially or adversely affects the value of the customer or jeopardizes any security therefor and to the actual knowledge of Loan Parties, the customer has no claim to any defense, set off or counter claim;

(l)    ' customer payments are made in Dollars;

(m)    the Security Alarm Contract and the RMR are not subject to any Lien, other than Permitted Liens;

(n)    if the customer is any Official Body, the rights to payment of such customer have been assigned to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 3727, et seq. and 41 U.S.C. Section 15, et seq.), or otherwise only if all applicable statutes or regulations respecting the assignment of government customers have been complied with;

(o)    in the case of all Alarm System installations, the customer shall have paid to Loan Parties, either via personal check or credit card, a minimum upfront or in equal payments over the first 3 months installation cost of:  (i) $75 during the first 6 months following the Closing Date and thereafter $95 for Residential Security Alarm Contracts, provided however that up to 20% of Eligible RMR originated in 2005 can be from customers evidenced by Residential Security Alarm Contracts for which such installation cost has been waived by sales management or 2 free months of service has been credited and, in each case, offset against sales commissions; which amount shall decrease as of January 1, 2006, to 15% of Eligible RMR originated in 2006, and further decrease as of January 1, 2007, to 10% of Eligible RMR originated in 2007; and (ii) $150 for Commercial Security Alarm Contracts, provided, however, that RMR from Security Alarm Contracts that existed as of 6 months prior to the Closing Date need not meet the criteria set forth in this clause (o);

(p)    the customer complies with all of Loan Parties' underwriting guidelines as set forth on Exhibit 8.2.23;

(q)    the customer is monitored at an Approved Central Station, provided that all customer accounts monitored at Criticom International Corporation and Monitronics International, Inc. as of the Closing Date may be included in Eligible RMR until April 1, 2005, whereupon only 500 of such accounts may be included, which number shall be reduced to 400 as of May 1, 2005, 300 as of June 1, 2005, 200 as of July 1, 2005, 100 as of August 1, 2005, and 0 as of September 1, 2005; and

(r)    the customer has not prepaid more than 12 months of RMR.  The granting of credits in connection with the settlement of the Consumer Affairs Litigation shall not reduce Eligible RMR unless the terms of the final settlement materially and adversely differ from those of the Proposed Settlement Agreement.

Environmental Complaint shall mean any written complaint by any Person or Official Body setting forth a cause of action for personal injury or property damage, natural

- 8 -

resource damage, contribution or Indemnity for response costs, civil or administrative penalties, criminal fines or penalties, or declaratory or equitable relief arising under any Environmental Laws or any order, notice of violation, citation, subpoena, request for information or other written notice or demand of any type issued by an Official Body pursuant to any Environmental Laws.

Environmental Laws shall mean all federal, state, local and foreign Laws and any consent decrees, settlement agreements, judgments, orders, directives, policies or programs issued by or entered into with an Official Body pertaining or relating to: (a) pollution or pollution control; (b) protection of human health or the environment; (c) employee safety in the workplace; (d) the presence, use, management, generation, manufacture, processing, extraction, treatment, recycling, refining, reclamation, labeling, transport, storage, collection, distribution, disposal or release or threat of release of Regulated Substances; (e) the presence of Contamination; (f) the protection of endangered or threatened species; and (g) the protection of Environmentally Sensitive Areas.

Environmentally Sensitive Area shall mean: (a) any wetland as defined by applicable Environmental Laws; (b) any area designated as a coastal zone pursuant to applicable Laws, including Environmental Laws; (c) any area of historic or archeological significance or scenic area as defined or designated by applicable Laws, including Environmental Laws; (d) habitats of endangered species or threatened species as designated by applicable Laws, including Environmental Laws; or (e) a floodplain or other flood hazard area as defined pursuant to any applicable Laws.

ERISA shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

ERISA Group shall mean, at any time, Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under Section 414 of the Internal Revenue Code.

Euro-Rate shall mean, with respect to the Loans comprising any Borrowing Tranche to which the Euro-Rate applies for any Interest Period, the interest rate per annum determined by Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum): (a) the rate of interest determined by Agent in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the average of the London interbank offered rates for U.S. Dollars quoted by the British Bankers' Association as set forth on Moneyline Telerate (or appropriate successor or, if the British Bankers' Association or its successor ceases to provide such quotes, a comparable replacement determined by Agent) display page 3750 (or such other display page on the Moneyline Telerate service as may replace display page 3750) two (2) Business Days prior to the first day of such Interest Period for an amount comparable to such Borrowing Tranche and having a borrowing date and a maturity comparable to such Interest Period, by (b) a number equal to 1.00 minus the Euro-Rate Reserve Percentage. The Euro-Rate may also be expressed by the following formula:

$$\text{Euro-Rate} = \frac{\text{Average of London interbank offered rates quoted by BBA or appropriate successor as shown on Moneyline Telerate Service display page 3750}}{1.00 - \text{Euro-Rate Reserve Percentage}}$$

The Euro-Rate shall be adjusted with respect to any Loan to which the Euro-Rate applies that is outstanding on the effective date of any change in the Euro-Rate Reserve Percentage as of such effective date. Agent shall give prompt notice to Borrower of the Euro-Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error. Notwithstanding the foregoing, in no event shall the Euro-Rate be less than 2.00%.

Euro-Rate Reserve Percentage shall mean as of any day the maximum percentage in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities").

Event of Default shall mean any of the events described in Section 9.1 [Events of Default] and referred to therein as an "Event of Default."

Excess Cash Flow shall be computed as of the close of each fiscal year beginning with the 2005 fiscal year by taking the difference between: (a) Consolidated Cash Flow from Operations for such fiscal year and (b) the sum of Fixed Charges and the numerator of the Creation Multiple for such fiscal year. All determinations of Excess Cash Flow shall be based on the immediately preceding fiscal year.

Executive Order No. 13224 shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

Expense Deposit shall mean the $100,000 initial deposit previously made by Borrower to Agent to defray a portion of Agent's costs and expenses incurred in connection with: (a) Agent's financial, legal and collateral due diligence and (b) the preparation of Agent's December 8, 2004 proposal and the Loan Documents.

Expiration Date shall mean, with respect to the Revolving Credit Commitments and the Term Loans, February 11, 2008.

Facility Fees shall mean the fees referred to in Sections 2.4 [Revolving Credit Facility Fee] and 3.3 [Term Loan Facility Fee].

Federal Funds Effective Rate for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate"

- 10 -

as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

Financial Projections shall have the meaning assigned to that term in Section 6.1.9 [Financial Statements].

Fixed Charge Coverage Ratio shall mean the ratio of Consolidated Cash Flow from Operations to Fixed Charges.

Fixed Charges shall mean for any period of determination the sum of interest expense, income taxes, S-Corporation Tax Distributions, scheduled principal installments on Indebtedness (for purposes of this definition, mandatory prepayments shall be considered scheduled principal installments on Indebtedness), capital expenditures and payments under capitalized leases, in each case of Loan Parties consolidated in accordance with GAAP.

Funded Debt shall mean as of any date of determination the total Indebtedness of Loan Parties to Lenders incurred under this Agreement.

GAAP shall mean generally accepted accounting principles as are in effect from time to time, subject to the provisions of Section 1.3 [Accounting Principles], and applied on a consistent basis both as to classification of items and amounts.

Guarantor shall mean each Person which joins this Agreement as a Guarantor after the date hereof pursuant to Section 11.18 [Joinder of Guarantors].

Guarantor Joinder shall mean a joinder by a Person as a Guarantor under this Agreement, the Guaranty Agreement and the other Loan Documents in the form of Exhibit 1.1(G)(1).

Guaranty of any Person shall mean any obligation of such Person guaranteeing or in effect guaranteeing any liability or obligation of any other Person in any manner, whether directly or indirectly, including any agreement to indemnify or hold harmless any other Person, any performance bond or other suretyship arrangement and any other form of assurance against loss, except endorsement of negotiable or other instruments for deposit or collection in the ordinary course of business.

Guaranty Agreement shall mean the Guaranty and Suretyship Agreement in substantially the form of Exhibit 1.1(G)(2) executed and delivered by each Guarantor to Agent for the benefit of Lender.

Historical Statements shall have the meaning assigned to that term in Section 6.1.9(a) [Historical Statements].

Indebtedness shall mean, as to any Person at any time, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of: (a) borrowed money, seller notes or seller holdbacks, (b) amounts raised under or

liabilities in respect of any note purchase or acceptance credit facility, (c) reimbursement obligations (contingent or otherwise) under any letter of credit, currency swap agreement, interest rate swap, cap, collar or floor agreement or other interest rate management device, (d) any other transaction (including forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements (but not including trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness and which are not more than sixty (60) days past due), or (e) any Guaranty of Indebtedness for borrowed money.

Ineligible Security shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

Insolvency Proceeding shall mean, with respect to any Person, (a) a case, action or proceeding with respect to such Person: (i) before any court or any other Official Body under any bankruptcy, insolvency, reorganization or other similar Law now or hereafter in effect, or (ii) for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator (or similar official) of any Loan Party or otherwise relating to the liquidation, dissolution, winding-up or relief of such Person, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of such Person's creditors generally or any substantial portion of its creditors; undertaken under any Law.

Interest Period shall mean the period of time selected by Borrower in connection with (and to apply to) any Revolving Credit Loans or Term Loans A that bear interest under the Euro-Rate. Subject to the last sentence of this definition, such period shall be one, two, three or six Months. Such Interest Period shall commence on the effective date, which shall be: (a) the Borrowing Date if Borrower is requesting new Loans, or (b) the date of renewal of the Euro-Rate if Borrower is renewing the Euro-Rate applicable to outstanding Loans. Notwithstanding the second sentence hereof: (i) any Interest Period which would otherwise end on a date which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) Borrower shall not select or renew an Interest Period for any portion of the Loans that would end after the Expiration Date.

Interim Statements shall have the meaning assigned to that term in Section 6.1.9(a) [Historical Statements].

Internal Revenue Code shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

Labor Contracts shall mean all employment agreements, employment contracts, collective bargaining agreements and other agreements among any Loan Party and its employees.

- 12 -

Landlord Waivers shall mean any one or more landlord waivers which relate to any Property executed from time to time in form and substance satisfactory to Agent.

Law shall mean any law (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, release, ruling, order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award by or settlement agreement with any Official Body.

Lenders shall mean the financial institutions named on Schedule 1.1(B) and their respective successors and assigns as permitted hereunder, each of which is referred to as a Lender.

Lien shall mean any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

LLC Interests shall have the meaning assigned to such term in Section 6.1.3 [Subsidiaries].

Loan Documents shall mean this Agreement, the Agent's Letter, the Collateral Assignment of Contracts, the Collateral Assignment of Telephone Numbers, the Assignment and Modification Agreement, the Guaranty Agreement, the Notes, the Pledge Agreement, the Pledge Agreement (Subsidiaries), the Security Agreement, the Subordination Agreement, the Landlord Waivers, the Nonsolicitation Agreements, and any other instruments, certificates or documents delivered or contemplated to be delivered hereunder or thereunder or in connection herewith or therewith, as the same may be supplemented or amended from time to time in accordance herewith or therewith, and Loan Document shall mean any of the Loan Documents.

Loan Parties shall mean Borrower and all of Borrower's direct and indirect Subsidiaries, if any.

Loan Request shall have the meaning assigned to such term in Section 2.5 [Revolving Credit Loan Requests].

Loans shall mean collectively and Loan shall mean separately all Revolving Credit Loans and all Term Loans or any Revolving Credit Loan or any Term Loan.

Mandatory Prepayment Date shall have the meaning assigned to that term in Section 5.5.1 [Excess Cash Flow].

Mandatory Prepayment of Excess Cash Flow shall have the meaning assigned to that term in Section 5.5.1 [Excess Cash Flow].

Material Adverse Change shall mean any set of circumstances or events which: (a) has or could reasonably be expected to have any material adverse effect whatsoever upon the validity or enforceability of any Loan Document, (b) is or could reasonably be expected to be material and adverse to the business, properties, assets, financial condition, results of operations or prospects of any Loan Party, (c) impairs materially or could reasonably be expected to impair materially the ability of any Loan Party to duly and punctually pay or perform its Indebtedness, or (d) impairs materially or could reasonably be expected to impair materially the ability of Agent or any Lender, to the extent permitted, to enforce their legal remedies pursuant any Loan Document.

Minimum Reserve shall mean $1,000,000 in unrestricted cash reserves and/or Availability of Loan Parties.

Month, with respect to an Interest Period under the Euro-Rate, shall mean the interval between the days in consecutive calendar months numerically corresponding to the first day of such Interest Period. If any Euro-Rate Interest Period begins on a day of a calendar month for which there is no numerically corresponding day in the month in which such Interest Period is to end, the final month of such Interest Period shall be deemed to end on the last Business Day of such final month.

Multiemployer Plan shall mean any employee benefit plan which is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and to which any member of the ERISA Group is then making or accruing an obligation to make contributions or, within the preceding five (5) Plan years, has made or had an obligation to make such contributions.

Multiple Employer Plan shall mean a Plan which has two (2) or more contributing sponsors (including Borrower or any member of the ERISA Group) at least two (2) of whom are not under common control, as such a plan is described in Sections 4063 and 4064 of ERISA.

Nonsolicitation Agreements shall mean the Nonsolicitation Agreements in substantially the forms of Exhibit 1.1(N)(1) and (2) executed by each Loan Party and each member of the Senior Management Team and Robert Moe, respectively, and delivered to Agent for the benefit of Lenders.

Notes shall mean the Revolving Credit Notes and the Term Notes.

Notices shall have the meaning assigned to that term in Section 11.6 [Notices].

Obligation shall mean any obligation or liability of any Loan Party to Agent or any Lender, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, under or in connection with this Agreement, the Notes, Agent's Letter or any other Loan Document.

Official Body shall mean any national, federal, state, local or other government or political subdivision or any agency, authority, board, bureau, central bank,

commission, department or instrumentality of either, or any court, tribunal, grand jury or arbitrator, in each case whether foreign or domestic.

Other Taxes shall have the meaning assigned to such term in Section 5.8.2 [Stamp Taxes].

Partnership Interests shall have the meaning assigned to such term in Section 6.1.3 [Subsidiaries].

PBGC shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

Permitted Acquisitions shall have the meaning assigned to such term in Section 8.2.6 [Liquidations, Mergers, Consolidations, Acquisitions].

Permitted Investments shall mean:

(a)     direct obligations of the United States of America or any agency or instrumentality thereof or obligations backed by the full faith and credit of the United States of America maturing in twelve (12) months or less from the date of acquisition;

(b)     commercial paper maturing in 180 days or less rated not lower than A-1, by Standard & Poor's or P-1 by Moody's Investors Service, Inc. on the date of acquisition; and

(c)     demand deposits, time deposits or certificates of deposit maturing within one year in commercial banks whose obligations are rated A-1, A or the equivalent or better by Standard & Poor's on the date of acquisition.

Permitted Liens shall mean:

(a)     Liens for taxes, assessments or similar charges, incurred in the ordinary course of business and which are not yet due and payable;

(b)     Pledges or deposits made in the ordinary course of business to secure payment of workmen's compensation, or to participate in any fund in connection with workmen's compensation, unemployment insurance, old-age pensions or other social security programs;

(c)     Liens of mechanics, materialmen, warehousemen, carriers or other like Liens, securing obligations incurred in the ordinary course of business that are not yet due and payable and Liens of landlords securing obligations to pay lease payments that are not yet due and payable or in default;

(d)     Good-faith pledges or deposits made in the ordinary course of business to secure performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, not in excess of the aggregate amount due thereunder, or to secure statutory obligations, or surety, appeal, indemnity, performance or other similar bonds required in the ordinary course of business;

(e)     Encumbrances consisting of zoning restrictions, easements or other restrictions on the use of real property, none of which materially impairs the use of such property or the value thereof, and none of which is violated in any material respect by existing or proposed structures or land use;

(f)     Liens in favor of Agent for the benefit of Lenders securing the Obligations;

(g)     Liens on property leased by any Loan Party under capital and operating leases permitted in Section 8.2.15 [Capital Expenditures and Leases] securing obligations of such Loan Party to the lessor under such leases;

(h)     Any Lien existing on the date of this Agreement and described on Schedule 1.1(P), provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien;

(i)     Purchase Money Security Interests, provided that the aggregate amount of loans and deferred payments secured by such Purchase Money Security Interests shall not exceed $50,000 (excluding for the purpose of this computation any loans or deferred payments secured by Liens described on Schedule 1.1(P)); and

(j)     The following, (A) if the validity or amount thereof is being contested in good faith by appropriate and lawful proceedings diligently conducted so long as levy and execution thereon have been stayed and continue to be stayed or (B) if a final judgment is entered and such judgment is discharged within thirty (30) days of entry, and in either case they do not affect the Collateral or, in the aggregate, materially impair the ability of any Loan Party to perform its Obligations hereunder or under the other Loan Documents:

(1)     Claims or Liens for taxes, assessments or charges due and payable and subject to interest or penalty, provided that the applicable Loan Party maintains such reserves or other appropriate provisions as shall be required by GAAP and pays all such taxes, assessments or charges forthwith upon the commencement of proceedings to foreclose any such Lien;

(2)     Claims, Liens or encumbrances upon, and defects of title to, real or personal property other than the Collateral, including any attachment of personal or real property or other legal process prior to adjudication of a dispute on the merits;

(3)     Claims or Liens of mechanics, materialmen, warehousemen, carriers, or other statutory nonconsensual Liens;

(4)     Liens resulting from final judgments or orders described in Section 9.1.6 [Final Judgments or Orders]; or

(k)     Second priority Liens in favor of the Subordinated Creditor securing Borrower's obligations under the Subordinated Debt Documents, which Liens are permitted under and subordinated pursuant to the Subordination Agreement.

Person shall mean any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, joint venture, government or political subdivision or agency thereof, or any other entity.

Plan shall mean at any time an employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Internal Revenue Code and either: (a) is maintained by any member of the ERISA Group for employees of any member of the ERISA Group or (b) has at any time within the preceding five (5) years been maintained by any entity which was at such time a member of the ERISA Group for employees of any entity which was at such time a member of the ERISA Group.

Pledge Agreement shall mean the Pledge Agreement in substantially the form of Exhibit 1.1(P)(1) executed by all of Borrower's shareholders and delivered to Agent for the benefit of Lenders.

Pledge Agreement (Subsidiaries) shall mean the Pledge Agreement (Subsidiaries) in substantially the form of Exhibit 1.1(P)(2) executed by the Borrower and delivered to Agent for the benefit of Lenders.

Pledged Collateral shall mean the property in which security interests are to be granted under the Pledge Agreement, the Pledge Agreement (Subsidiaries), the Collateral Assignment of Telephone Numbers or the Collateral Assignment of Contracts.

Potential Default shall mean any event or condition which with notice, passage of time, or any combination of the foregoing, would constitute an Event of Default.

Principal Office shall mean the main office of Agent in New York, New York.

Prior Security Interest shall mean a valid and enforceable perfected first-priority security interest under the Uniform Commercial Code in the UCC Collateral and the Pledged Collateral which is subject only to Liens for taxes not yet due and payable to the extent such prospective tax payments are given priority by statute or Purchase Money Security Interests as permitted hereunder.

Prohibited Transaction shall mean any prohibited transaction as defined in Section 4975 of the Internal Revenue Code or Section 406 of ERISA for which neither an individual nor a class exemption has been issued by the United States Department of Labor.

Property shall mean all real property, both owned and leased, of any Loan Party.

Proposed Settlement Agreement shall mean that proposed negotiated settlement entitled "11/30/2004 Revision Clean Copy; Settlement Agreement and Release" between Roy Gatan and Jeaneth Boholst, individually and on behalf of the class of individuals described therein, and Borrower, a copy of which has been delivered to Agent, prepared in connection with the Consumer Affairs Litigation.

- 17 -

Purchase Money Security Interest shall mean Liens upon tangible personal property securing loans to any Loan Party or deferred payments by such Loan Party for the purchase of such tangible personal property.

Purchasing Lender shall mean a Lender which becomes a party to this Agreement by executing an Assignment and Assumption Agreement.

Ratable Share shall mean the proportion that a Lender's aggregate Revolving Credit Commitment and Term Loan A Commitment bears to the aggregate Revolving Credit Commitments and Term Loan A Commitments of all Lenders.

Regulated Substances shall mean, without limitation, any substance, material or waste, regardless of its form or nature, defined under Environmental Laws as a "hazardous substance," "pollutant," "pollution," "contaminant," "hazardous or toxic substance," "extremely hazardous substance," "toxic chemical," "toxic substance," "toxic waste," "hazardous waste," "special handling waste," "industrial waste," "residual waste," "solid waste," "municipal waste," "mixed waste," "infectious waste," "chemotherapeutic waste," "medical waste," or "regulated substance" or any other material, substance or waste, regardless of its form or nature, which otherwise is regulated by Environmental Laws.

Regulation U shall mean Regulation U, T or X as promulgated by the Board of Governors of the Federal Reserve System, as amended from time to time.

Reportable Event shall mean a reportable event described in Section 4043 of ERISA and regulations thereunder with respect to a Plan or Multiemployer Plan.

Required Lenders shall mean:

(a)     if there are no Loans outstanding, Lenders whose Commitments aggregate at least 51% of the Commitments of all Lenders, or

(b)     if there are Loans outstanding, any Lender or group of Lenders if the sum of the Loans of such Lenders then outstanding plus the sum of the unused Revolving Credit Commitments of such Lenders aggregates at least 51% of the total principal amount of all of the Loans then outstanding.

Required Environmental Notices shall mean all notices, reports, plans, forms or other filings which pursuant to Environmental Laws, Required Environmental Permits or at the request or direction of an Official Body either must be submitted to an Official Body or which otherwise must be maintained.

Required Environmental Permits shall mean all permits, licenses, bonds, consents, programs, approvals or authorizations required under Environmental Laws to own, occupy or maintain the Property or which otherwise are required for the operations and business activities of any Loan Party.

Residential Security Alarm Contract shall mean a Security Alarm Contract where the obligor is a natural Person and the alarm monitoring service to be provided thereunder is for a single or multiple family residential home.

Revolving Credit Commitment shall mean, as to any Lender at any time, the amount initially set forth opposite its name on Schedule 1.1(B) in the column labeled "Amount of Commitment for Revolving Credit Loans," and thereafter on Schedule I to the most recent Assignment and Assumption Agreement, and Revolving Credit Commitments shall mean the aggregate Revolving Credit Commitments of all Lenders.

Revolving Credit Loans shall mean collectively and Revolving Credit Loan shall mean separately all Revolving Credit Loans or any Revolving Credit Loan made by Lenders or one Lender to Borrower pursuant to Section 2.1 [Revolving Credit Commitments] or 2.5 [Revolving Loan Requests].

Revolving Credit Notes shall mean collectively and Revolving Credit Note shall mean separately all the Revolving Credit Notes of Borrower in the form of Exhibit 1.1(R) evidencing the Revolving Credit Loans together with all amendments, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

Revolving Facility Usage shall mean at any time the sum of the Revolving Credit Loans outstanding.

RMR shall mean an amount equal to the gross recurring monthly revenue of Loan Parties that is billed to customers on a monthly basis (regardless of whether any particular customer is billed monthly, quarterly, annually or otherwise); but net of any monthly discounts afforded the customer (e.g. for prepayment or for paying by automated clearing house or electronic funds transfer) other than service credits granted from time to time in the ordinary course of Loan Parties' business; provided, however, that RMR shall not include any revenue attributable to or derived from: (a) reimbursement or prepayment of private telephone line or other utility company charges associated with the installation, monitoring or furnishing of alarm services; (b) reimbursement for or payment of any false alarm assessments; (c) reimbursement for or payment of any taxes, fees or other charges imposed by any Official Body relative to the furnishing of access control or alarm services; (d) non-recurring charges from customers for services which are not provided on a regular and recurring basis, such as installation and time and material charges; (e) guard response and patrol services; (f) closed-circuit television equipment that are not provided in conjunction with alarm monitoring; (g) fire test or fire inspection services; (h) service, extended repair service, maintenance or inspection agreements that are not provided in conjunction with alarm monitoring; (i) third-party or wholesale monitoring services; (j) lease agreements that provide the customer with the option of buying the underlying Alarm System for a nominal amount; or (k) late fees or fees for NSF checks.

Section 20 Subsidiary shall mean the Subsidiary of the lender holding company controlling any Lender, which Subsidiary has been granted authority by the Federal Reserve Board to underwrite and deal in certain Ineligible Securities.

Security Agreement shall mean the Security Agreement in substantially the form of Exhibit 1.1(S)(1) executed and delivered by each Loan Party to Agent for the benefit of Lenders.

Security Alarm Contract shall mean an agreement between a customer and a Loan Party, pursuant to which Loan Party is obligated to provide security alarm monitoring services in return for the customer's payment of RMR, and which meets each of the following criteria:

(a)     is evidenced by a fully-signed, original, written agreement, the form and content of which are acceptable to Agent in its reasonable discretion, with no material modifications having been made thereto which are unacceptable in Agent's reasonable discretion;

(b)     has a minimum original term of at least thirty-six (36) months, provided, however, that Loan Parties may include customer agreements that existed as of the Closing Date that had an original term of less than thirty-six (36) months;

(c)     provides that the agreement will automatically be renewed for a minimum period of twelve (12) months following the expiration of the then-current term, unless prohibited by Law;

(d)     (i) has not been cancelled by the customer or Loan Parties, nor have Loan Parties received written or oral notice of a pending cancellation within six (6) months of the expiration of such agreement, and unless the notice of pending cancellation is promptly rescinded by customer, the associated RMR shall cease to qualify as Eligible RMR even if the customer commits to pay the balance of payment due in a lump sum or over the remaining term of the contract, and (ii) any statutory or other applicable cancellation or rescission period has expired;

(e)     complies in all material respects with the terms, provisions and conditions of the Loan Documents, as well as with all applicable Laws, including all consumer protection laws;

(f)     represents a valid and binding obligation of the customer, enforceable in accordance with its terms without any basis for any offset, counterclaim or defense (whether actual or alleged);

(g)     is originated or purchased by Loan Parties in the ordinary course of their business;

(h)     is assignable to third parties without having to obtain the consent of or provide notice to the customer; and

(i)     contains terms and conditions which are standard within the security alarm industry for such agreements, including those involving limitation of liability/liquidated damages, third-party indemnification and the unilateral right to increase the RMR after the initial term of the Security Alarm Contract.

Security Alarm Contract Documents shall mean each Security Alarm Contract and all other documents (including any promissory notes, chattel paper, purchase money security agreements, security agreements or similar agreements evidencing or securing a customer's performance of a Security Alarm Contract or evidencing or securing financing for the installation of an Alarm System) executed by customer in connection with the Security Alarm Contract, together with, if applicable, all such documents, instruments and agreements effecting an assignment of such documents of customers acquired by Loan Parties, to Loan Parties, all of which documentation shall be in form and content as is acceptable to Agent in its reasonable discretion.

Senior Debt shall mean as of any date of determination the total Indebtedness of Loan Parties under the Revolving Credit Loans and Term Loans A.

Senior Management Team shall mean Peter Maltby, Patrick Smith, Douglas Schultz, as well as any Person who succeeds them and assumes their responsibilities.

Shares shall have the meaning assigned to that term in Section 6.1.2 [Capitalization and Ownership].

Solvent shall mean, with respect to any Person on a particular date, that on such date: (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair market value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, including contingent liabilities, and other commitments as they mature in the normal course of business, and (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

Standard & Poor's shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

Subordinated Creditor shall mean SunTrust Equity Funding, LLC, a Georgia limited liability company, and its successors and assigns.

Subordinated Debt shall mean the loan in the original maximum principal amount of $3,250,000, together with all principal, interest and other amounts payable or chargeable by Borrower to Subordinated Creditor in connection with the Subordinated Debt Documents.

Subordinated Debt Documents shall mean, collectively, the Note and Warrant Purchase Agreement, dated as of February 11, 2005, between Borrower and Subordinated Creditor, the Senior Subordinated Promissory Note dated February 11, 2005 issued by Borrower to Subordinated Creditor, and all other documents executed in connection therewith, as the same may be amended or modified from time to time as permitted by Section 8.2.14 [Changes in Documents].

Subordination Agreement shall mean that Subordination and Intercreditor Agreement in substantially the form of Exhibit 1.1(S)(2) executed on the Closing Date by Subordinated Creditor, Borrower, and Agent, as the same may be amended, restated, modified, or supplemented from time to time.

Subsidiary of any Person at any time shall mean:  (a) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees (regardless of any contingency which does or may suspend or dilute the voting rights) is at such time owned directly or indirectly by such Person or one or more of such Person's Subsidiaries, (b) any partnership of which such Person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries, (c) any limited liability company of which such Person is a member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries or (d) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such Person or one or more of such Person's Subsidiaries.

Subsidiary Shares shall have the meaning assigned to that term in Section 6.1.3 [Subsidiaries].

S-Corporation Tax Distributions shall mean dividends and distributions made by Borrower to its shareholders in an amount in the aggregate not in excess of the lesser of: (a) the federal and state income tax liability of such shareholders (assuming the highest tax rate then applicable to such shareholders) resulting solely from their ownership interest of an S-corporation, and (b) 30% of the income of Borrower.  Such dividends and distributions shall be made to the shareholders of Borrower no more than five (5) Business Days before shareholders have the obligation to make tax payments with respect to their respective federal and state income taxes and shall not be prepaid in advance of such liability.

Taxes shall have the meaning assigned to such term in Section 5.8.1 [No Deductions].

Term Loans shall mean collectively and Term Loan shall mean separately all Term Loans A and Term Loans B or any Term Loan A or Term Loan B made by Lenders or one Lender to Borrower pursuant to Section 3.1 [Term Loan Commitments].

Term Loan A shall have the meaning assigned to that term in Section 3.1.1 [Term Loan A]; Term Loans A shall mean collectively all of the Term Loans A.

Term Loan A Commitment shall mean, as to any Lender at any time, the amount initially set forth opposite its name on Schedule 1.1(B) in the column labeled "Amount of Commitment for Term Loan A," and thereafter on Schedule I to the most recent Assignment and Assumption Agreement, and Term Loan A Commitments shall mean the aggregate Term Loan A Commitments of all of the Lenders.

Term Loan A Notes shall mean collectively and Term Loan A Note shall mean separately all of the Term Loan A Notes of Borrower in the form of Exhibit 1.1(T-A) evidencing the Term Loans A together with all amendments, extensions, renewals, replacements, refinancings or refunds thereof in whole or in part.

Term Loan B shall have the meaning assigned to that term in Section 3.1.2 [Term Loan B]; Term Loans B shall mean collectively all of the Term Loans B.

Term Loan B Commitment shall mean, as to any Lender at any time, the amount initially set forth opposite its name on Schedule 1.1(B) in the column labeled "Amount of Commitment for Term Loan B," and thereafter on Schedule I to the most recent Assignment and Assumption Agreement, and Term Loan B Commitments shall mean the aggregate Term Loan B Commitments of all Lenders.

Term Loan B Notes shall mean collectively and Term Loan B Note shall mean separately all of the Term Loan B Notes of Borrower in the form of Exhibit 1.1(T-B) evidencing the Term Loans B together with all amendments, extensions, renewals, replacements, refinancings or refunds thereof in whole or in part.

Term Loan B Ratable Share shall mean as to any Lender the proportion that such Lender's Term Loan B Commitment bears to the Term Loan B Commitments of all of the Lenders.

Term Loan Commitment shall mean, as to any Lender at any time, the sum of such Lender's Term Loan A Commitment and its Term Loan B Commitment, and Term Loan Commitments shall mean the aggregate of the Term Loan A Commitments and Term Loan B Commitments of all Lenders.

Term Notes shall mean collectively and Term Note shall mean separately all of the Term Loan A Notes and Term Loan B Notes of Borrower.

Transferor Lender shall mean the selling Lender pursuant to an Assignment and Assumption Agreement.

UCC Collateral shall mean the property of Loan Parties in which security interests are to be granted under the Security Agreement.

Uniform Commercial Code shall have the meaning assigned to that term in Section 6.1.16 [Security Interests].

USA Patriot Act shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

1.2    Construction.

Unless the context otherwise clearly requires, the following rules of construction shall apply to each Loan Document:

1.2.1    <u>Number; Inclusion</u>.

references to the plural include the singular, the plural, the part and the whole; "or" has the inclusive meaning represented by the phrase "and/or," and "including" has the meaning represented by the phrase "including without limitation";

1.2.2    <u>Determination</u>.

references to "determination" of or by Agent or Lenders shall be deemed to include good-faith estimates by Agent or Lenders (in the case of quantitative determinations) and good-faith beliefs by Agent or Lenders (in the case of qualitative determinations) and such determination shall be conclusive absent manifest error;

1.2.3    <u>Discretion and Consent</u>.

whenever Agent or Lenders are granted the right herein to act in its or their sole discretion or to grant or withhold consent such right shall be exercised in good faith;

1.2.4    <u>Documents Taken as a Whole</u>.

the words "hereof," "herein," "hereunder," "hereto" and similar terms in any Loan Document refer to such Loan Document as a whole and not to any particular provision of such Loan Document;

1.2.5    <u>Headings</u>.

section and other headings contained in any Loan Document and the Table of Contents (if any) preceding any Loan Document are for reference purposes only and shall not control or affect the construction of any Loan Document or the interpretation in any respect;

1.2.6    <u>Implied References</u>.

article, section, subsection, clause, schedule and exhibit references in any Loan Document, are to that Loan Document, unless otherwise specified;

1.2.7    <u>Persons</u>.

reference to any Person includes such Person's successors and assigns, but, if applicable, only if such successors and assigns are permitted by such Loan Document, and reference to a Person in a particular capacity excludes such Person in any other capacity;

1.2.8    <u>Modifications to Documents</u>.

reference to any agreement (including any Loan Document together with the schedules and exhibits thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted, superseded or restated;

1.2.9    From, To and Through.

relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

1.2.10    Shall; Will.

references to "shall" and "will" have the same meaning.

1.3    Accounting Principles.

Except as otherwise provided in this Agreement, all computations and determinations as to accounting or financial matters and all financial statements to be delivered pursuant to this Agreement shall be made and prepared in accordance with GAAP (including principles of consolidation where appropriate), and all accounting or financial terms shall have the meanings ascribed to such terms by GAAP; provided, however, that all accounting terms used in Section 8.2 [Negative Covenants] (and all defined terms used in the definition of any accounting term used in Section 8.2 shall have the meaning given to such terms (and defined terms) under GAAP as in effect on the date hereof applied on a basis consistent with those used in preparing the Annual Statements referred to in Section 6.1.9(a) [Historical Statements]. In the event of any change after the date hereof in GAAP, and if such change would result in the inability to determine compliance with the financial covenants set forth in Section 8.2 [Negative Covenants] based upon Borrower's regularly prepared financial statements by reason of the preceding sentence, then the parties hereto agree to endeavor, in good faith, to agree upon an amendment to this Agreement that would adjust such financial covenants in a manner that would not affect the substance thereof, but would allow compliance therewith to be determined in accordance with Borrower's financial statements at that time.

2.    REVOLVING CREDIT FACILITY

2.1    Revolving Credit Commitments.

Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, each Lender severally agrees to make Revolving Credit Loans to Borrower at any time or from time to time on or after the date hereof to the Expiration Date, provided that after giving effect to such Loan the aggregate amount of Revolving Credit Loans from such Lender shall not exceed the lesser of such Lender's Revolving Credit Commitment and such Lender's Ratable Share of the Borrowing Base. Within such limits of time and amount and subject to the other provisions of this Agreement, Borrower may borrow, repay and reborrow pursuant to this Section 2.1.

2.2    Nature of Lenders' Obligations with Respect to Revolving Credit Loans.

Each Lender shall be obligated to participate in each request for Revolving Credit Loans pursuant to Section 2.5 [Revolving Credit Loan Requests] in accordance with its Ratable Share. The aggregate of each Lender's Revolving Credit Loans outstanding hereunder to

Borrower at any time shall never exceed its Revolving Credit Commitment. The obligations of each Lender hereunder are several. The failure of any Lender to perform its obligations hereunder shall not affect the Obligations of Borrower to any other party nor shall any other party be liable for the failure of such Lender to perform its obligations hereunder. Lenders shall have no obligation to make Revolving Credit Loans hereunder on or after the Expiration Date.

### 2.3 Commitment Fees.

Accruing from the date hereof until the Expiration Date, Borrower agrees to pay to Agent for the account of each Lender, as consideration for such Lender's Revolving Credit Commitment hereunder, a nonrefundable commitment fee (the "Commitment Fee") equal to .50% per annum (computed on the basis of a year of 360 days and actual days elapsed) on the average daily difference between the amount of: (a) such Lender's Revolving Credit Commitment as the same may be constituted from time to time and (b) such Lender's Revolving Credit Loans outstanding. All Commitment Fees shall be payable in arrears on the fifth day of each month after the date hereof and on the Expiration Date or upon acceleration of the Notes.

### 2.4 Revolving Credit Facility Fee.

Borrower agrees to pay to Agent for the account of each Lender, as consideration for such Lender's Commitments, a nonrefundable facility fee equal to 2% of such Lender's Revolving Credit Commitments, payable on the Closing Date.

### 2.5 Revolving Credit Loan Requests.

Except as otherwise provided herein, up to one week prior to the Expiration Date, Borrower may from time to time request Lenders to make Revolving Credit Loans, or renew the Interest Rate applicable to existing Revolving Credit Loans or Term Loans A pursuant to Section 4.2 [Interest Periods], by delivering to Agent, not later than 10:00 a.m., New York City time, three (3) Business Days prior to the proposed Borrowing Date of a duly completed request therefor substantially in the form of Exhibit 2.5 or a request by telephone immediately confirmed in writing by letter, facsimile or telex in such form (each, a "Loan Request"), it being understood that Agent may rely on the authority of any individual making such a telephonic request without the necessity of receipt of such written confirmation. Each Loan Request shall be irrevocable and shall specify: (a) the proposed Borrowing Date; (b) the aggregate amount of the proposed Loans comprising each Borrowing Tranche, which shall be in integral multiples of $100,000 during the first three (3) months following the Closing Date and thereafter in integral multiples of $250,000 for each Borrowing Tranche to which the Euro-Rate applies; and (c) an appropriate Interest Period for the Loans comprising such Borrowing Tranche. All Revolving Credit Loans advanced in a given month with an Interest Period of one (1) month may be consolidated into one Borrowing Tranche on the first day of the following month upon the written request of Borrower to Agent made no later than three (3) Business Days prior thereto and specifying the new Interest Period to be applied to such Borrowing Tranche.

### 2.6 Making Revolving Credit Loans.

Agent shall, promptly after receipt by it of a Loan Request pursuant to Section 2.5 [Revolving Credit Loan Requests], notify Lenders of its receipt of such Loan Request specifying:

(a) the proposed Borrowing Date and the time and method of disbursement of the Revolving Credit Loans requested thereby; (b) the amount and type of each such Revolving Credit Loan and the applicable Interest Period (if any); and (c) the apportionment among Lenders of such Revolving Credit Loans as determined by Agent in accordance with Section 2.2 [Nature of Lenders' Obligations With Respect to Revolving Credit Loans].  Each Lender shall remit the principal amount of each Revolving Credit Loan to Agent such that Agent is able to, and Agent shall, to the extent Lenders have made funds available to it for such purpose and subject to Section 7.2 [Each Additional Loan], fund such Revolving Credit Loans to Borrower in U.S. Dollars and immediately available funds at the Principal Office prior to 2:00 p.m., New York City time, on the applicable Borrowing Date, provided that if any Lender fails to remit such funds to Agent in a timely manner, Agent may elect in its sole discretion to fund with its own funds the Revolving Credit Loans of such Lender on such Borrowing Date, and such Lender shall be subject to the repayment obligation in Section 10.16 [Availability of Funds].

2.7     Revolving Credit Notes.

The Obligation of Borrower to repay the aggregate unpaid principal amount of the Revolving Credit Loans made to it by each Lender, together with interest thereon, shall be evidenced by a Revolving Credit Note dated the Closing Date payable to the order of such Lender in a face amount equal to the Revolving Credit Commitment of such Lender.

2.8     Use of Proceeds.

The proceeds of the Revolving Credit Loans shall be used in accordance with Section 8.1.10 [Use of Proceeds].

3.     TERM LOANS

3.1     Term Loan Commitments.

3.1.1     Term Loan A.

Subject to the terms and conditions hereof, and relying upon the representations and warranties herein set forth, each Lender severally agrees to make a term loan A (each a "Term Loan A") to Borrower on the Closing Date in the principal amount of such Lender's Term Loan A Commitment.

3.1.2     Term Loan B.

Subject to the terms and conditions hereof, and relying upon the representations and warranties herein set forth, each Lender severally agrees to make a term loan B (each a "Term Loan B") to Borrower on the Closing Date the principal amount of such Lender's Term Loan B Commitment.

3.2     Nature of Lenders' Obligations with Respect to Term Loans.

3.2.1     Term Loan A.

The obligations of each Lender to make Term Loans A to Borrower shall be in the proportion that such Lender's Term Loan A Commitment bears to the Term Loan A Commitments of all Lenders to Borrower, but each Lender's Term Loan A to Borrower shall never exceed its Term Loan A Commitment. The failure of any Lender to make a Term Loan A shall not relieve any other Lender of its obligations to make a Term Loan A nor shall it impose any additional liability on any other Lender hereunder. Lenders shall have no obligation to make Term Loans A hereunder after the Closing Date. The Term Loan A Commitments are not revolving credit commitments and Borrower shall not have the right to borrow, repay and reborrow under Section 3.1 [Term Loan Commitments].

3.2.2     Term Loan B.

The obligations of each Lender to make Term Loans B to Borrower shall be in the proportion that such Lender's Term Loan B Commitment bears to the Term Loan B Commitments of all Lenders to Borrower, but each Lender's Term Loan B to Borrower shall never exceed its Term Loan B Commitment. The failure of any Lender to make a Term Loan B shall not relieve any other Lender of its obligations to make a Term Loan B nor shall it impose any additional liability on any other Lender hereunder. Lenders shall have no obligation to make Term Loans B hereunder after the Closing Date. The Term Loan B Commitments are not revolving credit commitments and Borrower shall not have the right to borrow, repay and reborrow under Section 3.1 [Term Loan Commitments].

3.3     Term Loan Facility Fee.

Borrower agrees to pay to Agent for the account of each Lender, as consideration for such Lender's Term Loan Commitments, a nonrefundable facility fee equal to 2% of such Lender's Term Loan Commitments, payable on the Closing Date.

3.4     Term Notes.

The Obligation of Borrower to repay the unpaid principal amount of the Term Loans made to it by each Lender, together with interest thereon, shall be evidenced by a Term Note dated the Closing Date payable to the order of each Lender in a face amount equal to the Term Loan of such Lender. The principal amount as provided therein of the Term Notes shall be payable pursuant to Section 5.5 [Mandatory Prepayments] and on the Expiration Date or upon acceleration of the Term Notes.

3.5     Use of Proceeds.

The proceeds of the Term Loans shall be used in accordance with Section 8.1.10 [Use of Proceeds].

4.    INTEREST RATES

4.1    Interest Rates.

Borrower shall pay interest in respect of the outstanding unpaid principal amount of the Loans as set forth below, it being understood that, subject to the provisions of this Agreement, Borrower may select different Interest Periods to apply simultaneously to the Revolving Credit Loans and Term Loan A comprising different Borrowing Tranches and may renew the Euro-Rate with respect to all or any portion of the Revolving Credit Loans and Term Loan A comprising any Borrowing Tranche, provided that there shall not be at any one time outstanding more than eight (8) Borrowing Tranches in the aggregate among all of the Loans.  If at any time the designated rate applicable to any Loan made by any Lender exceeds such Lender's highest lawful rate, the rate of interest on such Lender's Loan shall be limited to such Lender's highest lawful rate.

4.1.1    Revolving Credit Interest Rate.

Borrower shall pay interest in respect of the outstanding principal amount of the Revolving Credit Loans at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Euro-Rate plus the Applicable Margin.

4.1.2    Term Loan A Interest Rate.

Borrower shall pay interest in respect of the outstanding principal amount of Term Loan A at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Euro-Rate plus the Applicable Margin.

4.1.3    Term Loan B Interest Rate.

Borrower shall pay interest in respect of the outstanding principal amount of  Term Loan B:  (a) at the rate of 12% per annum (computed on the basis of a year of 360 days and actual days elapsed), which interest shall be due and payable in arrears on the fifth day of each month after the date hereof and on the Expiration Date or upon acceleration of the Notes, and (b) at the rate of 7.0% per annum (computed on the basis of a year of 360 days and actual days elapsed), which interest shall be compounded quarterly and due and payable on the Expiration Date or upon acceleration of the Notes.

4.1.4    Rate Quotations.

Borrower may call Agent on or before the date on which a Loan Request is to be delivered to receive an indication of the rates then in effect, but it is acknowledged that such projection shall not be binding on Agent or Lenders nor affect the rate of interest which thereafter is actually in effect when the election is made.

4.2    Interest Periods.

At any time when Borrower shall select a new Interest Period under a Euro-Rate, Borrower shall notify Agent thereof at least three (3) Business Days prior to the expiration of the existing Interest Period by delivering a Loan Request.  The notice shall specify an Interest Period

during which such Euro-Rate shall apply.  Notwithstanding the preceding sentence, the following provisions shall apply to all Loans under a Euro-Rate:

### 4.2.1    Amount of Borrowing Tranche.

each Borrowing Tranche of Euro-Rate Loans shall be in integral multiples of $100,000 during the first three months following the Closing Date and thereafter in integral multiples of $250,000;

### 4.2.2    Renewals.

in the case of the renewal of a Euro-Rate at the end of an Interest Period, the first day of the new Interest Period shall be the last day of the preceding Interest Period, without duplication in payment of interest for such day.

### 4.3    Interest After Default.

To the extent permitted by Law, upon the occurrence of an Event of Default and until such time such Event of Default shall have been cured or waived:

### 4.3.1    Interest Rate.

the rate of interest for each Loan otherwise applicable pursuant to Section 4.1 [Interest Rates], shall be increased by 3.0% per annum; and

### 4.3.2    Other Obligations.

each other Obligation hereunder if not paid when due shall bear interest at a rate per annum equal to the sum of the rate of interest applicable under the Base Rate plus an additional 3.0% per annum from the time such Obligation becomes due and payable and until it is paid in full.

### 4.3.3    Acknowledgment.

Borrower acknowledges that the increase in rates referred to in this Section 4.3 reflects, among other things, the fact that such Loans or other amounts have become a substantially greater risk given their default status and that Lenders are entitled to additional compensation for such risk; and all such interest shall be payable by Borrower upon demand by Agent.

### 4.4    Euro-Rate Unascertainable; Illegality; Increased Costs; Deposits Not Available.

### 4.4.1    Unascertainable.

If on any date on which a Euro-Rate would otherwise be determined, Agent shall have determined that: