# EXHIBIT A

## (Part 2)

(a)  adequate and reasonable means do not exist for ascertaining such Euro-Rate, or

(b)  a contingency has occurred which materially and adversely affects the London interbank eurodollar market relating to the Euro-Rate, Agent shall have the rights specified in Section 4.4.3 [Agent's and Lender's Rights].

4.4.2    <u>Illegality; Increased Costs; Deposits Not Available</u>.

If at any time any Lender shall have determined that:

(a)  the making, maintenance or funding of any Loan to which a Euro-Rate applies has been made impracticable or unlawful by compliance by such Lender in good faith with any Law or any interpretation or application thereof by any Official Body or with any request or directive of any such Official Body (whether or not having the force of Law), or

(b)  such Euro-Rate will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any such Loan, or

(c)  after making all reasonable efforts, deposits of the relevant amount in Dollars for the relevant Interest Period for a Loan, or to lenders generally, to which a Euro-Rate applies, respectively, are not available to such Lender with respect to such Loan, or to lenders generally, in the interbank eurodollar market, then Agent shall have the rights specified in Section 4.4.3 [Agent's and Lender's Rights].

4.4.3    <u>Agent's and Lender's Rights</u>.

In the case of any event specified in Section 4.4.1 [Unascertainable], Agent shall promptly so notify Lenders and Borrower thereof, and in the case of an event specified in Section 4.4.2 [Illegality; Increased Costs; Deposits Not Available], such Lender shall promptly so notify Agent and endorse a certificate to such notice as to the specific circumstances of such notice, and Agent shall promptly send copies of such notice and certificate to the other Lenders and Borrower.  Upon such date as shall be specified in such notice (which shall not be earlier than the date such notice is given), the obligation of:  (a) Lenders, in the case of such notice given by Agent, or (b) such Lender, in the case of such notice given by such Lender, to allow Borrower to select a new Interest Period under a Euro-Rate shall be suspended until Agent shall have later notified Borrower, or such Lender shall have later notified Agent, of Agent's or such Lender's, as the case may be, determination that the circumstances giving rise to such previous determination no longer exist.  If at any time Agent makes a determination under Section 4.4.1 [Unascertainable] and Borrower has previously notified Agent of its selection of a new Interest Period under a Euro-Rate and such Interest Period has not yet gone into effect, such notification shall be deemed to provide for conversion to the Base Rate.  If any Lender notifies Agent of a determination under Section 4.4.2 [Illegality; Increased Costs; Deposits Not Available], Borrower shall, subject to Borrower's indemnification Obligations under Section 5.6.2 [Indemnity], as to any Loan of the Lender to which a Euro-Rate applies, on the date specified in such notice either convert such Loan to the Base Rate or prepay such Loan in accordance with Section 5.4 [Voluntary Prepayments].  Absent due notice from Borrower of

conversion or prepayment, such Loan shall automatically be converted to the Base Rate upon such specified date.

### 4.5    Failure to Select an Interest Period.

If Borrower fails to select a new Interest Period to apply to any Borrowing Tranche of Loans under the Euro-Rate at the expiration of an existing Interest Period applicable to such Borrowing Tranche in accordance with the provisions of Section 4.2 [Interest Periods], Borrower shall be deemed to have converted such Borrowing Tranche to the Base Rate, commencing upon the last day of the existing Interest Period.

## 5.    PAYMENTS

### 5.1    Payments.

All payments and prepayments to be made in respect of principal, interest, Commitment Fees, Facility Fees, Agent's Fee or other fees or amounts due from Borrower hereunder shall be payable prior to 11:00 a.m., New York City time, on the date when due without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by Borrower, and without set-off, counterclaim or other deduction of any nature, and an action therefor shall immediately accrue.  Such payments shall be made to Agent at the Principal Office for the ratable accounts of Lenders with respect to the Loans in U.S. Dollars and in immediately available funds, and Agent shall promptly distribute such amounts to Lenders in immediately available funds, provided that in the event payments are received by 11:00 a.m., New York City time, by Agent with respect to the Loans and such payments are not distributed to Lenders on the same day received by Agent, Agent shall pay Lenders the Federal Funds Effective Rate with respect to the amount of such payments for each day held by Agent and not distributed to Lenders.  Agent's and each Lender's statement of account, ledger or other relevant record shall, in the absence of manifest error, be conclusive as the statement of the amount of principal of and interest on the Loans and other amounts owing under this Agreement and shall be deemed an "account stated."

### 5.2    Pro Rata Treatment of Lenders.

Each borrowing of a Revolving Credit Loan or Term Loan A shall be allocated to each Lender according to its Ratable Share, and each borrowing of a Term Loan B shall be allocated to each Lender according to its Term Loan B Ratable Share.  Each selection of or renewal of the Euro-Rate and each payment or prepayment by Borrower with respect to principal, interest, Commitment Fees, Facility Fees, or other fees (except for Agent's Fee) or amounts due from Borrower hereunder to Lenders with respect to the Revolving Credit Loans and Term Loans A, shall (except as provided in Section 4.4.3 [Agent's and Lender's Rights] in the case of an event specified in Section 4.4 [Euro-Rate Unascertainable; Etc.], 5.4 [Voluntary Prepayments], or 5.6 [Additional Compensation in Certain Circumstances]) be made in proportion to the applicable Loans outstanding from each Lender and, if no such Loans are then outstanding, in proportion to the Ratable Share of each Lender.  Each payment or prepayment by Borrower with respect to principal, interest, or other amounts due from Borrower hereunder to Lenders with respect to Term Loans B, shall (except as provided in Section 4.4 [Euro-Rate Unascertainable; Etc.], 5.4

[Voluntary Prepayments], or 5.6 [Additional Compensation in Certain Circumstances]) be made in proportion to the Term Loans B outstanding from each Lender and if no such Term Loans B are then outstanding, in proportion to the Term Loan B Ratable Share of each Lender.

5.3     Interest Payment Dates.

Interest on Revolving Credit Loans and Term Loans A shall be due and payable in arrears on the fifth day of each month after the date hereof and on the Expiration Date or upon acceleration of the Notes.   Interest on Term Loans B shall be payable as specified in Section 4.1.3 [Term Loan B Interest Rate].   Interest on mandatory prepayments of principal under Section 5.5 [Mandatory Prepayments] shall be due on the date such mandatory prepayment is due.   Interest on the principal amount of each Loan or other monetary Obligation shall be due and payable on demand after such principal amount or other monetary Obligation becomes due and payable (whether on the stated maturity date, upon acceleration or otherwise).

5.4     Voluntary Prepayments.

5.4.1     Right to Prepay.

Borrower shall have the right at its option from time to time to prepay the Loans in whole but not in part without premium or penalty (except as provided in Section 5.4.2 [Replacement of a Lender], Section 5.4.3 [Prepayment Fee] or in Section 5.6 [Additional Compensation in Certain Circumstances]):

(a)     on the last day of the applicable Interest Period with respect to Loans to which the Euro-Rate applies,

(b)     on the date specified in a notice by any Lender pursuant to Section 4.4 [Euro-Rate Unascertainable, Etc.] with respect to any Loan to which the Euro-Rate applies.

Whenever Borrower desires to prepay the Loans in full, it shall provide a prepayment notice to Agent by 1:00 p.m., New York City time,   at least one (1) Business Day prior to the date of prepayment of Loans setting forth the date, which shall be a Business Day, on which the proposed prepayment is to be made.

All prepayment notices shall be irrevocable.   The principal amount of the Loans for which a prepayment notice is given, together with interest on such principal amount shall be due and payable on the date specified in such prepayment notice as the date on which the proposed prepayment is to be made.   Any prepayment hereunder shall be subject to Borrower's Obligation to indemnify Lenders under Section 5.6.2 [Indemnity].

5.4.2     Replacement of a Lender.

In the event any Lender:   (a) gives notice under Section 4.4 [Euro-Rate Unascertainable, Etc.] or Section 5.6.1 [Increased Costs or Reduced Return Resulting from Taxes, Etc.], (b) does not fund Revolving Credit Loans because the making of such Loans would contravene any Law applicable to such Lender, or (c) becomes subject to the control of an

Official Body (other than normal and customary supervision), then Borrower shall have the right at its option, with the consent of Agent, which shall not be unreasonably withheld, to prepay all of the Loans of such Lender in whole, together with all interest accrued thereon, and terminate such Lender's Commitment within ninety (90) days after: (x) receipt of such Lender's notice under Section 4.4 [Euro-Rate Unascertainable; Etc.] or 5.6.1 [Increased Costs or Reduced Return Resulting from Taxes, Etc.], (y) the date such Lender has failed to fund Revolving Credit Loans because the making of such Loans would contravene any Law applicable to such Lender, or (z) the date such Lender became subject to the control of an Official Body, as applicable; provided that Borrower shall also pay to such Lender at the time of such prepayment any amounts required under Section 5.6 [Additional Compensation in Certain Circumstances] and any accrued interest due on such amount and any related fees; provided, however, that the Commitment and any Term Loan of such Lender shall be provided by one or more of the remaining Lenders or a replacement lender acceptable to Agent; provided, further, the remaining Lenders shall have no obligation hereunder to increase their Commitments. Notwithstanding the foregoing, Agent may only be replaced subject to the requirements of Section 10.14 [Successor Agent].

### 5.4.3     Prepayment Fee.

In the event Borrower repays all of the Loans and terminates all of the Commitments on or prior to February 11, 2006, Borrower shall pay Agent for the benefit of Lenders at the date of such repayment and termination a prepayment fee equal to 1.0% of the maximum amount of the Revolving Credit Commitments and Term Loans during the period from the Closing Date until such repayment and termination. In the event Borrower repays all of the Loans and terminates all of the Commitments after February 11, 2006, but on or before February 11, 2007, Borrower shall pay Agent for the benefit of Lenders at the date of such repayment and termination a prepayment fee equal to .5% of the maximum amount of the Revolving Credit Commitments and Term Loans during the period from the Closing Date until such repayment and termination.

### 5.4.4     Change of Lending Office.

Each Lender agrees that upon the occurrence of any event giving rise to increased costs or other special payments under Section 4.4.2 [Illegality, Etc.] or 5.6.1 [Increased Costs or Reduced Return Resulting from Taxes, Etc.] with respect to such Lender, it will if requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 5.4.4 shall affect or postpone any of the Obligations of Borrower or any other Loan Party or the rights of Agent or any Lender provided in this Agreement.

5.5    Mandatory Prepayments.

5.5.1    Excess Cash Flow.

Within two (2) Business Days of delivery of Borrower's annual financial statements pursuant to Section 8.3.3 [Annual Financial Statements] commencing with the delivery of Borrower's financial statements for the fiscal year ending December 31, 2005, but in any event no later than March 31, 2006 and, thereafter, March 31 of each subsequent year during the term hereof (each, a "Mandatory Prepayment Date"), Borrower shall make a mandatory prepayment of principal equal to 50% of Excess Cash Flow for the immediately preceding fiscal year, together with accrued interest (including the 7.0% deferred interest on Term Loans B) on such principal amount (each, a "Mandatory Prepayment of Excess Cash Flow"). If on a Mandatory Prepayment Date, Borrower does not have sufficient cash reserves and Availability under the Revolving Credit Commitment in excess of the Minimum Reserve to make full payment of the Mandatory Prepayment of Excess Cash Flow, then Borrower shall make partial payment. The balance due shall be deferred and paid at such time as Borrower's cash reserves and Availability exceed the Minimum Reserve. Each Mandatory Prepayment of Excess Cash Flow shall be applied first to payment in full of the principal amount of Term Loans A, together with accrued interest, and then second to payment in full of the principal amount of Term Loans B, together with accrued interest. To the extent that a Mandatory Prepayment of Excess Cash Flow exceeds the outstanding principal amount of the Term Loans, such prepayment shall be applied to reduce permanently the Revolving Credit Commitments.

5.5.2    Sale of Assets.

(a)    Within two (2) Business Days of any sale of assets authorized by Section 8.2.7(e) [Dispositions of Assets or Subsidiaries], Borrower shall make a mandatory prepayment of principal equal to the proceeds (net of transaction costs) of such sale (as estimated in good faith by Borrower), first to payment in full of the principal amount, together with accrued interest, of the Revolving Credit Loans and then second to payment in full of the principal amount, together with accrued interest, of Term Loans A and then third to payment in full of the principal amount, together with accrued interest, of Term Loans B.

(b)    Within two (2) Business Days of any sale of assets authorized by Section 8.2.7(f) [Dispositions of Assets or Subsidiaries], unless waived by Agent, Borrower shall make a mandatory prepayment of principal equal to the proceeds (net of transaction costs) of such sale (as estimated in good faith by Borrower), first to payment in full of the principal amount, together with accrued interest, of Term Loans A and then second to payment in full of the principal amount, together with accrued interest, of Term Loans B. To the extent that such a mandatory prepayment exceeds the outstanding principal amount, together with accrued interest, of the Term Loans, such excess shall be applied to payment of the Revolving Credit Loans and to reduce permanently the Revolving Credit Commitments. Notwithstanding the foregoing, Agent, in its sole discretion, may modify such application of such mandatory prepayment.

(c)    Notwithstanding anything herein to the contrary, within two (2) Business Days of any sale of assets permitted under this Agreement that directly results in a decrease of RMR, Borrower shall make a mandatory prepayment of principal equal to the

proceeds (net of transaction costs) of such sale (as estimated in good faith by Borrower) which prepayment shall be applied at the sole discretion of Agent.

### 5.5.3    Euro-Rate.

In accordance with Section 5.6.2 [Indemnity], Borrower shall indemnify Lenders for any loss or expense, including loss of margin, incurred with respect to any such prepayments applied against Loans subject to the Euro-Rate on any day other than the last day of the applicable Interest Period.

### 5.5.4    Borrowing Base Exceeded.

Whenever the Revolving Facility Usage exceeds the Borrowing Base, Borrower shall immediately make, without the necessity of any demand by Agent, a mandatory prepayment of principal equal to the excess of the Revolving Facility Usage over the Borrowing Base, together with accrued interest on such principal amount.

### 5.5.5    Prepayment Fee.

Mandatory prepayments pursuant to Section 5.5.2(b) [Sale of Assets] occurring on or prior to February 11, 2006, shall be subject to a prepayment fee equal to 1.0% of the sum of the amount of the Term Loans prepaid by such prepayment and the amount of any reduction of the Revolving Credit Commitments resulting from such prepayment. Mandatory prepayments pursuant to Section 5.5.2 [Sale of Assets] occurring after February 11, 2006, but on or before February 11, 2007, shall be subject to a prepayment fee equal to .5% of the sum of the amount of the Term Loans prepaid by such prepayment and the amount of any reduction of the Revolving Credit Commitments resulting from such prepayment. Such prepayment fees shall be payable to Agent for the benefit of Lenders at the date of such prepayment.

### 5.6    Additional Compensation in Certain Circumstances.

#### 5.6.1    Increased Costs or Reduced Return Resulting from Taxes, Reserves, Capital Adequacy Requirements, Expenses, Etc.

If any Law, guideline or interpretation or any change in any Law, guideline or interpretation or application thereof by any Official Body charged with the interpretation or administration thereof or compliance with any request or directive (whether or not having the force of Law) of any central lender or other Official Body:

(a)    subjects any Lender to any tax or changes the basis of taxation with respect to this Agreement, the Notes, the Loans or payments by Borrower of principal, interest, Commitment Fees, or other amounts due from Borrower hereunder or under the Notes (except for taxes on the overall net income of such Lender),

(b)    imposes, modifies or deems applicable any reserve, special deposit or similar requirement against credits or commitments to extend credit extended by, or assets (funded or contingent) of, deposits with or for the account of, or other acquisitions of funds by, any Lender, or

(c)    imposes, modifies or deems applicable any capital adequacy or similar requirement: (i) against assets (funded or contingent) of, or letters of credit, other credits or commitments to extend credit extended by, any Lender, or (ii) otherwise applicable to the obligations of any Lender under this Agreement, and the result of any of the foregoing is to increase the cost to, reduce the income receivable by, or impose any expense (including loss of margin) upon any Lender with respect to this Agreement, the Notes or the making, maintenance or funding of any part of the Loans (or, in the case of any capital adequacy or similar requirement, to have the effect of reducing the rate of return on any Lender's capital, taking into consideration such Lender's customary policies with respect to capital adequacy) by an amount which such Lender in its sole discretion deems to be material, such Lender shall from time to time notify Borrower and Agent of the amount determined in good faith (using any averaging and attribution methods employed in good faith) by such Lender to be necessary to compensate such Lender for such increase in cost, reduction of income, additional expense or reduced rate of return.  Such notice shall set forth in reasonable detail the basis for such determination.  Such amount shall be due and payable by Borrower to such Lender ten (10) Business Days after such notice is given.

5.6.2    Indemnity.

In addition to the compensation required by Section 5.6.1 [Increased Costs or Reduced Return Resulting from Taxes, Etc.], Borrower shall indemnify each Lender against all liabilities, losses or expenses (including loss of margin, any loss or expense incurred in liquidating or employing deposits from third parties and any loss or expense incurred in connection with funds acquired by a Lender to fund or maintain Loans subject to a Euro-Rate) which such Lender sustains or incurs as a consequence of any:

(a)    payment, prepayment, conversion or renewal of any Loan to which the Euro-Rate applies on a day other than the last day of the corresponding Interest Period (whether or not such payment or prepayment is mandatory, voluntary or automatic and whether or not such payment or prepayment is then due),

(b)    attempt by Borrower to revoke (expressly, by later inconsistent notices or otherwise) in whole or part any Loan Requests under Section 2.5 [Revolving Credit Loan Requests] or Section 4.2 [Interest Periods] or notice relating to prepayments under Section 5.4 [Voluntary Prepayments], or

(c)    default by Borrower in the performance or observance of any covenant or condition contained in this Agreement or any other Loan Document, including any failure of Borrower to pay when due (by acceleration or otherwise) any principal, interest, Commitment Fee or any other amount due hereunder.

If any Lender sustains or incurs any such loss or expense, it shall from time to time notify Borrower of the amount determined in good faith by such Lender (which determination may include such assumptions, allocations of costs and expenses and averaging or attribution methods as such Lender shall deem reasonable) to be necessary to indemnify such Lender for such loss or expense.  Such notice shall set forth in reasonable detail the basis for such determination.  Such amount shall be due and payable by Borrower to such Lender ten (10) Business Days after such notice is given.

- 37 -

5.7    Interbank Market Presumption.

For all purposes of this Agreement and each Note with respect to any aspects of the Euro-Rate or any Loan under the Euro-Rate, each Lender and Agent shall be presumed to have obtained rates, funding, currencies, deposits, and the like in the applicable interbank market regardless whether it did so or not; and, each Lender's and Agent's determination of amounts payable under, and actions required or authorized by, Sections 4.4 [Euro-Rate Unascertainable; Etc.] and 5.6 [Additional Compensation in Certain Circumstances] shall be calculated, at each Lender's and Agent's option, as though each Lender and Agent funded each Borrowing Tranche of Loans under the Euro-Rate through the purchase of deposits of the types and maturities corresponding to the deposits used as a reference in accordance with the terms hereof in determining the Euro-Rate applicable to such Loans, whether in fact that is the case.

5.8    Taxes.

5.8.1    No Deductions.

All payments made by Borrower hereunder and under each Note shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto, excluding taxes imposed on the net income of any Lender and all income and franchise taxes applicable to any bank of the United States (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings, and liabilities being hereinafter referred to as "Taxes").  If Borrower shall be required by Law to deduct any Taxes from or in respect of any sum payable hereunder or under any Note, (a) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 5.8.1) each Lender receives an amount equal to the sum it would have received had no such deductions been made, (b) Borrower shall make such deductions, and (c) Borrower shall timely pay the full amount deducted to the relevant tax authority or other authority in accordance with applicable Law.

5.8.2    Stamp Taxes.

In addition, Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies which arise from any payment made hereunder or from the execution, delivery, or registration of, or otherwise with respect to, this Agreement or any Note (hereinafter referred to as "Other Taxes").

5.8.3    Indemnification for Taxes Paid by a Lender.

Borrower shall indemnify each Lender for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 5.8.3) paid by any Lender and any liability (including penalties, interest, and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  This indemnification shall be made within 30 days from the date a Lender makes written demand therefor.

- 38 -

5.8.4    Certificate.

Within 30 days after the date of any payment of any Taxes by Borrower, Borrower shall furnish to each Lender, at its address referred to herein, the original or a certified copy of a receipt evidencing payment thereof. If no Taxes are payable in respect of any payment by Borrower, such Borrower shall, if so requested by a Lender, provide a certificate of an officer of Borrower to that effect.

5.8.5    Survival.

Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in Sections 5.8.1 through 5.8.4 shall survive the payment in full of principal and interest hereunder and under any instrument delivered hereunder.

5.9    Judgment Currency.

5.9.1    Currency Conversion Procedures for Judgments.

If for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder or under a Note in any currency (the "Original Currency") into another currency (the "Other Currency"), the parties hereby agree, to the fullest extent permitted by Law, that the rate of exchange used shall be that at which in accordance with normal banking procedures each Lender could purchase the Original Currency with the Other Currency after any premium and costs of exchange on the Business Day preceding that on which final judgment is given.

5.9.2    Indemnity in Certain Events.

The obligation of Borrower in respect of any sum due from Borrower to any Lender hereunder shall, notwithstanding any judgment in an Other Currency, whether pursuant to a judgment or otherwise, be discharged only to the extent that, on the Business Day following receipt by any Lender of any sum adjudged to be so due in such Other Currency, such Lender may in accordance with normal banking procedures purchase the Original Currency with such Other Currency. If the amount of the Original Currency so purchased is less than the sum originally due to such Lender in the Original Currency, Borrower agrees, as a separate obligation and notwithstanding any such judgment or payment, to indemnify such Lender against such loss.

5.10    Exit Fee.

Immediately upon payment in full of all Loans and termination of all Commitments, Borrower shall pay to Agent an exit fee in the principal amount of $1,000,000. Such fee shall be payable to Agent for the benefit of Lenders making Term Loans B.

6.    REPRESENTATIONS AND WARRANTIES

6.1    Representations and Warranties.

Loan Parties, jointly and severally, represent and warrant to Agent and each Lender as follows:

6.1.1    Organization and Qualification.

Each Loan Party is a corporation, partnership or limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Each Loan Party has the lawful power to own or lease its properties and to engage in the business it presently conducts or proposes to conduct. Each Loan Party is duly licensed or qualified and in good standing in each jurisdiction listed on Schedule 6.1.1 and in all other jurisdictions where the property owned or leased by it or the nature of the business transacted by it or both makes such licensing or qualification necessary.

6.1.2    Capitalization and Ownership.

The authorized capital stock of Borrower consists of 10,000, of which 7,100 shares ("Shares") are issued and outstanding and are owned as indicated on Schedule 6.1.2. All of the Shares have been validly issued and are fully paid and nonassessable. There are no options, warrants or other rights outstanding to purchase any of Borrower's shares, except as indicated on Schedule 6.1.2.

6.1.3    Subsidiaries.

Schedule 6.1.3 states the name of each of the Borrower's Subsidiaries, its jurisdiction of incorporation, its authorized capital stock, the issued and outstanding shares ("Subsidiary Shares") and the owners thereof if it is a corporation, its outstanding partnership interests ("Partnership Interests") if it is a partnership and its outstanding limited liability company interests, interests assigned to managers thereof and the voting rights associated therewith ("LLC Interests") if it is a limited liability company. Each Loan Party has good and marketable title to all of the Subsidiary Shares, Partnership Interests and LLC Interests it purports to own, free and clear in each case of any Lien. All Subsidiary Shares, Partnership Interests and LLC Interests have been validly issued, and all Subsidiary Shares are fully paid and nonassessable. All capital contributions and other consideration required to be made or paid in connection with the issuance of the Partnership Interests and LLC Interests have been made or paid, as the case may be. There are no options, warrants or other rights outstanding to purchase any Subsidiary Shares, Partnership Interests or LLC Interests, except as indicated on Schedule 6.1.3.

6.1.4    Power and Authority.

Each Loan Party has full power to enter into, execute, deliver and carry out the Loan Documents to which it is a party, to incur the Indebtedness contemplated by the Loan Documents and to perform its Obligations under the Loan Documents to which it is a party, and all such actions have been duly authorized by all necessary proceedings on its part.

6.1.5    <u>Validity and Binding Effect</u>.

This Agreement has been duly and validly executed and delivered by each Loan Party, and each other Loan Document which any Loan Party is required to execute and deliver on or after the date hereof will have been duly executed and delivered by such Loan Party on the required date of delivery of such Loan Document. Each Loan Document constitutes, or will constitute, legal, valid and binding obligations of each Loan Party which is or will be a party thereto on and after its date of delivery thereof, enforceable against such Loan Party in accordance with its terms, except to the extent that enforceability of any Loan Document may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforceability of creditors' rights generally or limiting the right of specific performance.

6.1.6    <u>No Conflict</u>.

Neither the execution and delivery of the Loan Documents by any Loan Party nor the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof by any of them will conflict with, constitute a default under or result in any breach of:  (a) the terms and conditions of the certificate of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate of formation, limited liability company agreement or other organizational documents of any Loan Party or (b) any Law or any material agreement or instrument or order, writ, judgment, injunction or decree to which any Loan Party is a party or by which any Loan Party is bound or to which it is subject, or result in the creation or enforcement of any Lien, upon any property (now or hereafter acquired) of any Loan Party (other than Liens granted under the Loan Documents).

6.1.7    <u>Litigation</u>.

Except as set forth on <u>Schedule 6.1.7</u>, there are no actions, suits, proceedings or investigations pending or, to the knowledge of any Loan Party, threatened against any Loan Party at law or equity before any Official Body. Except as set forth on <u>Schedule 6.1</u>.7, none of Loan Parties is in violation of any order, writ, injunction or any decree of any Official Body. <u>Schedule 6.1.7</u> describes the Consumer Affairs Litigation and the terms of the Proposed Settlement Agreement, which the parties agree shall not be considered a Material Adverse Change unless the terms of the final settlement materially and adversely differ from those of the Proposed Settlement Agreement.

6.1.8    <u>Title to Properties</u>.

The real property owned or leased by each Loan Party is described on <u>Schedule 6.1.8</u>. Each Loan Party has good and marketable title to or valid leasehold interest in all properties, assets and other rights which it purports to own or lease or which are reflected as owned or leased on its books and records, free and clear of all Liens except Permitted Liens, and subject to the terms and conditions of the applicable leases. All leases of property are in full force and effect without the necessity for any consent which has not previously been obtained upon consummation of the transactions contemplated hereby.

6.1.9      Financial Statements.

(a)      Historical Statements.  Borrower has delivered to Agent copies of its audited consolidated year-end financial statements for and as of the end of the last three (3) fiscal years ended December 31, 2001, 2002 and 2003 (the "Annual Statements").  In addition, Borrower has delivered to Agent copies of its unaudited consolidated interim financial statements for the fiscal year to date and as of the end of the fiscal quarter ended September 30, 2004 (the "Interim Statements") (the Annual and Interim Statements being collectively referred to as the "Historical Statements").  The Historical Statements were compiled from the books and records maintained by Borrower's management, are correct and complete and fairly represent the consolidated financial condition of Loan Parties as of their dates and the results of operations for the fiscal periods then ended and have been prepared in accordance with GAAP consistently applied, subject (in the case of the Interim Statements) to normal year-end audit adjustments.

(b)      Financial Projections.  Borrower has delivered to Agent monthly financial projections of Loan Parties for the period January 2005 through December 2007 derived from various assumptions of Borrower's management (the "Financial Projections").  The Financial Projections represent a reasonable range of possible results in light of the history of the business, present and foreseeable conditions and the intentions of Borrower's management.  The Financial Projections accurately reflect the liabilities of Loan Parties upon consummation of the transactions contemplated hereby as of the Closing Date.

(c)      Accuracy of Financial Statements.  No Loan Party has any liabilities, contingent or otherwise, or forward or long-term commitments that are not disclosed in the Historical Statements or in the notes thereto, and except as disclosed therein there are no unrealized or anticipated losses from any commitments of any Loan Party which may cause a Material Adverse Change.  Since December 31, 2003, no Material Adverse Change has occurred.

6.1.10      Use of Proceeds; Margin Stock; Section 20 Subsidiaries.

(a)      General.  Loan Parties intend to use the proceeds of the Loans in accordance with Sections 8.1.10 [Use of Proceeds].

(b)      Margin Stock.  No Loan Party engages or intends to engage principally, or as one of its important activities, in the business of extending credit for the purpose, immediately, incidentally or ultimately, of purchasing or carrying margin stock (within the meaning of Regulation U).  No part of the proceeds of any Loan has been or will be used, immediately, incidentally or ultimately, to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or to refund Indebtedness originally incurred for such purpose, or for any purpose which entails a violation of or which is inconsistent with the provisions of the regulations of the Board of Governors of the Federal Reserve System.  No Loan Party holds or intends to hold margin stock in such amounts that more than 5% of the reasonable value of the assets of any Loan Party are or will be represented by margin stock.

(c)      Section 20 Subsidiaries.  Loan Parties do not intend to use and shall not use any portion of the proceeds of the Loans, directly or indirectly, to purchase during

- 42 -

the underwriting period, or for thirty (30) days thereafter, Ineligible Securities being underwritten by a Section 20 Subsidiary.

### 6.1.11    Full Disclosure.

No Loan Document, nor any certificate, statement, agreement or other documents furnished to Agent or any Lender in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading. There is no fact known to any Loan Party which materially adversely affects the business, property, assets, financial condition, results of operations or prospects of any Loan Party which has not been set forth in this Agreement or in the certificates, statements, agreements or other documents furnished in writing to Agent and Lenders prior to or at the date hereof in connection with the transactions contemplated hereby.

### 6.1.12    Taxes.

All federal, state, local and other tax returns required to have been filed with respect to any Loan Party have been filed, and payment or adequate provision has been made for the payment of all taxes, fees, assessments and other governmental charges which have or may become due pursuant to said returns or to assessments received, except to the extent that such taxes, fees, assessments and other charges are being contested in good faith by appropriate proceedings diligently conducted and for which such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made. There are no agreements or waivers extending the statutory period of limitations applicable to any federal income tax return of any Loan Party for any period.

### 6.1.13    Consents and Approvals.

Except for the filing of financing statements in the required filing offices, no consent, approval, exemption, order or authorization of, or a registration or filing with, any Official Body or any other Person is required by any Law or any agreement in connection with the execution, delivery and carrying out of the Loan Documents by any Loan Party, except as listed on Schedule 6.1.13, all of which shall have been obtained or made on or prior to the Closing Date, except as otherwise indicated on Schedule 6.1.13.

### 6.1.14    No Event of Default; Compliance with Instruments.

No event has occurred and is continuing and no condition exists or will exist after giving effect to the borrowings or other extensions of credit to be made on the Closing Date under or pursuant to the Loan Documents which constitutes an Event of Default or Potential Default. No Loan Party is in violation of: (a) any term of its certificate of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate of formation, limited liability company agreement or other organizational documents or (b) any material agreement or instrument to which it is a party or by which it or any of its properties may be subject or bound where such violation would constitute a Material Adverse Change.

- 43 -

6.1.15    Patents, Trademarks, Copyrights, Licenses, Etc.

Each Loan Party owns or possesses all the material patents, trademarks, service marks, trade names, copyrights, licenses, registrations, franchises, permits and rights necessary to own and operate its properties and to carry on its business as presently conducted and planned to be conducted by such Loan Party, without known, possible, alleged or actual conflict with the rights of others. All material patents, trademarks, service marks, trade names, copyrights, licenses, registrations, franchises and permits of each Loan Party are listed and described on Schedule 6.1.15. Borrower maintains its customer data base on system configured for Borrower that is compatible with all other similar industry data base platforms. Borrower has the necessary staffing with sufficient expertise to service, update, maintain, and operate such system. Borrower acknowledges and agrees that no "opensource", "shareware", "freeware", or other similar third party source code is included in such system.

6.1.16    Security Interests.

The Liens granted to Agent for the benefit of Lenders pursuant to the Loan Documents in the Collateral constitute and will continue to constitute Prior Security Interests under the Uniform Commercial Code as in effect in each applicable jurisdiction (the "Uniform Commercial Code") or other applicable Law entitled to all the rights, benefits and priorities provided by the Uniform Commercial Code or such Law. Upon the filing and recording of financing statements relating to said security interests in each office and in each jurisdiction where required in order to perfect the security interests described above, and taking possession of any stock certificates or other certificates evidencing the Pledged Collateral as applicable, all such action as is necessary or advisable to establish such rights of Agent will have been taken, and there will be upon execution and delivery of the Loan Documents, such filings and such taking of possession, no necessity for any further action in order to preserve, protect and continue such rights, except the filing of continuation statements with respect to such financing statements within six months prior to each five-year anniversary of the filing of such financing statements. All filing fees and other expenses in connection with each such action have been or will be paid by Borrower.

6.1.17    Anti-Terrorism Laws.

(a)    General. No Loan Party nor any Affiliate of any Loan Party is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)    Executive Order No. 13224. To the knowledge of Loan Parties, no Loan Party nor any Affiliate of any Loan Party or their respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, is any of the following (each a "Blocked Person"):

(a)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

- 44 -

(b)  a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(c)  a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(d)  a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(e)  a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(f)  a Person who is affiliated or associated with a person or entity listed above.

No Loan Party or to the knowledge of any Loan Party, any of its agents acting in any capacity in connection with the Loans or other transactions hereunder:  (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

6.1.18    Status of the Pledged Collateral.

All the Shares, Subsidiary Shares, Partnership Interests or LLC Interests included in the Pledged Collateral to be pledged pursuant to the Pledge Agreement, the Pledge Agreement (Subsidiaries), or the Collateral Assignment of Contract Rights are or will be upon issuance validly issued and nonassessable and owned beneficially and of record by the pledgor free and clear of any Lien or restriction on transfer, except as otherwise provided by the Pledge Agreement, the Pledge Agreement (Subsidiaries), or the Collateral Assignment of Contract Rights and except as the right of Lenders to dispose of the Shares, Subsidiary Shares, Partnership Interests or LLC Interests may be limited by the Securities Act of 1933, as amended, and the regulations promulgated by the Securities and Exchange Commission thereunder and by applicable state securities laws.  There are no shareholder, partnership, limited liability company or other agreements or understandings with respect to the Shares, Subsidiary Shares, Partnership Interests or LLC Interests included in the Pledged Collateral, except for the shareholder agreements, partnership agreements and limited liability company agreements described on Schedule 6.1.18.  Loan Parties have delivered true and correct copies of such partnership agreements and limited liability company agreements to Agent.

6.1.19    Insurance.

Schedule 6.1.19 lists all insurance policies and other bonds to which any Loan Party is a party, all of which are valid and in full force and effect.  No notice has been given

- 45 -

or claim made and no grounds exist to cancel or avoid any of such policies or bonds or to reduce the coverage provided thereby. Such policies and bonds provide adequate coverage from reputable and financially sound insurers in amounts sufficient to insure the assets and risks of each Loan Party in accordance with prudent business practice in the industry of Loan Parties.

6.1.20    Compliance with Laws.

Loan Parties are in compliance in all material respects with all applicable Laws (other than Environmental Laws which are specifically addressed in Section 6.1.25 [Environmental Matters]) in all jurisdictions in which any Loan Party is presently or will be doing business, except where the failure to do so would not constitute a Material Adverse Change. Without limiting foregoing, Loan Parties have provided, and after the Closing Date will, when applicable, provide and will require all dealers under any Dealer Program to provide, each residential customer with the 3-day right of rescission in compliance with the provisions of 16 C.F.R. Part 429 (Cooling-Off Period for Door-to-Door Sales) and any applicable state laws. Each Loan Party acknowledges that any failure on its behalf to comply with such regulation and laws in connection with any transaction involving a residential customer may result in such customer having the right to rescind or cancel such transaction.

6.1.21    Material Contracts; Burdensome Restrictions.

Schedule 6.1.21 lists all material contracts relating to the business operations of each Loan Party, including all employee benefit plans and Labor Contracts. All such material contracts are valid, binding and enforceable upon each Loan Party and each of the other parties thereto in accordance with their respective terms, except to the extent any lack of such validity, binding effect or enforceability may be the result of bankruptcy, insolvency, moratorium, and other similar laws affecting the enforceability of creditors' rights generally and by general principles of equity, whether considered in a proceeding at law or in equity, and there is no default thereunder, to Loan Parties' knowledge, with respect to parties other than such Loan Party. No Loan Party is bound by any contractual obligation, or subject to any restriction in any organization document, or any requirement of Law which would result in a Material Adverse Change.

6.1.22    Investment Companies; Regulated Entities.

No Loan Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940 or under the "control" of an "investment company" as such terms are defined in the Investment Company Act of 1940 and shall not become such an "investment company" or under such "control." No Loan Party is subject to any other Federal or state statute or regulation limiting its ability to incur Indebtedness for borrowed money.

6.1.23    Plans and Benefit Arrangements.

Except as set forth on Schedule 6.1.23:

(a)    Each member of the ERISA Group is in compliance in all material respects with any applicable provisions of ERISA with respect to all Benefit Arrangements, Plans

and Multiemployer Plans.  There has been no Prohibited Transaction with respect to any Benefit Arrangement or any Plan or, to the best knowledge of Borrower, with respect to any Multiemployer Plan or Multiple Employer Plan, which could result in any material liability of any member of the ERISA Group.  All members of the ERISA Group have made when due any and all payments required to be made under any agreement relating to a Multiemployer Plan or a Multiple Employer Plan or any Law pertaining thereto.  With respect to each Plan and Multiemployer Plan, each member of the ERISA Group:  (i) has fulfilled in all material respects its obligations under the minimum funding standards of ERISA, (ii) has not incurred any liability to the PBGC, and (iii) has not had asserted against it any penalty for failure to fulfill the minimum funding requirements of ERISA.

(b)    To the best of Loan Parties' knowledge, each Multiemployer Plan and Multiple Employer Plan is able to pay benefits thereunder when due.

(c)    No member of the ERISA Group has instituted or intends to institute proceedings to terminate any Plan.

(d)    No event requiring notice to the PBGC under Section 302(f)(4)(A) of ERISA has occurred or is reasonably expected to occur with respect to any Plan, and no amendment with respect to which security is required under Section 307 of ERISA has been made or is reasonably expected to be made to any Plan.

(e)    The aggregate actuarial present value of all benefit liabilities (whether or not vested) under each Plan, determined on a plan termination basis, as disclosed in, and as of the date of, the most recent actuarial report for such Plan, does not exceed the aggregate fair market value of the assets of such Plan.

(f)    No member of the ERISA Group has incurred or reasonably expects to incur any material withdrawal liability under ERISA to any Multiemployer Plan or Multiple Employer Plan.  No member of the ERISA Group has been notified by any Multiemployer Plan or Multiple Employer Plan that such Multiemployer Plan or Multiple Employer Plan has been terminated within the meaning of Title IV of ERISA and, to the best knowledge of Borrower, no Multiemployer Plan or Multiple Employer Plan is reasonably expected to be reorganized or terminated, within the meaning of Title IV of ERISA.

(g)    To the extent that any Benefit Arrangement is insured, all members of the ERISA Group have paid when due all premiums required to be paid for all periods through the Closing Date.  To the extent that any Benefit Arrangement is funded other than with insurance, all members of the ERISA Group have made when due all contributions required to be paid for all periods through the Closing Date.

(h)    All Plans, Benefit Arrangements and Multiemployer Plans have been administered in accordance with their terms and applicable Law.

6.1.24    Employment Matters.

Each Loan Party is in compliance with the Labor Contracts and all applicable federal, state and local labor and employment Laws including those related to equal

employment opportunity and affirmative action, labor relations, minimum wage, overtime, child labor, medical insurance continuation, worker adjustment and relocation notices, immigration controls and worker and unemployment compensation, where the failure to comply would constitute a Material Adverse Change. There are no outstanding grievances, arbitration awards or appeals therefrom arising out of the Labor Contracts or current or threatened strikes, picketing, handbilling or other work stoppages or slowdowns at facilities of any Loan Party which in any case would constitute a Material Adverse Change. Borrower has delivered to Agent true and correct copies of each Labor Contract.

        6.1.25    <u>Environmental Matters</u>.

        Except as disclosed on <u>Schedule 6.1.25</u>:

        (a)    No Loan Party has received any Environmental Complaint, whether directed or issued to any Loan Party or relating or pertaining to any prior owner, operator or occupant of the Property, and has no reason to believe that it might receive an Environmental Complaint.

        (b)    No activity of any Loan Party at the Property is being or has been conducted in violation of any Environmental Law or Required Environmental Permit and to the knowledge of any Loan Party no activity of any prior owner, operator or occupant of the Property was conducted in violation of any Environmental Law.

        (c)    There are no Regulated Substances present on, in, under, or emanating from, or to any Loan Party's knowledge emanating to, the Property or any portion thereof which result in Contamination.

        (d)    Each Loan Party has all Required Environmental Permits and all such Required Environmental Permits are in full force and effect.

        (e)    Each Loan Party has submitted to an Official Body and/or maintains, as appropriate, all Required Environmental Notices.

        (f)    No structures, improvements, equipment, fixtures, impoundments, pits, lagoons or aboveground or underground storage tanks located on the Property contain or use, except in compliance with Environmental Laws and Required Environmental Permits, Regulated Substances or otherwise are operated or maintained except in compliance with Environmental Laws and Required Environmental Permits. To the knowledge of each Loan Party, no structures, improvements, equipment, fixtures, impoundments, pits, lagoons or aboveground or underground storage tanks of prior owners, operators or occupants of the Property contained or used, except in compliance with Environmental Laws, Regulated Substances or otherwise were operated or maintained by any such prior owner, operator or occupant except in compliance with Environmental Laws.

        (g)    To the knowledge of each Loan Party, no facility or site to which any Loan Party, either directly or indirectly by a third party, has sent Regulated Substances for storage, treatment, disposal or other management has been or is being operated in violation of Environmental Laws or pursuant to Environmental Laws is identified or proposed to be identified

on any list of contaminated properties or other properties which pursuant to Environmental Laws are the subject of an investigation, cleanup, removal, remediation or other response action by an Official Body.

(h)    No portion of the Property is identified or to the knowledge of any Loan Party proposed to be identified on any list of contaminated properties or other properties which pursuant to Environmental Laws are the subject of an investigation or remediation action by an Official Body, nor to the knowledge of any Loan Party is any property adjoining or in the proximity of the Property identified or proposed to be identified on any such list.

(i)    No portion of the Property constitutes an Environmentally Sensitive Area.

(j)    No lien or other encumbrance authorized by Environmental Laws exists against the Property and no Loan Party has any reason to believe that such a lien or encumbrance may be imposed.

6.1.26    <u>Security Alarm Contracts.</u>

All of the Security Alarm Contracts are valid, enforceable and in full force and effect in accordance with their terms (except to the extent any lack of such validity, binding effect or enforceability may be the result of bankruptcy, insolvency, moratorium, and other similar laws affecting the enforceability of creditors' rights generally and by general principles of equity, whether considered in a proceeding at law or in equity), are assignable to Agent without obtaining the consent of or providing notice to any customer or other Person, and contain terms and conditions which are standard within the electronic security industry, including those involving limitation of liability/liquidated damages, third-party indemnification, automatic renewals and the right to increase customer rates. Upon demand of Agent after the occurrence of an Event of Default, Loan Parties shall deliver the originals of all of the Security Alarm Contract Documents, but Loan Parties may retain copies. Without limiting the foregoing, to the best of the Loan Parties' knowledge, their business and all equipment used in connection with it, are now being utilized, operated and maintained in conformity with the Security Alarm Contracts. No Loan Party has in any manner at any time failed to so utilize, operate and maintain its business in a manner that could now or hereafter result in cancellation or termination of any of the Security Alarm Contracts, or in liability for damages under any of the Security Alarm Contracts nor has any Loan Party defaulted in its obligations pursuant to any of the Security Alarm Contracts, which default could result in the cancellation of any Security Alarm Contract or adversely affect the rights of any Loan Party under that Security Alarm Contract. No Loan Party is a party to any franchise, license, distributor or other similar type of agreement. All of Loan Parties' predecessors under Security Alarm Contracts acquired by Loan Parties are governed by noncompetition or nonsolicitation agreements which have at least two (2) years remaining on them and are assignable to Agent. Loan Parties may terminate any agreement providing for the monitoring of any of its customers by any third party on not more than thirty (30) days' notice. No person has any right to acquire any Loan Party's accounts. No Loan Party has sold or otherwise made its existing customer lists available to any third party other than Coastal Security Systems, Inc., Monitronics International, Inc., Criticom International Corporation, SAFE Financial LLC and General Electric Capital Corporation. While Loan Parties do not have stand

alone leases with their customers for the Alarm Systems that generate lease RMR, Loan Parties
do retain title to the Alarm Systems for the initial term of the Security Alarm Contract. Loan
Parties offer an extended repair service program to all of their customers at an average rate of
approximately $5.50. The Security Alarm Contracts for such customers separate the charge for
the extended repair service program from the charge for monitoring, but such charges are
combined in the customer invoices. Customers are not permitted to cancel the extended repair
service portion of their Security Alarm Contract. Over 80% of Loan Parties' customers pay their
RMR invoices by credit card, automated clearing house or other electronic funds transfers.

### 6.1.27    Alarm Systems.

All of the Alarm Systems installed by Loan Parties, or by sellers under
contracts acquired by Loan Parties, are in good working order and condition (ordinary wear and
tear, routine service needs, customer misuse, failure of a customer to report to Loan Parties any
problem with an Alarm System known to the customer and customer non-use excepted), and
have been installed and maintained in accordance with good and workmanlike practices
prevailing in the security alarm industry at the time of installation in accordance with the
specifications or standards appropriate for their business and all governmental authorities. All
such Alarm Systems conform in all material respects to the contracts pursuant to which they were
installed and in no case has an installation been made by any Loan Party (or to the best of Loan
Parties' knowledge, any predecessor of any Loan Party) which at the time of installation was in
material violation of any applicable Law. To the extent freely assignable, all manufacturer's
warranties applicable to such Alarm Systems are hereby assigned to Agent to secure the
Obligations. No Loan Party is aware of any material difficulty in obtaining replacement parts for
its product lines or installed Alarm Systems.

### 6.1.28    Telephone Numbers.

Except as disclosed on Schedule 6.1.28, Loan Parties have the exclusive
contractual right to use all of the telephone lines and numbers applicable to Loan Parties'
accounts and can convert all such lines and numbers to communicate with another central station
by means of a line switch. Schedule A to the Collateral Assignment of Telephone Numbers sets
forth a list of all of the telephone numbers used in connection with the operation of Loan Parties'
business which Loan Parties shall assign to Agent pursuant to such Collateral Assignment of
Telephone Numbers. To Loan Parties' knowledge, there are no pending plans by any telephone
company to change the dialing procedures or exchange numbers within the areas servicing Loan
Parties' customers such that Loan Parties would need to reprogram their customer's digital
dialers.

### 6.1.29    Account Sales.

Schedule 6.1.29 sets forth a true, correct and complete description of all
sales of 100 or more accounts that Loan Parties have completed since December 1, 2003
detailing the amount of RMR sold, the number of accounts sold, the sales price, the holdback
amount and period, the details of any account guaranty (including whether there is a cushion
and/or a cap), the buyer, the terms of any noncompetition provisions.

### 6.1.30    Seasonal Customers.

Loan Parties have no seasonal customers.

### 6.1.31    Alarm Licenses.

No alarm license of any Loan Party has been suspended for more than sixty (60) days and, to Loan Parties' knowledge, there are no unresolved complaints or indictments by any state bureau of consumer affairs or attorney general.

## 6.2    Updates to Schedules.

Should any of the information or disclosures provided on any of the Schedules become outdated or incorrect in any material respect, Borrower shall promptly provide Agent in writing with such revisions or updates to such Schedule as may be necessary or appropriate to update or correct same; provided, however, that no Schedule shall be deemed to have been amended, modified or superseded by any such correction or update, nor shall any breach of warranty or representation resulting from the inaccuracy or incompleteness of any such Schedule be deemed to have been cured thereby, unless and until Required Lenders, in their sole and absolute discretion, shall have accepted in writing such revisions or updates to such Schedule.

## 7.    CONDITIONS OF LENDING

The obligation of each Lender to make Loans hereunder is subject to the performance by each Loan Party of its Obligations to be performed hereunder at or prior to the making of any such Loans and to the satisfaction of the following further conditions:

## 7.1    First Loans.

On the Closing Date:

### 7.1.1    Officer's Certificate.

The representations and warranties of each Loan Party contained in Section 6 [Representations and Warranties] and in each of the other Loan Documents shall be true and accurate on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein), and each Loan Party shall have performed and complied with all covenants and conditions hereof and thereof, no Event of Default or Potential Default shall have occurred and be continuing or shall exist; and there shall be delivered to Agent for the benefit of each Lender a certificate of each Loan Party, dated the Closing Date and signed by the Chief Executive Officer, President or Chief Financial Officer of each Loan Party, to each such effect.

7.1.2     Secretary's Certificate.

There shall be delivered to Agent for the benefit of each Lender a certificate dated as of the Closing Date and signed by the Secretary or an Assistant Secretary of each Loan Party, certifying as appropriate as to:

(a)     all action taken by each Loan Party in connection with the Loan Documents;

(b)     the names of the officers authorized to sign the Loan Documents and the true signatures of such officers and specifying the Authorized Officers permitted to act on behalf of each Loan Party for purposes of the Loan Documents and the true signatures of such officers, on which Agent and each Lender may conclusively rely; and

(c)     copies of its organizational documents, including its certificate of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate of formation, and limited liability company agreement as in effect on the Closing Date certified by the appropriate state official where such documents are filed in a state office together with recent certificates from the appropriate state officials as to the continued existence and good standing of each Loan Party in each state where organized or qualified to do business.

7.1.3     Delivery of Loan Documents.

The Collateral Assignment of Contracts, Collateral Assignments of Telephone Numbers, Assignment and Modification Agreements, Pledge Agreement, Security Agreement, the Subordination Agreement, and all other Loan Documents shall have been duly executed and delivered to Agent for the benefit of Lenders, together with all appropriate financing statements and appropriate stock powers and certificates evidencing the Shares.

7.1.4     Opinion of Counsel.

There shall be delivered to Agent for the benefit of each Lender a written opinion of Mitchell Silberberg & Knupp LLP, counsel for Loan Parties, dated as of the Closing Date and in form and substance satisfactory to Agent and its counsel:

(a)     as to the matters set forth in Exhibit 7.1.4; and

(b)     as to such other matters incident to the transactions contemplated herein as Agent may reasonably request.

7.1.5     Legal Details.

All legal details and proceedings in connection with the transactions contemplated by the Loan Documents shall be in form and substance satisfactory to Agent and counsel for Agent, and Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to Agent and said counsel, as Agent or said counsel may reasonably request.

- 52 -

7.1.6    <u>Payment of Fees.</u>

Borrower shall have paid or caused to be paid to Agent for itself and for the account of Lenders to the extent not previously paid the Facility Fees, all other commitment and other fees accrued through the Closing Date and the costs and expenses for which Agent and Lenders are entitled to be reimbursed.

7.1.7    <u>Background Checks.</u>

Lenders shall be satisfied in their sole discretion with the results of Agent's background investigations of Peter Maltby, Patrick Smith, and Douglas Schultz.

7.1.8    <u>Average Eligible RMR.</u>

Borrower's average Eligible RMR for the last three months of 2004 shall have exceeded $1,000,000.

7.1.9    <u>Consents.</u>

All material consents required to effectuate the transactions contemplated hereby as set forth on <u>Schedule 6.1.13</u> shall have been obtained.

7.1.10    <u>Officer's Certificate Regarding No Material Adverse Changes.</u>

Since December 31, 2003, no Material Adverse Change shall have occurred; prior to the Closing Date, there shall have been no material change in the management of any Loan Party; and there shall have been delivered to Agent for the benefit of each Lender a certificate dated as of the Closing Date and signed by the Chief Executive Officer, President or Chief Financial Officer of each Loan Party to each such effect.

7.1.11    <u>No Violation of Laws.</u>

The making of the Loans shall not contravene any Law applicable to any Loan Party or any Lender.

7.1.12    <u>No Actions or Proceedings.</u>

No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or proposed before any Official Body to enjoin, restrain or prohibit, or to obtain damages in respect of, the Loan Documents  or the consummation of the transactions contemplated hereby or thereby or which, in Agent's sole discretion, would make it inadvisable to consummate the transactions contemplated by the Loan Documents.

7.1.13    <u>Insurance Policies; Certificates of Insurance; Endorsements.</u>

Loan Parties shall have delivered evidence acceptable to Agent that adequate insurance in compliance with Section 8.1.3 [Maintenance of Insurance] is in full force and effect and that all premiums then due thereon have been paid, together with a certified copy of each Loan Party's casualty insurance policy or policies evidencing coverage satisfactory to

Agent, with additional insured, mortgagee and lender loss payable special endorsements attached thereto in form and substance satisfactory to Agent and its counsel naming Agent as additional insured, mortgagee and lender loss payee.  Loan Parties shall have delivered a copy of the life insurance policy on Peter Maltby in the amount of $3,000,000, together with a fully-executed collateral assignment of such life insurance policy, in form and substance satisfactory to Agent.

7.1.14    [Intentionally Omitted].

7.1.15    Filing Receipts.

Agent shall have received:  (a) copies of all filing receipts and acknowledgments issued by any governmental authority to evidence any recordation or filing necessary to perfect the Lien of Lenders on the Collateral or other satisfactory evidence of such recordation and filing and (b) evidence in a form acceptable to Agent that such Lien constitutes a Prior Security Interest in favor of Lenders.

7.1.16    Landlord's Waiver.

Loan Parties shall have delivered an executed Landlord's Waiver in substantially the form of Exhibit 7.1.16 from the lessor for the location of Borrower's headquarters.

7.1.17    [Intentionally Omitted].

7.1.18    Subordinated Debt Documents.

The Borrower shall have delivered to Agent a copy of the executed Subordinated Debt Documents and any amendments, supplements, schedules and exhibits thereto, the terms and conditions of which shall be satisfactory to Agent in all respects.

7.1.19    Due Diligence.

Agent shall have completed its due diligence review of all aspects of Borrower, and such review shall be satisfactory to Agent in its reasonable discretion. Without limiting the foregoing, Agent shall have received on or before the Closing Date lien searches demonstrating the absence of Liens on any Loan Party's properties and assets other than Permitted Liens or Liens satisfied as of the Closing Date to the satisfaction of Agent.

7.1.20    Account Control Agreements.

Loan Parties shall have delivered to Agent account control agreements with respect to all bank accounts of Loan Parties in form and substance satisfactory to Agent in its reasonable discretion, executed by Loan Parties and each respective bank.

7.1.21    Closing Date Compliance Certificate.

Borrower shall have delivered to Agent a certificate (the "Closing Date Compliance Certificate") of Borrower, dated as of the Closing Date, signed by the Chief

Executive Officer, President or Chief Financial Officer, substantially in the form of <u>Exhibit 8.3.4</u>, together with supporting accounting and financial information satisfactory to Agent.

      7.2    <u>Each Additional Loan.</u>

      At the time of making any Loans other than Loans made on the Closing Date and after giving effect to the proposed extensions of credit: the representations and warranties of Loan Parties contained in Section 6 [Representations and Warranties] and in the other Loan Documents shall be true on and as of the date of such additional Loan with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which expressly relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein) and Loan Parties shall have performed and complied with all covenants and conditions hereof; no Event of Default or Potential Default shall have occurred and be continuing or shall exist; the making of the Loans shall not contravene any Law applicable to any Loan Party or any Lender; and Borrower shall have delivered to Agent a duly executed and completed Loan Request.

## 8.  COVENANTS

      8.1    <u>Affirmative Covenants.</u>

      Loan Parties, jointly and severally, covenant and agree that until indefeasible payment in full of the Loans and interest thereon, satisfaction of all of Loan Parties' other Obligations under the Loan Documents and termination of the Commitments, Loan Parties shall comply at all times with the following affirmative covenants:

      8.1.1    <u>Preservation of Existence, Etc.</u>

      Each Loan Party shall maintain its legal existence as a corporation, limited partnership or limited liability company and its license or qualification and good standing in each jurisdiction in which its ownership or lease of property or the nature of its business makes such license or qualification necessary, except as otherwise expressly permitted in Section 8.2.6 [Liquidations, Mergers, Etc.].

      8.1.2    <u>Payment of Liabilities, Including Taxes, Etc.</u>

      Each Loan Party shall duly pay, discharge, or otherwise satisfy all liabilities to which it is subject or which are asserted against it, promptly as and when the same shall become due and payable, including all taxes, assessments and governmental charges upon it or any of its properties, assets, income or profits, prior to the date on which penalties attach thereto, except to the extent that such liabilities, including taxes, assessments or charges, are being contested in good faith and by appropriate and lawful proceedings diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by GAAP shall have been made, but only to the extent that failure to discharge any such liabilities would not result in any additional liability which would adversely affect to a material extent the financial condition of any Loan Party or which would affect the Collateral, <u>provided</u> that Loan Parties will

pay all such liabilities forthwith upon the commencement of proceedings to foreclose any Lien which may have attached as security therefor.

### 8.1.3    Maintenance of Insurance.

Each Loan Party shall insure its properties and assets against loss or damage by fire and such other insurable hazards as such assets are commonly insured (including fire, extended coverage, property damage, workers' compensation, public liability and business interruption insurance) and against other risks (including errors and omissions) in such amounts as similar properties and assets are insured by prudent companies in similar circumstances carrying on similar businesses, and with reputable and financially sound insurers, including self-insurance to the extent customary, all as reasonably determined by Agent.  At the request of Agent, Loan Parties shall deliver to Agent and each Lender:  (a) on the Closing Date and annually thereafter an original certificate of insurance signed by Loan Parties' independent insurance broker describing and certifying as to the existence of the insurance on the Collateral required to be maintained by the Loan Documents, together with a copy of the endorsement described in the next sentence attached to such certificate and (b) from time to time a summary schedule indicating all insurance then in force with respect to each Loan Party.  Such policies of insurance shall contain special endorsements, in form and substance acceptable to Agent, which shall:  (i) specify Agent as an additional insured, mortgagee and lender loss payee as its interests may appear, with the understanding that any obligation imposed upon the insured (including the liability to pay premiums) shall be the sole obligation of the applicable Loan Parties and not that of the insured, (ii) provide that the interest of Lenders shall be insured regardless of any breach or violation by the applicable Loan Parties of any warranties, declarations or conditions contained in such policies or any action or inaction of the applicable Loan Parties or others insured under such policies, (iii) provide a waiver of any right of the insurers to set off or counterclaim or any other deduction, whether by attachment or otherwise, (iv) provide that any and all rights of subrogation which the insurers may have or acquire shall be, at all times and in all respects, junior and subordinate to the prior payment in full of the Indebtedness hereunder and that no insurer shall exercise or assert any right of subrogation until such time as the Indebtedness hereunder has been indefeasibly paid in full and the Commitments have terminated, (v) provide, except in the case of public liability insurance and workmen's compensation insurance, that all insurance proceeds for losses of less than $250,000 shall be adjusted with and payable to the applicable Loan Parties and that all insurance proceeds for losses of $250,000 or more shall be adjusted with and payable to Agent, (vi) include effective waivers by the insurer of all claims for insurance premiums against Agent, (vii) provide that no cancellation of such policies for any reason (including non-payment of premium) nor any change therein shall be effective until at least thirty (30) days after receipt by Agent of written notice of such cancellation or change, (viii) be primary without right of contribution of any other insurance carried by or on behalf of any additional insureds with respect to their respective interests in the Collateral, and (ix) provide that inasmuch as the policy covers more than one insured, all terms, conditions, insuring agreements and endorsements (except limits of liability) shall operate as if there were a separate policy covering each insured.  The applicable Loan Parties shall notify Agent promptly of any occurrence causing a material loss or decline in value of the Collateral and the estimated (or actual, if available) amount of such loss or decline.  Any monies received by Agent constituting insurance proceeds or condemnation proceeds may, at the option of Agent, (A) be applied by Agent to the payment of the Loans in such manner as Agent may reasonably determine, or (B) be disbursed to the applicable Loan

Parties on such terms as are deemed appropriate by Agent for the repair, restoration and/or replacement of property in respect of which such proceeds were received.

8.1.4     Maintenance of Properties and Leases.

Each Loan Party shall maintain in good repair, working order and condition (ordinary wear and tear excepted) in accordance with the general practice of other businesses of similar character and size, all of those properties useful or necessary to its business, and from time to time, such Loan Party will make or cause to be made all appropriate repairs, renewals or replacements thereof.

8.1.5     Maintenance of Patents, Trademarks, Etc.

Each Loan Party shall maintain in full force and effect all patents, trademarks, service marks, trade names, copyrights, licenses, franchises, permits and other authorizations necessary for the ownership and operation of its properties and business if the failure so to maintain the same would constitute a Material Adverse Change.

8.1.6     Visitation Rights.

Each Loan Party shall permit any of the officers or authorized employees or representatives of Agent or any Lender to visit and inspect any of its properties and to examine and make excerpts from its books and records and discuss its business affairs, finances and accounts with its officers, all in such detail and at such times and as often as any Lender may reasonably request, provided that each Lender shall provide Borrower and Agent with reasonable notice prior to any visit or inspection. In the event any Lender desires to conduct an audit of any Loan Party, it is hereby agreed that such audit shall be performed by Agent or its officers, authorized employees or representatives. Agent in its sole discretion may have any of the officers or authorized employees or representatives of Agent conduct, at Borrower's expense, (a) up to two times annually field audits of Loan Parties' business, property, and locations, and (b) up to one time annually an appraisal of the Collateral; provided, however, such limitation regarding the frequency of such audits and appraisals shall not apply if an Event of Default has occurred and is continuing.

8.1.7     Keeping of Records and Books of Account.

Each Loan Party shall maintain and keep proper books of record and account which enable Loan Parties to issue financial statements in accordance with GAAP and as otherwise required by applicable Laws of any Official Body having jurisdiction over Loan Parties, and in which full, true and correct entries shall be made in all material respects of all its dealings and business and financial affairs.

8.1.8     Plans and Benefit Arrangements.

Borrower shall, and shall cause each other member of the ERISA Group to, comply with ERISA, the Internal Revenue Code and other applicable Laws applicable to Plans and Benefit Arrangements except where such failure, alone or in conjunction with any other failure, would not result in a Material Adverse Change. Without limiting the generality of

- 57 -

the foregoing, Borrower shall cause all of its Plans and all Plans maintained by any member of the ERISA Group to be funded in accordance with the minimum funding requirements of ERISA and shall make, and cause each member of the ERISA Group to make, in a timely manner, all contributions due to Plans, Benefit Arrangements and Multiemployer Plans.

8.1.9    Compliance with Laws.

Each Loan Party shall comply with all applicable Laws, including all Environmental Laws, in all respects, provided that it shall not be deemed to be a violation of this Section 8.1.9 if any failure to comply with any Law would not result in fines, penalties, remediation costs, other similar liabilities or injunctive relief which in the aggregate would constitute a Material Adverse Change.

8.1.10    Use of Proceeds.

Loan Parties will use the proceeds of the Loans only for:  (a) general corporate purposes and for working capital, (b) to finance Permitted Acquisitions, or (c) to repay and terminate all Indebtedness outstanding under that certain amended and restated loan agreement dated as of December 30, 2002, among Borrower, SAFE Financial LLC, and General Electric Capital Corporation.  Loan Parties shall not use the proceeds of the Loans for any purposes which contravenes any applicable Law or any provision hereof.

8.1.11    Further Assurances.

Each Loan Party shall, from time to time, at its expense, faithfully preserve and protect Agent's Lien on and Prior Security Interest in the Collateral as a continuing first priority perfected Lien, subject only to Permitted Liens, and shall do such other acts and things as Agent in its sole discretion may deem necessary or advisable from time to time in order to preserve, perfect and protect the Liens granted under the Loan Documents and to exercise and enforce Agent's rights and remedies thereunder with respect to the Collateral.

8.1.12    Subordination of Intercompany Loans.

Each Loan Party shall cause any intercompany Indebtedness, loans or advances owed by any Loan Party to any other Loan Party to be subordinated pursuant to the terms of a customary intercompany subordination agreement to be executed and delivered to Agent at the date any Subsidiary becomes a Loan Party hereunder.

8.1.13    Anti-Terrorism Laws.

Loan Parties and their respective Affiliates and agents shall not:  (a) conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, (b) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224; or (c) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law.  Loan Parties shall deliver to

- 58 -

Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming Loan Parties' compliance with this Section 8.1.13.

8.1.14    Account Control Agreements.

Each Loan Party shall maintain at all times a valid and enforceable account control agreement with respect to each bank account of such Loan Party, in form and substance satisfactory to Agent in its reasonable discretion.

8.1.15    Trade Payables.

Each Loan Party shall cause its trade payables and accrued expenses incurred in the ordinary course of business to be kept current with respect to payments due.

8.1.16    Storage of Security Alarm Contract Documents.

Loan Parties shall cause all Security Alarm Contract Documents to be filed and stored in one designated file room or an off-site facility approved by Agent in its reasonable discretion, to which access is restricted exclusively to the file room clerk and members of senior management. Agent may, in its sole discretion and regardless of whether an Event of Default has occurred and is continuing, require Borrower to cause all Security Alarm Contract Documents to be delivered to Agent or such other custodian as Agent may select in its sole discretion.

8.1.17    Landlords' Waivers.

Loan Parties shall use commercially reasonable efforts to deliver to Agent an executed Landlord's Waiver in substantially the form of Exhibit 7.1.16 from the lessor for each leased Collateral location, as listed on Schedule A to the Security Agreement, as soon as practicable but not later than 90 days following the Closing Date. In the event that the location of Borrower's headquarters or location of the maintenance of the Security Alarm Contract Documents changes, Loan Parties shall deliver to Agent an executed Landlord's Waiver in substantially the form of Exhibit 7.1.16 from the lessor for such new location not later than the date of Borrower's move to such new location. In the event Loan Parties acquire any additional leased Collateral locations, Loan Parties shall use commercially reasonable efforts to deliver to Agent an executed Landlord's Waiver in substantially the form of Exhibit 7.1.16 from the lessor for each such leased Collateral location at the time each related lease is executed.

8.2    Negative Covenants.

Loan Parties, jointly and severally, covenant and agree that until indefeasible payment in full of the Loans, and interest thereon, satisfaction of all of Loan Parties' other Obligations hereunder and termination of the Commitments, they shall comply with the following negative covenants:

8.2.1    Indebtedness.

No Loan Party shall, at any time create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness under the Loan Documents;

(b)     Existing Indebtedness as set forth on Schedule 8.2.1 (including any extensions or renewals thereof, provided there is no increase in the amount thereof or other significant change in the terms thereof unless otherwise specified on Schedule 8.2.1;

(c)     Capitalized and operating leases as and to the extent permitted under Section 8.2.15 [Capital Expenditures and Leases];

(d)     Indebtedness secured by Purchase Money Security Interests not exceeding $50,000 in the aggregate;

(e)     Indebtedness related to open account trade debt owed to Ademco incurred in the ordinary course of business, the balance due of which is not more than 90 days past the invoice date;

(f)     Indebtedness of a Loan Party to another Loan Party which is subordinated in accordance with the provisions of Section 8.1.12 [Subordination of Intercompany Loans]; and

(g)     Indebtedness evidenced by the Subordinated Debt Documents, together with any extensions, modifications, or amendments thereto or replacements and substitutions therefor.

8.2.2     Liens.

No Loan Party shall, at any time create, incur, assume or suffer to exist any Lien on any of its property or assets, tangible or intangible, now owned or hereafter acquired, or agree or become liable to do so, except Permitted Liens.  No Loan Party shall, directly or indirectly, enter into any agreement with any Person other than Agent or Lenders pursuant to a Loan Document which prohibits or limits the ability of any Loan Party to create, incur, assume, . or suffer to exist any Lien upon any of its property, assets, or revenues, whether now owned or hereafter acquired.

8.2.3     Guaranties.

No Loan Party shall, at any time, directly or indirectly, become or be liable in respect of any Guaranty, or assume, guarantee, become surety for, endorse or otherwise agree, become or remain directly or contingently liable upon or with respect to any obligation or liability of any other Person, except for Guaranties of Indebtedness of Loan Parties permitted hereunder; provided however that this provision shall not apply to account guaranties that are customary in the security alarm industry for the sale of assets.

8.2.4     Loans and Investments.

No Loan Party shall, at any time make or suffer to remain outstanding any loan or advance to, or purchase, acquire or own any stock, bonds, notes or securities of, or any partnership interest (whether general or limited) or limited liability company interest in, or any

- 60 -

other investment or interest in, or make any capital contribution to, any other Person, or agree, become or remain liable to do any of the foregoing, except:

        (a)     trade credit extended on usual and customary terms in the ordinary course of business;

        (b)     advances to employees to meet expenses incurred by such employees in the ordinary course of business;

        (c)     Permitted Investments; and

        (d)     loans, advances and investments in other Loan Parties.

### 8.2.5    Dividends and Related Distributions.

No Loan Party shall, make or pay, or agree to become or remain liable to make or pay, any dividend or other distribution of any nature (whether in cash, property, securities or otherwise) on account of or in respect of its shares of capital stock, partnership interests or limited liability company interests on account of the purchase, redemption, retirement or acquisition of its shares of capital stock (or warrants, options or rights therefor), partnership interests or limited liability company interests, except dividends or other distributions payable to another Loan Party and S Corporation Tax Distributions, so long as no Potential Default or Event of Default exists or would result therefrom.

### 8.2.6    Liquidations, Mergers, Consolidations, Acquisitions.

No Loan Party shall, dissolve, liquidate or wind-up its affairs, or become a party to any merger or consolidation, or acquire by purchase, lease or otherwise all or substantially all of the assets or capital stock of any other Person, provided that

        (a)     any Loan Party other than Borrower may consolidate or merge into another Loan Party which is wholly-owned by one or more of the other Loan Parties, and

        (b)     any Loan Party may acquire, whether by purchase or by merger, (i) all of the ownership interests of another Person , (ii) substantially all of assets of another Person or of a business or division of another Person, or (iii) a bulk purchase of Security Alarm Contracts not purchased pursuant to clause (c) below (each a "Permitted Acquisition"), provided that each of the following requirements is met:

        (A)     if Loan Parties are acquiring the ownership interests in such Person, such Person shall execute a Guarantor Joinder and join this Agreement as a Guarantor pursuant to Section 11.18 [Joinder of Guarantors] on or before the date of such Permitted Acquisition;

        (B)     Loan Parties, such Person and its owners, as applicable, shall grant Liens in the assets of or acquired from and stock or other ownership interests in such Person and otherwise comply with Section 11.18 [Joinder of Guarantors] on or before the date of such Permitted Acquisition;

(C)      the board of directors or other equivalent governing body of such Person shall have approved such Permitted Acquisition and, if Loan Parties use any portion of the Loans to fund such Permitted Acquisition, Loan Parties also shall have delivered to Lenders written evidence of the approval of the board of directors (or equivalent body) of such Person for such Permitted Acquisition;

(D)      the business acquired, or the business conducted by the Person whose ownership interests are being acquired, as applicable, shall be substantially the same as one or more line or lines of business conducted by Loan Parties and shall comply with Section 8.2.10 [Continuation of or Change in Business];

(E)      no Potential Default or Event of Default shall exist immediately prior to or after giving effect to such Permitted Acquisition;

(F)      Loan Parties shall demonstrate that they shall be in compliance with the covenants contained in Section 8.2.15 [Capital Expenditures and Leases], Section 8.2.16 [Minimum Fixed Charge Coverage Ratio], Section 8.2.17 [Maximum Funded Debt], Section 8.2.18 [Maximum Senior Debt], Section 8.2.19 [Minimum Liquidity], Section 8.2.20 [Maximum Attrition Rate], and Section 8.2.21 [Maximum Creation Multiple] after giving effect to such Permitted Acquisition (including in such computation Indebtedness or other liabilities assumed or incurred in connection with such Permitted Acquisition, but excluding income earned or expenses incurred by the Person, business or assets to be acquired prior to the date of such Permitted Acquisition) by delivering at least five (5) Business Days prior to such Permitted Acquisition a certificate in the form of Exhibit 8.2.6 evidencing such compliance;

(G)      the Consideration paid by Loan Parties for all Permitted Acquisitions made during the current fiscal year of Loan Parties shall not exceed $200,000 and the aggregate of the Consideration paid by Loan Parties for such Permitted Acquisition and all other Permitted Acquisitions made between the Closing Date and the date of such Permitted Acquisition shall not exceed $500,000; and

(H)      Loan Parties shall deliver to Agent at least five (5) Business Days before such Permitted Acquisition copies of any agreements entered into or proposed to be entered into by such Loan Parties in connection with such Permitted Acquisition and shall deliver to Agent such other information about such Person or its assets as any Lender may reasonably require; and

(c)      subject to Section 8.2.24 [Dealer Programs], any Loan Party may acquire customer accounts through a Dealer Program.

8.2.7      Dispositions of Assets or Subsidiaries.

No Loan Party shall sell, convey, assign, lease, abandon or otherwise transfer or dispose of, voluntarily or involuntarily, any of its properties or assets, tangible or intangible (including sale, assignment, discount or other disposition of accounts, contract rights, chattel paper, equipment or general intangibles with or without recourse or of capital stock, shares of beneficial interest, partnership interests or limited liability company interests of such Loan Party), except:

(a)    transactions involving the sale of inventory in the ordinary course of business;

(b)    any sale, transfer or lease of assets in the ordinary course of business which are no longer necessary or required in the conduct of such Loan Party's business;

(c)    any sale, transfer or lease of assets by any wholly-owned Subsidiary of such Loan Party to another Loan Party;

(d)    any sale, transfer or lease of assets in the ordinary course of business which are replaced by substitute assets acquired or leased within the parameters of Section 8.2.15 [Capital Expenditures and Leases], provided such substitute assets are subject to Lenders' Prior Security Interest;

(e)    any sale, transfer or lease of assets, other than those specifically excepted pursuant to clauses (a) through (d) above, for which the proceeds (as reasonably estimated by Borrower) are not anticipated to exceed $100,000 and which is approved by Required Lenders so long as such proceeds are applied as a mandatory prepayment of the Revolving Credit Loans in accordance with the provisions of Section 5.5.2(a) [Sale of Assets]; or

(f)    any sale, transfer or lease of assets, other than those specifically excepted pursuant to clauses (a) through (e) above, for which the proceeds (as reasonably estimated by Borrower) are anticipated to exceed $100,000 and which is approved by Required Lenders, so long as such proceeds are applied as a mandatory prepayment of the Term Loans and a reduction in the Revolving Credit Commitment in accordance with the provisions of Section 5.5.2(b) [Sale of Assets].

8.2.8    Affiliate Transactions.

No Loan Party shall, enter into or carry out any transaction (including purchasing property or services from or selling property or services to any Affiliate of any Loan Party or other Person) unless such transaction is not otherwise prohibited by this Agreement, is entered into in the ordinary course of business upon fair and reasonable arm's-length terms and conditions which are fully disclosed to Agent and is in accordance with all applicable Law.

8.2.9    Subsidiaries, Partnerships and Joint Ventures.

No Loan Party shall own or create directly or indirectly any Subsidiaries other than:  (a) any Subsidiary which has joined this Agreement as Guarantor on the Closing Date; and (b) any Subsidiary formed after the Closing Date which joins this Agreement as a Guarantor pursuant to Section 11.18 [Joinder of Guarantors], provided that Required Lenders shall have consented to such formation and joinder and that such Subsidiary and Loan Parties, as applicable, shall grant and cause to be perfected first priority Liens to Agent for the benefit of Lenders in the assets held by, and stock of or other ownership interests in, such Subsidiary.  No Loan Party shall become or agree to:  (i) become a general or limited partner in any general or limited partnership, except that Loan Parties may be general or limited partners in other Loan Parties, (ii) become a member or manager of, or hold a limited liability company interest in, a limited liability company, except that Loan Parties may be members or managers of, or hold

limited liability company interests in, other Loan Parties, or (iii) become a joint venturer or hold a joint venture interest in any joint venture.

8.2.10    Continuation of or Change in Business.

No Loan Party shall engage in any business other than the security alarm business, substantially as conducted and operated by such Loan Party during the present fiscal year, and such Loan Party shall not permit any material change in such business.

8.2.11    Plans and Benefit Arrangements.

No Loan Party shall:

(a)    fail to satisfy the minimum funding requirements of ERISA and the Internal Revenue Code with respect to any Plan;

(b)    request a minimum funding waiver from the Internal Revenue Service with respect to any Plan;

(c)    engage in a Prohibited Transaction with any Plan, Benefit Arrangement or Multiemployer Plan which, alone or in conjunction with any other circumstances or set of circumstances resulting in liability under ERISA, would constitute a Material Adverse Change;

(d)    permit the aggregate actuarial present value of all benefit liabilities (whether or not vested) under each Plan, determined on a plan termination basis, as disclosed in the most recent actuarial report completed with respect to such Plan, to exceed, as of any actuarial valuation date, the fair market value of the assets of such Plan;

(e)    fail to make when due any contribution to any Multiemployer Plan that any member of the ERISA Group may be required to make under any agreement relating to such Multiemployer Plan, or any Law pertaining thereto;

(f)    withdraw (completely or partially) from any Multiemployer Plan or withdraw (or be deemed under Section 4062(e) of ERISA to withdraw) from any Multiple Employer Plan, where any such withdrawal is likely to result in a material liability of any member of the ERISA Group;

(g)    terminate, or institute proceedings to terminate, any Plan, where such termination is likely to result in a material liability to any member of the ERISA Group;

(h)    make any amendment to any Plan with respect to which security is required under Section 307 of ERISA; or

(i)    fail to give any and all notices and make all disclosures and governmental filings required under ERISA or the Internal Revenue Code, where such failure is likely to result in a Material Adverse Change.

8.2.12    Fiscal Year.

No Loan Party shall change its fiscal year from the twelve-month period beginning January 1st and ending December 31st.

8.2.13    Issuance of Stock.

No Loan Party shall issue any additional shares of its capital stock or any options, warrants or other rights in respect thereof, except for those warrants and other rights issued to Subordinated Creditor as described in the Subordinated Debt Documents and the other warrants described on Schedule 6.1.2.  Upon any issuance of capital stock of any Loan Party, Loan Parties shall immediately cause the holders of such stock to execute such documents and take such actions reasonably required by Agent in order to grant and perfect Prior Security Interests in such stock to Agent for the benefit of Lenders.

8.2.14    Changes in Documents.

(a)    No Loan Party shall amend in any respect its certificate of incorporation (including any provisions or resolutions relating to capital stock), by-laws, certificate of limited partnership, partnership agreement, certificate of formation, limited liability company agreement or other organizational documents without providing at least fifteen (15) days' prior written notice to Agent and Lenders and, in the event such change would be adverse to Lenders, as determined by Agent in its sole discretion, obtaining the prior written consent of Required Lenders.

(b)    Except as may be otherwise permitted under the Subordination Agreement, Loan Parties shall not enter into any renewal, replacement, or refinancing of nor any amendment or modification to or waiver or consent under (or solicit any such renewal, replacement, refinancing, amendment, modification, waiver or consent) any of the Subordinated Debt Documents, provided however that the terms of the Subordinated Debt Documents may be amended or modified and any waiver may be obtained thereunder so long as prior to any amendment or modification of the Subordinated Debt Documents or any waiver under the Subordinated Debt Documents, Borrower provides at least ten (10) calendar days' written notice to Agent and Lenders and obtains the prior written consent of the Agent to each amendment or modification to or waiver under the Subordinated Debt Documents.  Notwithstanding anything herein to the contrary, Borrower shall not amend or otherwise modify the terms of the Warrant to Purchase Stock issued by Borrower to Subordinated Creditor and included in the Subordinated Debt Documents (whether or not such Warrant to Purchase Stock shall have then been exercised) unless Borrower provides at least ten (10) calendar days' written notice to Agent and Lenders and obtains the prior written consent of the Agent to each such amendment or modification.

8.2.15    Capital Expenditures and Leases.

No Loan Party shall make any payments exceeding $250,000 in the aggregate in any fiscal year on account of the purchase or lease of any assets which if purchased would constitute fixed assets or which if leased would constitute a capitalized lease; provided, however, that up to $100,000 of unused amounts permitted for capital expenditures in one fiscal year may be carried over to the immediately succeeding fiscal year; and provided further that the