# EXHIBIT A

## (Part 3)

costs related to the purchase of the "EMCLIENTCARE Contact Center" telephone switch by Borrower, in the amount of approximately $150,000 for hardware and software, shall be excluded in their entirety from such calculation. No Loan Party shall make any payments exceeding $700,000 in the aggregate in any fiscal year on account of the rental or lease of real or personal property of any other Person which does not constitute a capitalized lease, provided that such amount may be increased in accordance with the annual budget and operating plan for each fiscal year delivered to and approved by Agent in its reasonable discretion. No Loan Party shall make any capital expenditures and leases payments which are not made under usual and customary terms and in the ordinary course of business.

8.2.16    Minimum Fixed Charge Coverage Ratio.

Loan Parties shall not permit the Fixed Charge Coverage Ratio, calculated as of the end of each fiscal quarter for the fiscal quarter then ended, to be less than the ratio set forth below for the period specified below:

| Period | Ratio |
|---|---|
| Closing Date through July 31, 2005 | 1.25 to 1.0 |
| August 1, 2005 through January 31, 2006 | 1.50 to 1.0 |
| February 1, 2006 through January 31, 2007 | 1.75 to 1.0 |
| February 1, 2007 and thereafter | 2.00 to 1.0 |

8.2.17    Maximum Funded Debt.

Loan Parties shall not at any time permit the ratio of their Funded Debt to Consolidated Cash Flow from Operations (calculated for the twelve (12) months then ended) to exceed the ratio set forth below for the period specified below:

| Period | Ratio |
|---|---|
| Closing Date through July 31, 2005 | 5.5 to 1.0 |
| August 1, 2005 through January 31, 2006 | 5.0 to 1.0 |
| February 1, 2006 through | 4.5 to 1.0 |

- 66 -

| January 31, 2007 | |
|---|---|
| February 1, 2007 and thereafter | 4.0 to 1.0 |

Loan Parties shall not at any time permit the ratio of their Funded Debt to Eligible RMR to exceed the ratio set forth below for the period specified below:

| Period | Ratio |
|---|---|
| Closing Date through January 31, 2006 | 30.0 to 1.0 |
| February 1, 2006 through July 31, 2006 | 29.5 to 1.0 |
| August 1, 2006 through January 31, 2007 | 29.0 to 1.0 |
| February 1, 2007 through July 31, 2007 | 28.5 to 1.0 |
| August 1, 2007 and thereafter | 28.0 to 1.0 |

8.2.18    Maximum Senior Debt.

Loan Parties shall not at any time permit the ratio of their Senior Debt to Eligible RMR to exceed 24.0 to 1.0.

8.2.19    Minimum Liquidity.

Borrower shall not at any time permit the sum of Availability plus unrestricted cash to be less than $1,000,000, provided that such limit shall be reduced to $750,000 for the periods commencing February 1 through April 30 and August 1 through October 31, 2006 and February 1 through April 30 and August 1 through October 31, 2007.

8.2.20    Maximum Attrition Rate.

(a)    Loan Parties shall not permit their Attrition Rate to be more than the following:

| Period | Maximum Attrition Rate |
|---|---|

| Closing Date through July 31, 2005 | 15.00% |
|---|---|
| August 1, 2005 through January 31, 2006 | 14.00% |
| February 1, 2006 through April 30, 2006 | 13.75% |
| May 1, 2006 through July 31, 2006 | 13.50% |
| August 1, 2006 through October 31, 2006 | 13.00% |
| November 1, 2006 through January 31, 2007 | 12.50% |
| February 1, 2007 and thereafter | 12.00% |

(b)     In addition, Loan Parties shall not permit the amount of RMR that cancelled or failed to renew, as determined in clause (a)(i) of the definition of Attrition Rate, to exceed the amounts set forth below for the periods specified below:

| Period | Maximum RMR that Cancelled or Failed to Renew |
|---|---|
| Closing Date through July 31, 2005 | $73,500 |
| August 1, 2005 through January 31, 2006 | $73,500 |
| February 1, 2006 through April 30, 2006 | $38,325 |
| May 1, 2006 through July 31, 2006 | $38,115 |
| August 1, 2006 through October 31, 2006 | $38,115 |
| November 1, 2006 through January 31, 2007 | $39,165 |

| February 1, 2007 through January 31, 2008 | $168,000 |
|---|---|

8.2.21    Maximum Creation Multiple.

Loan Parties shall not permit their Creation Multiple, calculated as of the end of each month as the average for the three (3) months then ended, to be more than 32 through April 30, 2005, and thereafter to be more than 30.

8.2.22    Dealer Programs.

No Loan Party shall enter into (nor subsequently amend in any material manner) any Dealer Program without the prior written consent of Agent, which consent may be withheld in Agent's sole discretion.

8.2.23    Underwriting Guidelines.

Loan Parties shall not amend or otherwise modify their underwriting guidelines, a copy of which is attached hereto as Exhibit 8.2.23, without the prior written consent of Agent, which consent shall not be unreasonably withheld.  Loan Parties shall not make any material change with respect to their billing and collection processes, including late fees and service credits.

8.2.24    Certain Restrictions Regarding Subordinated Debt.

Loan Parties shall not defease or make any payments, prepayments, repayments, purchases, repurchases, or redemptions of or in respect of the Subordinated Debt, provided however that, so long as no Potential Default or Event of Default has occurred and is continuing or will result after giving effect thereto, Loan Parties may make such payments, prepayments, repayments, purchases, repurchases, or redemptions as are permitted under the Subordination Agreement.

8.2.25    Alarm Licenses.

No Loan Party shall have any alarm license suspension longer than sixty (60) days.

8.2.26    Compensation.

Loan Parties shall not pay salary to Peter Maltby in excess of $375,000, Patrick Smith in excess of $175,000, and Douglas Schultz in excess of $210,000 in the 2005 fiscal year.  In any subsequent fiscal year, the aggregate amount of salary paid to each such individual shall not exceed, in the aggregate, an amount equal to 105% of the total allowed salary for such individual in the immediately preceding fiscal year.  Loan Parties shall not pay discretionary bonuses or make any other distributions (other than salary) to Peter Maltby in the aggregate in excess of $75,000, Patrick Smith in the aggregate in excess of $75,000, and Douglas Schultz in the aggregate in excess of $90,000 in the 2005 fiscal year  In any subsequent fiscal year, the aggregate amount of discretionary bonuses paid to each such individual shall not

- 69 -

exceed, in the aggregate, an amount equal to 110% of the total allowed discretionary bonus for such individual in the immediately preceding fiscal year, provided that no such discretionary bonuses may be paid by any Loan Party if a Potential Default or an Event of Default has occurred and is continuing or if Borrower's financial performance for such fiscal year did not meet the projections set forth in the annual budget and operating plan delivered to and approved by Agent for such fiscal year.

### 8.2.27    Sale-Leasebacks.

No Loan Party shall engage in any sale-leaseback or similar transaction involving any of its property or assets.

### 8.2.28    Cancellation of Indebtedness.

No Loan Party shall cancel any material claim or Indebtedness owing to it, except for reasonable consideration and in the ordinary course of its business, or voluntarily prepay any Indebtedness except as otherwise permitted herein.

### 8.3    Reporting Requirements.

Loan Parties, jointly and severally, covenant and agree that until indefeasible payment in full of the Loans and interest thereon, satisfaction of all of Loan Parties' other Obligations under the Loan Documents and termination of the Commitments, Loan Parties will furnish or cause to be furnished to Agent and each Lender:

### 8.3.1    Monthly Financial Statements.

As soon as available and in any event within twenty (20) days after the end of each month through June 2005 and thereafter within fifteen (15) days after the end of each month, Borrower's financial statements, consisting of a consolidated and consolidating balance sheet as of the end of such month and related consolidated and consolidating statements of income, stockholders' equity and cash flows for the month then ended and the fiscal year through that date, all in reasonable detail and certified (subject to normal year-end adjustments) by the Chief Executive Officer, President or Chief Financial Officer of Borrower as having been prepared in accordance with GAAP, consistently applied, and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.

### 8.3.2    Quarterly Financial Statements.

As soon as available and in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters in each fiscal year, financial statements of Borrower, consisting of a consolidated and consolidating balance sheet as of the end of such fiscal quarter and related consolidated and consolidating statements of income, stockholders' equity and cash flows for the fiscal quarter then ended and the fiscal year through that date, all in reasonable detail and certified (subject to normal year-end audit adjustments) by the Chief Executive Officer, President or Chief Financial Officer of Borrower as having been prepared in

accordance with GAAP, consistently applied, and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.

        8.3.3        Annual Financial Statements.

        As soon as available and in any event within 120 days after the end of each fiscal year of Borrower, financial statements of Borrower consisting of a consolidated and consolidating balance sheet as of the end of such fiscal year, and related consolidated and consolidating statements of income, stockholders' equity and cash flows for the fiscal year then ended, all in reasonable detail and setting forth in comparative form the financial statements as of the end of and for the preceding fiscal year, and certified by independent certified public accountants of nationally recognized standing satisfactory to Agent; provided however within ninety (90) days after the end of each fiscal year of Borrower, Borrower shall deliver such financial statements certified (subject to normal year-end audit adjustments) by the Chief Executive Officer, President or Chief Financial Officer of Borrower as having been prepared in accordance with GAAP, consistently applied.  The certificate or report of accountants shall be free of qualifications (other than any consistency qualification that may result from a change in the method used to prepare the financial statements as to which such accountants concur) and shall not indicate the occurrence or existence of any event, condition or contingency which would materially impair the prospect of payment or performance of any covenant, agreement or duty of any Loan Party under any of the Loan Documents.  Loan Parties shall deliver with such financial statements and certification by their accountants a letter of such accountants to Agent and Lenders substantially:  (a) to the effect that, based upon their ordinary and customary examination of the affairs of Borrower, performed in connection with the preparation of such consolidated financial statements, and in accordance with generally accepted auditing standards, they are not aware of the existence of any condition or event which constitutes an Event of Default or, if they are aware of such condition or event, stating the nature thereof and confirming Borrower's calculations with respect to the certificate to be delivered pursuant to Section 8.3.4 [Certificate of Borrower] with respect to such financial statements and (b) to the effect that Lenders are intended to rely upon such accountant's certification of the annual financial statements and that such accountants authorize Loan Parties to deliver such reports and certificate to Lenders on such accountants' behalf.

        8.3.4        Certificate of Borrower.

        Concurrently with the financial statements of Borrower furnished to Agent and to Lenders pursuant to Sections 8.3.2 [Quarterly Financial Statements] and 8.3.3 [Annual Financial Statements], a certificate (each a "Compliance Certificate") of Borrower signed by the Chief Executive Officer, President or Chief Financial Officer of Borrower, in the form of Exhibit 8.3.4, to the effect that, except as described pursuant to Section 8.3.6 [Notice of Default], (a) the representations and warranties of Loan Parties contained in Section 6 [Representations and Warranties] and in the other Loan Documents are true on and as of the date of such certificate with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which expressly relate solely to an earlier date or time) and Loan Parties have performed and complied with all covenants and conditions hereof, (b) no Event of Default or Potential Default exists and is continuing on the date of such certificate and (c) containing calculations in sufficient detail to demonstrate compliance as of the

date of such financial statements with all financial covenants contained in Section 8.2 [Negative Covenants]. The certificate delivered with the annual financial statements pursuant to Section 8.3.3 [Annual Financial Statements] shall include a determination in reasonable detail of the Excess Cash Flow and the amount of the Mandatory Prepayment of Excess Cash Flow applicable to such fiscal year.

      8.3.5      Borrowing Base Certificate.

Borrower shall deliver a Borrowing Base Certificate in the form of Exhibit 8.3.5 to Agent on each of the following dates:

      (a)      with each Loan Request;

      (b)      monthly with the other monthly reports required to be delivered hereunder; and

      (c)      at the request of Agent.

      8.3.6      Notice of Default.

Promptly after any officer of any Loan Party has learned of the occurrence of an Event of Default or Potential Default, a certificate signed by the Chief Executive Officer, President or Chief Financial Officer of such Loan Party setting forth the details of such Event of Default or Potential Default and the action which such Loan Party proposes to take with respect thereto.

      8.3.7      Notice of Litigation.

Promptly after the commencement thereof, notice of all actions, suits, proceedings or investigations before or by any Official Body or any other Person against any Loan Party which relate to the Collateral, involve a claim or series of claims in excess of $150,000 or which if adversely determined would constitute a Material Adverse Change.

      8.3.8      Certain Events.

Written notice to Agent:

      (a)      at least thirty (30) days prior thereto, with respect to any proposed sale or transfer of assets pursuant to Section 8.2.7(e) [Dispositions of Assets or Subsidiaries],

      (b)      within the time limits set forth in Section 8.2.14 [Changes in Organizational Documents], any amendment to the organizational documents of any Loan Party;

      (c)      at least thirty (30) days prior thereto, with respect to any change in any Loan Party's locations from the locations set forth in Schedule A to the Security Agreement; and

      (d)      promptly after the occurrence thereof, notice of any material developments with respect to those matters described on Schedule 6.1.7.

8.3.9    Budgets, Forecasts, Other Reports and Information.

Promptly upon their becoming available to Loan Parties:

(a)    the annual budget and any forecasts or projections of Loan Parties, to be supplied not later than thirty (30) days prior to commencement of the fiscal year to which any of the foregoing may be applicable,

(b)    any reports including management letters submitted to Loan Parties by independent accountants in connection with any annual, interim or special audit,

(c)    any reports, notices or proxy statements generally distributed by Borrower to its stockholders on a date no later than the date supplied to such stockholders,

(d)    any regular or periodic reports, if any, including Forms 10-K, 10-Q and 8-K, registration statements and prospectuses, filed by Borrower with the Securities and Exchange Commission,

(e)    a copy of any order in any proceeding to which any Loan Party is a party issued by any Official Body, and

(f)    such other reports and information as any Lender may from time to time reasonably request, including the monthly reporting package consisting of those reports described on Exhibit 8.3.9, samples of which reports have been previously delivered to Agent. Loan Parties shall also notify Lenders promptly of the enactment or adoption of any Law which may result in a Material Adverse Change.

8.3.10    Notices Regarding Plans and Benefit Arrangements.

(a)    Certain Events.  Promptly upon becoming aware of the occurrence thereof, notice (including the nature of the event and, when known, any action taken or threatened by the Internal Revenue Service or the PBGC with respect thereto) of:

(i)    any Reportable Event with respect to any member of the ERISA Group (regardless of whether the obligation to report said Reportable Event to the PBGC has been waived),

(ii)    any Prohibited Transaction which could subject any member of the ERISA Group to a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Internal Revenue Code in connection with any Plan, any Benefit Arrangement or any trust created thereunder,

(iii)    any assertion of material withdrawal liability with respect to any Multiemployer Plan,

(iv)    any partial or complete withdrawal from a Multiemployer Plan by any member of the ERISA Group under Title IV of ERISA (or assertion thereof), where such withdrawal is likely to result in material withdrawal liability,

- 73 -

(v)    any cessation of operations (by any member of the ERISA Group) at a facility in the circumstances described in Section 4062(e) of ERISA,

(vi)    withdrawal by any member of the ERISA Group from a Multiple Employer Plan,

(vii)    a failure by any member of the ERISA Group to make a payment to a Plan required to avoid imposition of a Lien under Section 302(f) of ERISA,

(viii)    the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA, or

(ix)    any change in the actuarial assumptions or funding methods used for any Plan, where the effect of such change is to materially increase or materially reduce the unfunded benefit liability or obligation to make periodic contributions.

(b)    Notices of Involuntary Termination and Annual Reports.  Promptly after receipt thereof, copies of:  (a) all notices received by any member of the ERISA Group of the PBGC's intent to terminate any Plan administered or maintained by any member of the ERISA Group, or to have a trustee appointed to administer any such Plan; and (b) at the request of Agent or any Lender each annual report (IRS Form 5500 series) and all accompanying schedules, the most recent actuarial reports, the most recent financial information concerning the financial status of each Plan administered or maintained by any member of the ERISA Group, and schedules showing the amounts contributed to each such Plan by or on behalf of any member of the ERISA Group in which any of their personnel participate or from which such personnel may derive a benefit, and each Schedule B (Actuarial Information) to the annual report filed by any member of the ERISA Group with the Internal Revenue Service with respect to each such Plan.

(c)    Notice of Voluntary Termination.  Promptly upon the filing thereof, copies of any Form 5310, or any successor or equivalent form to Form 5310, filed with the PBGC in connection with the termination of any Plan.

## 9.    DEFAULT

9.1    Events of Default.

An Event of Default shall mean the occurrence or existence of any one or more of the following events or conditions (whatever the reason therefor and whether voluntary, involuntary or effected by operation of Law):

9.1.1    Payments Under Loan Documents.

Borrower shall fail to pay any principal of any Loan (including scheduled installments, mandatory prepayments or the payment due at maturity) or shall fail to pay any interest on any Loan, or any other amount owing under the Loan Documents after such principal, interest or other amount becomes due in accordance with the terms hereof or thereof;

9.1.2    Breach of Warranty.

Any representation or warranty made at any time by any Loan Party in any Loan Document, or in any certificate, other instrument or statement furnished pursuant to the provisions hereof or thereof, shall prove to have been false or misleading in any material respect as of the time it was made or furnished;

9.1.3    Breach of Negative Covenants or Visitation Rights or Account Control Agreements.

Any Loan Party shall default in the observance or performance of any covenant contained in Section 8.1.6 [Visitation Rights], Section 8.1.14 [Account Control Agreements], or Section 8.2 [Negative Covenants];

9.1.4    Breach of Other Covenants.

Any Loan Party shall default in the observance or performance of any other covenant, condition or provision of any Loan Document and such default shall continue unremedied for a period of ten (10) Business Days after any officer of any Loan Party becomes aware of the occurrence thereof (such grace period to be applicable only in the event such default can be remedied by corrective action of Loan Parties as determined by Agent in its sole discretion);

9.1.5    Defaults in Other Agreements or Indebtedness.

A default or event of default shall occur at any time under the terms of the Subordinated Debt Documents or any other agreement involving borrowed money or the extension of credit or any other Indebtedness under which any Loan Party may be obligated as a borrower or guarantor in excess of $200,000 in the aggregate, and such breach, default or event of default consists of the failure to pay (beyond any period of grace permitted with respect thereto, whether waived or not) any Indebtedness when due (whether at stated maturity, by acceleration or otherwise) or if such breach or default permits or causes the acceleration of any Indebtedness (whether or not such right shall have been waived) or the termination of any commitment to lend;

9.1.6    Final Judgments or Orders.

Any final judgments or orders (after the expiration of all times to appeal therefrom) shall be entered against any Loan Party by a court having jurisdiction in the premises: (a) for the payment of money in excess of $200,000 in the aggregate which is not insured or for the payment of money in excess of $500,000 which is insured, or (b) which judgment or order would constitute a Material Adverse Change, in each instance which judgment is not discharged, vacated, bonded or stayed pending appeal within a period of thirty (30) days from the date of entry ;

- 75 -

9.1.7    <u>Loan Document Unenforceable.</u>

Any of the Loan Documents shall cease to be legal, valid and binding agreements enforceable against the party executing the same or such party's successors and assigns (as permitted under the Loan Documents) in accordance with the respective terms thereof or shall in any way be terminated (except in accordance with its terms) or become or be declared ineffective or inoperative or shall in any way be challenged or contested or cease to give or provide the respective Liens, rights, titles, interests, remedies, powers or privileges intended to be created thereby;

9.1.8    <u>Uninsured Losses; Proceedings Against Assets.</u>

There shall occur any material uninsured damage to or loss, theft or destruction of any of the Collateral in excess of $150,000 or the Collateral or any other of Loan Parties' assets are attached, seized, levied upon or subjected to a writ or distress warrant; or such come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not cured within thirty (30) days thereafter;

9.1.9    <u>Notice of Lien or Assessment.</u>

A notice of Lien or assessment in excess of $150,000 which is not a Permitted Lien is filed of record with respect to all or any part of any assets of any Loan Party by the United States, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency, including the PBGC, or any taxes or debts owing at any time or times hereafter to any one of the foregoing governmental entities becomes payable and the same is not paid within thirty (30) days after the same becomes payable;

9.1.10    <u>Insolvency.</u>

Any Loan Party ceases to be Solvent or admits in writing its inability to pay its debts as they mature;

9.1.11    <u>Events Relating to Plans and Benefit Arrangements.</u>

Any of the following occurs:  (a) any Reportable Event, which Agent determines in good faith constitutes grounds for the termination of any Plan by the PBGC or the appointment of a trustee to administer or liquidate any Plan, shall have occurred and be continuing; (b) any proceeding shall have been instituted or other action taken to terminate any Plan, or a termination notice shall have been filed with respect to any Plan; (c) a trustee shall be appointed to administer or liquidate any Plan; (d) the PBGC shall give notice of its intent to institute proceedings to terminate any Plan or Plans or to appoint a trustee to administer or liquidate any Plan; and, in the case of the occurrence of clauses (a), (b), (c) or (d), Agent determines that the amount of Borrower's liability is likely to exceed 10% of its Consolidated Tangible Net Worth; (e) any member of the ERISA Group shall fail to make any contributions when due to a Plan or a Multiemployer Plan; (f) any member of the ERISA Group shall make any amendment to a Plan with respect to which security is required under Section 307 of ERISA; (g) any member of the ERISA Group shall withdraw completely or partially from a Multiemployer Plan; (h) any member of the ERISA Group shall withdraw (or shall be deemed

under Section 4062(e) of ERISA to withdraw) from a Multiple Employer Plan; or (i) any applicable Law is adopted, changed or interpreted by any Official Body with respect to or otherwise affecting one or more Plans, Multiemployer Plans or Benefit Arrangements and, with respect to any of the events specified in (e), (f), (g), (h) or (i), Agent determines in good faith that any such occurrence would be reasonably likely to materially and adversely affect the total enterprise represented by the members of the ERISA Group;

### 9.1.12 Cessation of Business.

Any Loan Party ceases to conduct its business as contemplated, except as expressly permitted under Section 8.2.6 [Liquidations, Mergers, Etc.] or 8.2.7 [Dispositions of Assets or Subsidiaries], or any Loan Party is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business and such injunction, restraint or other preventive order is not dismissed within thirty (30) days after the entry thereof;

### 9.1.13 Change of Control.

(a) Peter Maltby ceases to own 67% or more of the voting capital stock of Borrower; or (b) Peter Maltby shall cease to be substantially involved in the day-to-day management of Loan Parties and Loan Parties have not hired or appointed an individual reasonably acceptable to Required Lenders within four (4) months of such occurrence to replace such Person;

### 9.1.14 Involuntary Proceedings.

A proceeding shall have been instituted in a court having jurisdiction in the premises seeking a decree or order for relief in respect of any Loan Party in an involuntary case under any applicable bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator or similar official of any Loan Party for any substantial part of its property, or for the winding-up or liquidation of its affairs, and such proceeding shall remain undismissed or unstayed and in effect for a period of thirty (30) consecutive days or such court shall enter a decree or order granting any of the relief sought in such proceeding; or

### 9.1.15 Voluntary Proceedings.

Any Loan Party shall commence a voluntary case under any applicable bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect, shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator or other similar official of itself or for any substantial part of its property or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any action in furtherance of any of the foregoing.

9.2    Consequences of Event of Default.

    9.2.1    Events of Default Other Than Bankruptcy, Insolvency or Reorganization Proceedings.

        If an Event of Default specified under Sections 9.1.1 through 9.1.13 shall occur and be continuing, Lenders and Agent shall be under no further obligation to make Loans and Agent may, and upon the request of Required Lenders, shall, by written notice to Borrower, declare the unpaid principal amount of the Notes then outstanding and all interest accrued thereon, any unpaid fees and all other Indebtedness of Loan Parties to Lenders hereunder and thereunder to be forthwith due and payable, and the same shall thereupon become and be immediately due and payable to Agent for the benefit of each Lender without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, and Agent may, in its sole discretion, require Borrower to cause all Security Alarm Contract Documents to be delivered to Agent or such other custodian as Agent may select in its sole discretion; and

    9.2.2    Bankruptcy, Insolvency or Reorganization Proceedings.

        If an Event of Default specified under Section 9.1.14 [Involuntary Proceedings] or 9.1.15 [Voluntary Proceedings] shall occur, Lenders shall be under no further obligations to make Loans hereunder and the unpaid principal amount of the Loans then outstanding and all interest accrued thereon, any unpaid fees and all other Indebtedness of Loan Parties to Lenders hereunder and thereunder shall be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived; and

    9.2.3    Set-off.

        If an Event of Default shall occur and be continuing, any Lender to whom any Obligation is owed by any Loan Party under any Loan Document or any participant of such Lender which has agreed in writing to be bound by the provisions of Section 10.13 [Equalization of Lenders] and any branch, Subsidiary or Affiliate of such Lender or participant anywhere in the world shall have the right, in addition to all other rights and remedies available to it, without notice to such Loan Party, to set-off against and apply to the then unpaid balance of all the Loans and all other Obligations of Loan Parties or under any Loan Document any debt owing to, and any other funds held in any manner for the account of, any Loan Party by such Lender or participant or by such branch, Subsidiary or Affiliate, including all funds in all deposit accounts (whether time or demand, general or special, provisionally credited or finally credited, or otherwise) now or hereafter maintained by any Loan Party for its own account (but not including funds held in custodian or trust accounts) with such Lender or participant or such branch, Subsidiary or Affiliate.  Such right shall exist whether or not any Lender or Agent shall have made any demand under any Loan Document, whether or not such debt owing to or funds held for the account of any Loan Party is or are matured or unmatured and regardless of the existence or adequacy of any Collateral, Guaranty or any other security, right or remedy available to any Lender or Agent; and

### 9.2.4    Suits, Actions, Proceedings.

If an Event of Default shall occur and be continuing, and whether or not Agent shall have accelerated the maturity of Loans pursuant to any of the foregoing provisions of this Section 9.2, Agent or any Lender, if owed any amount with respect to the Loans, may proceed to protect and enforce its rights by suit in equity, action at law and/or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any Loan Document, including as permitted by applicable Law the obtaining of the ex parte appointment of a receiver, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of Agent or such Lender; and

### 9.2.5    Application of Proceeds; Collateral Sharing.

(a)    Application of Proceeds.  From and after the date on which Agent has taken any action pursuant to this Section 9.2 and until all Obligations of Loan Parties have been indefeasibly paid in full, any and all proceeds received by Agent from any sale or other disposition of the Collateral, or any part thereof, or the exercise of any other remedy by Agent, shall be applied as follows:

(i)    first, to reimburse Agent and Lenders for out-of-pocket costs, expenses and disbursements, including reasonable attorneys' and paralegals' fees and legal expenses, incurred by Agent or Lenders in connection with realizing on the Collateral or collection of any Obligations of any Loan Party under any of the Loan Documents, including advances made by Lenders or any one of them or Agent for the reasonable maintenance, preservation, protection or enforcement of, or realization upon, the Collateral, including advances for taxes, insurance, repairs and the like and reasonable expenses incurred to sell or otherwise realize on, or prepare for sale or other realization on, any of the Collateral;

(ii)    second, to past due fees and past due interest with respect to the Revolving Credit Loans and Term Loans A pro rata according to the aggregate amount of such fees and interest due to each Lender;

(iii)    third, to past due fees and past due interest with respect to the Term Loans B pro rata according to the aggregate amount of such fees and interest due to each Lender;

(iv)    fourth, to past due principal of the Revolving Credit Loans and Term Loans A pro rata according to the aggregate amount of such principal due to each Lender;

(v)    fifth, to past due principal of the Term Loans B pro rata according to the aggregate amount of such principal due to each Lender;

(vi)    sixth, to other fees and interest with respect to the Revolving Credit Loans and Term Loans A pro rata according to the aggregate amount of such fees and interest payable to each Lender;

- 79 -

(vii)    seventh, to other fees and interest with respect to the Term Loans B pro rata according to the aggregate amount of such fees and interest payable to each Lender;

(viii)    eighth, to other principal of the Revolving Credit Loans and Term Loans A pro rata according to the aggregate amount of such principal payable to each Lender;

(ix)    ninth, to other principal of the Term Loans B pro rata according to the aggregate amount of such principal payable to each Lender;

(x)    tenth, to other Obligations due to Lenders hereunder or under the other Loan Documents pro rata according to the amounts of such other Obligations payable to each Lender; and

(xi)    the balance, if any, as required by Law.

(b)    Collateral Sharing. All Liens granted under the Security Agreement, the Pledge Agreement, the Pledge Agreement (Subsidiaries), and any other Loan Document (the "Collateral Documents") shall secure ratably and on a pari passu basis the Obligations in favor of Agent and Lenders hereunder. Agent under the Collateral Documents shall be deemed to serve as the collateral agent (the "Collateral Agent") for Lenders, provided that the Collateral Agent shall comply with the instructions and directions of Agent (or Lenders under this Agreement to the extent that any Loan Document empowers Lenders to direct Agent), as to all matters relating to the Collateral, including the maintenance and disposition thereof.

9.2.6    Other Rights and Remedies.

In addition to all of the rights and remedies contained in any of the Loan Documents, Agent shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or other applicable Law, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by Law. Agent may, and upon the request of Required Lenders shall, exercise all post-default rights granted to Agent and Lenders under the Loan Documents or applicable Law.

9.3    Notice of Sale.

Any notice required to be given by Agent of a sale, lease or other disposition of the Collateral or any other intended action by Agent, if given ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice thereof to Borrower.


10.    AGENT

10.1    Appointment.

Each Lender hereby irrevocably designates, appoints and authorizes Fortress Credit Corp. to act as Agent for such Lender under this Agreement and to execute and deliver or accept on behalf of each Lender the Subordination Agreement and each of the other Loan

Documents, and each Lender expressly agrees to the provisions of the Subordination Agreement. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of a Note shall be deemed irrevocably to authorize, Agent to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and any other instruments and agreements referred to herein, and to exercise such powers and to perform such duties hereunder as are specifically delegated to or required of Agent by the terms hereof, together with such powers as are reasonably incidental thereto. Fortress Credit Corp. agrees to act as Agent on behalf of Lenders to the extent provided in this Agreement.

10.2    Delegation of Duties.

Agent may perform any of its duties hereunder by or through agents or employees (provided such delegation does not constitute a relinquishment of its duties as Agent) and, subject to Sections 10.5 [Reimbursement and Indemnification of Agent by Borrower, Etc.] and 10.6 [Exculpatory Provisions; Limitation of Liability], shall be entitled to engage and pay for the advice or services of any attorneys, accountants or other experts concerning all matters pertaining to its duties hereunder and to rely upon any advice so obtained.

10.3    Nature of Duties; Independent Credit Investigation.

Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist. The duties of Agent shall be mechanical and administrative in nature. Agent shall not have by reason of this Agreement a fiduciary or trust relationship in respect of any Lender. Nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Each Lender expressly acknowledges: (a) that Agent has not made any representations or warranties to it and that no act by Agent hereafter taken, including any review of the affairs of any of Loan Parties, shall be deemed to constitute any representation or warranty by Agent to any Lender; (b) that it has made and will continue to make, without reliance upon Agent, its own independent investigation of the financial condition and affairs and its own appraisal of the creditworthiness of each Loan Party in connection with this Agreement and the making and continuance of the Loans hereunder; and (c) except as expressly provided herein, that Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of any Loan or at any time or times thereafter.

10.4    Actions in Discretion of Agent; Instructions From Lenders.

Agent agrees, upon the written request of Required Lenders, to take or refrain from taking any action of the type specified as being within Agent's rights, powers or discretion herein, provided that Agent shall not be required to take any action which exposes Agent to personal liability or which is contrary to this Agreement or any other Loan Document or

applicable Law.  In the absence of a request by Required Lenders, Agent shall have authority, in its sole discretion, to take or not to take any such action, unless this Agreement specifically requires the consent of Required Lenders or all Lenders.  Any action taken or failure to act pursuant to such instructions or discretion shall be binding on Lenders, subject to Section 10.6 [Exculpatory Provisions; Limitation of Liability].  Subject to the provisions of Section 10.6 [Exculpatory Provisions; Limitation of Liability], no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder in accordance with the instructions of Required Lenders, or in the absence of such instructions, in the absolute discretion of Agent.

      10.5    <u>Reimbursement and Indemnification of Agent by Borrower</u>.

Borrower unconditionally agrees to pay or reimburse Agent and hold Agent harmless against: (a) liability for the payment of all reasonable out-of-pocket costs, expenses and disbursements, including fees and expenses of counsel (including the allocated costs of staff counsel), appraisers and environmental consultants, incurred by Agent: (i) in connection with the development, negotiation, preparation, printing, execution, administration, syndication, interpretation and performance of the Loan Documents:  <u>provided, however</u>, Agent agrees to apply the Expense Deposit previously received from Borrower against such costs and expenses; (ii) relating to any requested amendments, waivers or consents pursuant to the provisions hereof, (iii) in connection with the enforcement of any Loan Document or collection of amounts due hereunder or thereunder or the proof and allowability of any claim arising under any Loan Document, whether in bankruptcy or receivership proceedings or otherwise, and (iv) in any workout or restructuring or in connection with the protection, preservation, exercise or enforcement of any of the terms hereof or of any rights hereunder or under any other Loan Document or in connection with any foreclosure, collection or bankruptcy proceedings, and (b) all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent, in its capacity as such, in any way relating to or arising out of any Loan Document or any action taken or omitted by Agent hereunder or thereunder, <u>provided</u> that Borrower shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements if the same results from Agent's gross negligence or willful misconduct, or if Borrower was not given notice of the subject claim and the opportunity to participate in the defense thereof, at its expense (except that Borrower shall remain liable to the extent such failure to give notice does not result in a loss to Borrower), or if the same results from a compromise or settlement agreement entered into without the consent of Borrower, which shall not be unreasonably withheld.  In addition, Borrower agrees to reimburse and pay all reasonable out-of-pocket expenses of Agent's regular employees and agents engaged periodically to perform audits of Loan Parties' books, records and business properties.

      10.6    <u>Exculpatory Provisions; Limitation of Liability</u>.

Neither Agent nor any of its directors, officers, employees, agents, attorneys or Affiliates shall: (a) be liable to any Lender for any action taken or omitted to be taken by it or them hereunder, or in connection herewith including pursuant to any Loan Document, unless caused by its or their own gross negligence or willful misconduct, (b) be responsible in any

manner to any Lenders for the effectiveness, enforceability, genuineness, validity or the due execution of any Loan Document or for any recital, representation, warranty, document, certificate, report or statement herein or made or furnished under or in connection with any Loan Document, or (c) be under any obligation to any Lenders to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions hereof or thereof on the part of Loan Parties, or the financial condition of Loan Parties, or the existence or possible existence of any Event of Default or Potential Default. No claim may be made by any Loan Party, any Lender, Agent or any of their respective Subsidiaries against Agent, any Lender or any of their respective directors, officers, employees, agents, attorneys or Affiliates, or any of them, for any special, indirect or consequential damages or, to the fullest extent permitted by Law, for any punitive damages in respect of any claim or cause of action (whether based on contract, tort, statutory liability, or any other ground) based on, arising out of or related to any Loan Document or the transactions contemplated hereby or any act, omission or event occurring in connection therewith, including the negotiation, documentation, administration or collection of the Loans, and each Loan Party, Agent and each Lender hereby waive, releases and agree never to sue upon any claim for any such damages, whether such claim now exists or hereafter arises and whether or not it is now known or suspected to exist in its favor. Each Lender agrees that, except for notices, reports and other documents expressly required to be furnished to Lenders by Agent hereunder or given to Agent for the account of or with copies for Lenders, Agent and each of its directors, officers, employees, agents, attorneys or Affiliates shall not have any duty or responsibility to provide any Lender with credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of Loan Parties which may come into the possession of Agent or any of its directors, officers, employees, agents, attorneys or Affiliates.

10.7    <u>Reimbursement and Indemnification of Agent by Lenders.</u>

Each Lender agrees to reimburse and indemnify Agent (to the extent not reimbursed by Borrower and without limiting the Obligation of Borrower to do so) in proportion to its Aggregate Ratable Share from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, including attorneys' fees and disbursements (including the allocated costs of staff counsel), and costs of appraisers and environmental consultants, of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent, in its capacity as such, in any way relating to or arising out of any Loan Document or any action taken or omitted by Agent hereunder or thereunder, <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements: (a) if the same results from Agent's gross negligence or willful misconduct, or (b) if such Lender was not given notice of the subject claim and the opportunity to participate in the defense thereof, at its expense (except that such Lender shall remain liable to the extent such failure to give notice does not result in a loss to the Lender), or (c) if the same results from a compromise and settlement agreement entered into without the consent of such Lender, which consent shall not be unreasonably withheld. In addition, each Lender agrees promptly upon demand to reimburse Agent (to the extent not reimbursed by Borrower and without limiting the Obligation of Borrower to do so) in proportion to its Aggregate Ratable Share for all amounts due and payable by Borrower to Agent in connection with Agent's periodic audit of Loan Parties' books, records and business properties.

10.8    Reliance by Agent.

Agent shall be entitled to rely upon any writing, telegram, telex or teletype message, resolution, notice, consent, certificate, letter, cablegram, statement, order or other document or conversation by telephone or otherwise believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon the advice and opinions of counsel and other professional advisers selected by Agent. Agent shall be fully justified in failing or refusing to take any action hereunder unless it shall first be indemnified to its satisfaction by Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

10.9    Notice of Default.

Agent shall not be deemed to have knowledge or notice of the occurrence of any Potential Default or Event of Default unless Agent has received written notice from a Lender or Borrower referring to this Agreement, describing such Potential Default or Event of Default and stating that such notice is a "notice of default."

10.10    Notices.

Agent shall promptly send to each Lender a copy of all notices received from Borrower pursuant to the provisions of the Loan Documents promptly upon receipt thereof.

10.11    Lenders in Their Individual Capacities; Agent in its Individual Capacity.

With respect to its Revolving Credit Commitment, the Revolving Credit Loans, the Term Loan Commitment and the Term Loans made by it and any other rights and powers given to it as a Lender hereunder or under any of the other Loan Documents, Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not Agent, and the term "Lender" and "Lenders" shall, unless the context otherwise indicates, include Agent in its individual capacity. Fortress Credit Corp. and its Affiliates and each Lender and their respective Affiliates may, without liability to account, except as prohibited herein, make loans to, issue letters of credit for the account of, acquire equity interests in, accept deposits from, discount drafts for, act as trustee under indentures of, and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with, Loan Parties and their Affiliates, in the case of Agent, as though it were not acting as Agent hereunder, and in the case of each Lender, as though such Lender were not a Lender hereunder, in each case without notice to or consent of the other Lenders. Lenders acknowledge that, pursuant to such activities, Agent or its Affiliates may: (a) receive information regarding Loan Parties or any of their Subsidiaries or Affiliates (including information that may be subject to confidentiality obligations in favor of Loan Parties or such Subsidiary or Affiliate) and acknowledge that Agent shall be under no obligation to provide such information to them, and (b) accept fees and other consideration from Loan Parties for services in connection with this Agreement and otherwise without having to account for the same to Lenders.

- 84 -

10.12  Holders of Notes.

Agent may deem and treat any payee of any Note as the owner thereof for all purposes hereof unless and until written notice of the assignment or transfer thereof shall have been filed with Agent. Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note or of any Note or Notes issued in exchange therefor.

10.13  Equalization of Lenders.

Lenders and the holders of any participations in any Notes agree among themselves that, with respect to all amounts received by any Lender or any such holder for application on any Obligation hereunder or under any Note or under any such participation, whether received by voluntary payment, by realization upon security, by the exercise of the right of set-off or banker's lien, by counterclaim or by any other non-pro rata source, equitable adjustment will be made in the manner stated in the following sentence so that, in effect, all such excess amounts will be shared ratably among Lenders and such holders in proportion to their interests in payments under the Notes, except as otherwise provided in Section 4.4.3 [Agent's and Lender's Rights], 5.4.2 [Replacement of a Lender] or 5.6 [Additional Compensation in Certain Circumstances]. Lenders or any such holder receiving any such amount shall purchase for cash from each of the other Lenders an interest in such Lender's Loans in such amount as shall result in a ratable participation by Lenders and each such holder in the aggregate unpaid amount under the Notes, provided that if all or any portion of such excess amount is thereafter recovered from the Lender or the holder making such purchase, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, together with interest or other amounts, if any, required by law (including court order) to be paid by the Lender or the holder making such purchase.

10.14  Successor Agent.

Agent: (a) may resign as Agent or (b) shall resign if such resignation is requested by Required Lenders (if Agent is a Lender, Agent's Loans and its Commitment shall be considered in determining whether Required Lenders have requested such resignation) or required by Section 5.4.2 [Replacement of a Lender], in either case of (a) or (b) by giving not less than thirty (30) days' prior written notice to Borrower. If Agent shall resign under this Agreement, then either: (i) Required Lenders shall appoint from among Lenders a successor agent for Lenders, or (ii) if a successor agent shall not be so appointed within the thirty (30) day period following Agent's notice to Lenders of its resignation, then Agent shall appoint a successor agent who shall serve as Agent until such time as Required Lenders appoint a successor agent in accordance with clause (i) above. Upon its appointment pursuant to either clause (i) or (ii) above, such successor agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent, effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. After the resignation of any Agent hereunder, the provisions of Section 10 [Agent] shall inure to the benefit of such former Agent and such former Agent shall not by reason of such resignation

be deemed to be released from liability for any actions taken or not taken by it while it was an Agent under this Agreement.

10.15   Agent's Fee.

Borrower shall pay to Agent a nonrefundable fee ("Agent's Fee") under the terms of a letter ("Agent's Letter") between Borrower and Agent, as amended from time to time.

10.16   Availability of Funds.

Agent may assume that each Lender has made or will make the proceeds of a Loan available to Agent unless Agent shall have been notified by such Lender on or before the later of: (a) the close of Business on the Business Day preceding the Borrowing Date with respect to such Loan, or (b) two (2) hours before the time on which Agent actually funds the proceeds of such Loan to Borrower (whether using its own funds pursuant to this Section 10.16 or using proceeds deposited with Agent by Lenders and whether such funding occurs before or after the time on which Lenders are required to deposit the proceeds of such Loan with Agent). Agent may, in reliance upon such assumption (but shall not be required to), make available to Borrower a corresponding amount. If such corresponding amount is not in fact made available to Agent by such Lender, Agent shall be entitled to recover such amount on demand from such Lender (or, if such Lender fails to pay such amount forthwith upon such demand from Borrower) together with interest thereon, in respect of each day during the period commencing on the date such amount was made available to Borrower and ending on the date Agent recovers such amount, at a rate per annum equal to: (i) the Federal Funds Effective Rate during the first three (3) days after such interest shall begin to accrue and (ii) the applicable interest rate in respect of such Loan after the end of such three-day period.

10.17   Calculations.

In the absence of gross negligence or willful misconduct, Agent shall not be liable for any error in computing the amount payable to any Lender whether in respect of the Loans, fees or any other amounts due to Lenders under this Agreement. In the event an error in computing any amount payable to any Lender is made, Agent, Borrower and each affected Lender shall, forthwith upon discovery of such error, make such adjustments as shall be required to correct such error, and any compensation therefor will be calculated at the Federal Funds Effective Rate.

10.18   No Reliance on Agent's Customer Identification Program.

Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity

verification procedures, (b) any recordkeeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other Laws.

### 10.19   Beneficiaries.

Except as expressly provided herein, the provisions of this Section 10 [Agent] are solely for the benefit of Agent and Lenders, and no Loan Party shall have any right to rely on or enforce any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Loan Party.

### 10.20   Exit Fee.

Lenders making Revolving Credit Loans and Term Loans A hereby acknowledge and agree that they have no right, title, or interest in or to the exit fee described in Section 5.10. Such Lenders acknowledge that the Term Loans B are made at substantially greater risk and that the Term Loan B Lenders are entitled to additional consideration for such risk in the form of such exit fee.


## 11.   MISCELLANEOUS

### 11.1   Modifications, Amendments or Waivers.

With the written consent of Required Lenders, Agent, acting on behalf of all Lenders, and Borrower, acting on behalf of all Loan Parties, may from time to time enter into written agreements amending or changing any provision of any Loan Document or the rights of Lenders or Loan Parties hereunder or thereunder, or may grant written waivers or consents to a departure from the due performance of the Obligations of Loan Parties hereunder or thereunder. Any such agreement, waiver or consent made with such written consent shall be effective to bind all Lenders and Loan Parties; provided, that no such agreement, waiver or consent may be made which will:

#### 11.1.1   Increase of Commitment; Extension of Expiration Date.

Increase the amount of the Revolving Credit Commitment or Term Loan Commitment of any Lender hereunder or extend the Expiration Date without the prior written consent of all Lenders;

#### 11.1.2   Extension of Payment; Reduction of Principal Interest or Fees; Modification of Terms of Payment.

Whether or not any Loans are outstanding, extend the time for payment of principal or interest of any Loan (excluding the due date of any mandatory prepayment of a Loan or any mandatory Commitment reduction in connection with such a mandatory prepayment hereunder), the Commitment Fee or any other fee payable to any Lender, or reduce the principal amount of or the rate of interest borne by any Loan or reduce the Commitment Fee or any other fee payable to any Lender, or otherwise affect the terms of payment of the principal of or interest

of any Loan, the Commitment Fee or any other fee payable to any Lender without the prior written consent of each Lender directly affected thereby;

.11.1.3    Release of Collateral or Guarantor.

Except for sales of assets permitted by Section 8.2.7 [Dispositions of Assets or Subsidiaries], release any Collateral consisting of capital stock or other ownership interests of any Loan Party or substantially all of the assets of any Loan Party or any Guarantor from its Obligations under the Guaranty Agreement without the prior written consent of all Lenders; or

11.1.4    Miscellaneous.

Amend Section 5.2 [Pro Rata Treatment of Lenders], 10.6 [Exculpatory Provisions; Limitation of Liability] or 10.13 [Equalization of Lenders] or this Section 11.1, alter any provision regarding the pro rata treatment of Lenders, change the definition of Required Lenders, or change any requirement providing for Lenders or Required Lenders to authorize the taking of any action hereunder without the prior written consent of all Lenders;

provided, further, that no agreement, waiver or consent which would modify the interests, rights or obligations of Agent in its capacity as Agent shall be effective without the written consent of Agent.

11.2    No Implied Waivers; Cumulative Remedies; Writing Required.

No course of dealing and no delay or failure of Agent or any Lender in exercising any right, power, remedy or privilege under any Loan Document shall affect any other or future exercise thereof or operate as a waiver thereof, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power, remedy or privilege preclude any further exercise thereof or of any other right, power, remedy or privilege. The rights and remedies of Agent and Lenders under any Loan Document are cumulative and not exclusive of any rights or remedies which they would otherwise have. Any waiver, permit, consent or approval of any kind or character on the part of any Lender of any breach or default under this Agreement or any such waiver of any provision or condition of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing.

11.3    Reimbursement and Indemnification of Lenders by Borrower; Taxes.

Borrower agrees unconditionally upon demand to pay or reimburse to each Lender (other than Agent, as to which Borrower's Obligations are set forth in Section 10.5 [Reimbursement and Indemnification of Agent By Borrower]) and to save such Lender harmless against: (a) liability for the payment of all reasonable out-of-pocket costs, expenses and disbursements (including fees and expenses of counsel (including allocated costs of staff counsel) for each Lender except with respect to (i) and (ii) below), incurred by such Lender: (i) in connection with the administration and interpretation of this Agreement, and other instruments and documents to be delivered hereunder, (ii) relating to any amendments, waivers or consents pursuant to the provisions hereof, (iii) in connection with the enforcement of any Loan Document, or collection of amounts due hereunder or thereunder or the proof and allowability of

- 88 -

any claim arising under any Loan Document, whether in bankruptcy or receivership proceedings or otherwise, and (iv) in any workout or restructuring or in connection with the protection, preservation, exercise or enforcement of any of the terms hereof or of any rights hereunder or under any other Loan Document or in connection with any foreclosure, collection or bankruptcy proceedings, or (b) all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Lender, in its capacity as such, in any way relating to or arising out of any Loan Document or any action taken or omitted by such Lender hereunder or thereunder, provided that Borrower shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements: (A) if the same results from such Lender's gross negligence or willful misconduct, or (B) if Borrower was not given notice of the subject claim and the opportunity to participate in the defense thereof, at its expense (except that Borrower shall remain liable to the extent such failure to give notice does not result in a loss to Borrower), or (C) if the same results from a compromise or settlement agreement entered into without the consent of Borrower, which consent shall not be unreasonably withheld by Borrower.  Lenders will attempt to minimize the fees and expenses of legal counsel for Lenders which are subject to reimbursement by Borrower hereunder by considering the usage of one law firm to represent Lenders and Agent if appropriate under the circumstances.  Borrower agrees unconditionally to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by Agent or any Lender to be payable in connection with any Loan Document, and Borrower agrees unconditionally to save Agent and Lenders harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions.

        11.4   Holidays.

        Whenever payment of a Loan to be made or taken hereunder shall be due on a day which is not a Business Day such payment shall be due on the next Business Day (except as provided in Section 4.2 [Interest Periods] with respect to Interest Periods under the Euro-Rate) and such extension of time shall be included in computing interest and fees, except that the Loans shall be due on the Business Day preceding the Expiration Date if the Expiration Date is not a Business Day.  Whenever any payment or action to be made or taken hereunder (other than payment of the Loans) shall be stated to be due on a day which is not a Business Day, such payment or action shall be made or taken on the next following Business Day, and such extension of time shall not be included in computing interest or fees, if any, in connection with such payment or action.

        11.5   Funding by Branch, Subsidiary or Affiliate.

        11.5.1   Notional Funding.

        Each Lender shall have the right from time to time, without notice to Borrower, to deem any branch, Subsidiary or Affiliate (which for the purposes of this Section 11.5 shall mean any corporation or association which is directly or indirectly controlled by or is under direct or indirect common control with any corporation or association which directly or indirectly controls such Lender) of such Lender to have made, maintained or funded any Loan to which the Euro-Rate applies at any time, provided that immediately following (on

the assumption that a payment were then due from Borrower to such other office), and as a result of such change, Borrower would not be under any greater financial obligation pursuant to Section 5.6 [Additional Compensation in Certain Circumstances] than it would have been in the absence of such change.   Notional funding offices may be selected by each Lender without regard to such Lender's actual methods of making, maintaining or funding the Loans or any sources of funding actually used by or available to such Lender.

        11.5.2     Actual Funding.

        Each Lender shall have the right from time to time to make or maintain any Loan by arranging for a branch, Subsidiary or Affiliate of such Lender to make or maintain such Loan subject to the last sentence of this Section 11.5.2.  If any Lender causes a branch, Subsidiary or Affiliate to make or maintain any part of the Loans hereunder, all terms and conditions of this Agreement shall, except where the context clearly requires otherwise, be applicable to such part of the Loans to the same extent as if such Loans were made or maintained by such Lender, but in no event shall any Lender's use of such a branch, Subsidiary or Affiliate to make or maintain any part of the Loans hereunder cause such Lender or such branch, Subsidiary or Affiliate to incur any cost or expenses payable by Borrower hereunder or require Borrower to pay any other compensation to any Lender (including any expenses incurred or payable pursuant to Section 5.6 [Additional Compensation in Certain Circumstances]) which would otherwise not be incurred.

        11.6     Notices.

        Any notice, request, demand, direction or other communication (for purposes of this Section 11.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes means of electronic transmission (i.e., "e-mail") or facsimile transmission in accordance with this Section 11.6.  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Schedule 1.1(B) or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 11.6.  Any Notice shall be effective:

        (a)     In the case of hand-delivery, when delivered;

        (b)     If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

        (c)     In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission or overnight courier delivery of a confirmatory notice (received at or before noon on such next Business Day);

        (d)     In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

        (e)     In the case of electronic transmission, when actually received;

(f)    If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to a Loan Party shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders of Agent's receipt of such Notice.

### 11.7    Severability.

The provisions of this Agreement are intended to be severable. If any provision of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

### 11.8    Governing Law.

This Agreement shall be deemed to be a contract under the Laws of the State of New York and shall, pursuant to New York General Obligations Law Section 5-1401, for all purposes be governed by and construed and enforced in accordance with the laws of the State of New York.

### 11.9    Prior Understanding.

This Agreement and the other Loan Documents supersede all prior understandings and agreements, whether written or oral, among the parties hereto and thereto relating to the transactions provided for herein and therein, including any prior confidentiality agreements, proposals, term sheets and commitments.

### 11.10    Duration; Survival.

All representations and warranties of Loan Parties contained herein or made in connection herewith shall survive the making of Loans and shall not be waived by the execution and delivery of this Agreement, any investigation by Agent or Lenders, the making of Loans or payment in full of the Loans. All covenants and agreements of Loan Parties contained in Sections 8.1 [Affirmative Covenants], 8.2 [Negative Covenants] and 8.3 [Reporting Requirements] shall continue in full force and effect from and after the date hereof so long as Borrower may borrow and until termination of the Commitments and payment in full of the Loans. All covenants and agreements of Borrower contained herein relating to the payment of principal, interest, premiums, additional compensation or expenses and indemnification, including those set forth in the Notes, Section 5 [Payments] and Sections 10.5 [Reimbursement and Indemnification of Agent by Borrower], 10.7 [Reimbursement and Indemnification of Agent by Lenders, Etc.] and 11.3 [Reimbursement and Indemnification of Lenders by Borrower; Taxes], shall survive payment in full of the Loans and termination of the Commitments.

### 11.11    Successors and Assigns.

(a)    This Agreement shall be binding upon and shall inure to the benefit of Lenders, Agent, Loan Parties and their respective successors and assigns, except that no Loan

- 91 -

Party may assign or transfer any of its rights and Obligations hereunder or any interest herein. Each Lender may, at its own cost, make assignments of or sell participations in all or any part of its Commitments and the Loans made by it to one or more banks or other entities, subject to the consent of Agent with respect to any assignee, such consent not to be unreasonably withheld, provided that: (i) any assignment by a Lender to a Person other than an Affiliate of such Lender may not be made in amounts less than the lesser of $5,000,000 or the amount of the assigning Lender's Commitment, and (ii) any assignment made by a Lender of any portion of its Revolving Credit Commitment, Term Loan A Commitment, or Term Loan A shall be a pro rata assignment of its Revolving Credit Commitment, Term Loan A Commitment, and Term Loan A. In the case of an assignment, upon receipt by Agent of the Assignment and Assumption Agreement, the assignee shall have, to the extent of such assignment (unless otherwise provided therein), the same rights, benefits and obligations as it would have if it had been a signatory Lender hereunder, the Commitments shall be adjusted accordingly, and upon surrender of any Note subject to such assignment, Borrower shall execute and deliver a new Note to the assignee in an amount equal to the amount of the Revolving Credit Commitment or Term Loans assumed by it and a new Revolving Credit Note or Term Notes to the assigning Lender in an amount equal to the Revolving Credit Commitment or Term Loans retained by it hereunder. Any Lender which assigns any or all of its Commitment or Loans to a Person other than an Affiliate of such Lender shall pay to Agent a service fee in the amount of $3,500 for each assignment. In the case of a participation, the participant shall only have the rights specified in Section 9.2.3 [Set-off] (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto and not to include any voting rights except with respect to changes of the type referenced in Sections 11.1.1 [Increase of Commitment, Etc.], 11.1.2 [Extension of Payment, Etc.], or 11.1.3 [Release of Collateral or Guarantor]), all of such Lender's obligations under any Loan Document shall remain unchanged, and all amounts payable by any Loan Party hereunder or thereunder shall be determined as if such Lender had not sold such participation.

(b)    Any assignee or participant which is not incorporated under the Laws of the United States of America or a state thereof shall deliver to Borrower and Agent the form of certificate described in Section 11.17.1 [Tax Withholding] relating to federal income tax withholding. Each Lender may furnish any publicly available information concerning any Loan Party and any other information concerning any Loan Party in the possession of such Lender from time to time to assignees and participants (including prospective assignees or participants), provided that such assignees and participants agree to be bound by the provisions of Section 11.12 [Confidentiality].

(c)    Notwithstanding any other provision in this Agreement, any Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement, its Note and the other Loan Documents to any Federal Reserve Bank in accordance with Regulation A of the FRB or U.S. Treasury Regulation 31 CFR Section 203.14 without notice to or consent of Borrower or Agent. No such pledge or grant of a security interest shall release the transferor Lender of its obligations hereunder or under any other Loan Document.

11.12   Confidentiality.

11.12.1   General.

Agent and Lenders each agree to keep confidential all information obtained from any Loan Party which is nonpublic and confidential or proprietary in nature (including any information Borrower specifically designates as confidential), except as provided below, and to use such information only in connection with their respective capacities under this Agreement and for the purposes contemplated hereby. Agent and Lenders shall be permitted to disclose such information: (a) to outside legal counsel, accountants and other professional advisors who need to know such information in connection with the administration and enforcement of this Agreement, subject to agreement of such Persons to maintain the confidentiality, (b) to assignees and participants as contemplated by Section 11.11 [Successors and Assigns], and prospective assignees and participants, (c) to the extent requested by any regulatory authority or, with notice to Borrower, as otherwise required by applicable Law or by any subpoena or similar legal process, or in connection with any investigation or proceeding arising out of the transactions contemplated by this Agreement, (d) if it becomes publicly available other than as a result of a breach of this Agreement or becomes available from a source not known to be subject to confidentiality restrictions, or (e) if Borrower shall have consented to such disclosure.

11.12.2   Sharing Information With Affiliates of Lenders.

Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Loan Party hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or affiliate of any Lender receiving such information shall be bound by the provisions of Section 11.12.1 [General] as if it were a Lender hereunder. Such Authorization shall survive the repayment of the Loans and other Obligations and the termination of the Commitments.

11.13   Counterparts.

This Agreement may be executed by different parties hereto on any number of separate counterparts, each of which, when so executed and delivered, shall be an original, and all such counterparts shall together constitute one and the same instrument.

11.14   Agent's or Lender's Consent.

Whenever Agent's or any Lender's consent is required to be obtained under any Loan Document as a condition to any action, inaction, condition or event, Agent and each Lender shall be authorized to give or withhold such consent in its sole and absolute discretion and to condition its consent upon the giving of additional collateral, the payment of money or any other matter.

11.15  Exceptions.

The representations, warranties and covenants contained herein shall be independent of each other, and no exception to any representation, warranty or covenant shall be deemed to be an exception to any other representation, warranty or covenant contained herein unless expressly provided, nor shall any such exceptions be deemed to permit any action or omission that would be in contravention of applicable Law.

## 11.16  CONSENT TO FORUM; WAIVER OF JURY TRIAL.

**EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK, NEW YORK, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO SUCH LOAN PARTY AT THE ADDRESSES PROVIDED FOR IN SECTION 11.6 [NOTICES] AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT THEREOF. EACH LOAN PARTY WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED AGAINST IT AS PROVIDED HEREIN AND AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE. LOAN PARTIES, AGENT AND LENDERS HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE COLLATERAL TO THE FULL EXTENT PERMITTED BY LAW.**

11.17  Certifications From Lenders and Participants.

11.17.1  Tax Withholding.

Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and, upon the written request of Agent, each other Lender or assignee or participant of a Lender) agrees that it will deliver to Borrower and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under § 1.1441-1(c)(16) of the Income Tax Regulations (the "Regulations")) certifying its status (i.e. U.S. or foreign person) and, if appropriate, making a claim of reduced, or exemption from, U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Internal Revenue Code. The term "Withholding Certificate" means a Form W-9; a Form W-8BEN; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under § 1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in § 1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Internal Revenue Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person. Each Lender, assignee or participant required to deliver to Borrower and Agent a Withholding Certificate pursuant to the preceding sentence shall deliver such valid Withholding Certificate as follows:  (a) each Lender which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by Borrower hereunder for the account of such Lender;  and (b) each assignee or participant shall deliver such valid Withholding Certificate at least five (5)

Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such assignee or participant to deliver such valid Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent). Each Lender, assignee or participant which so delivers a valid Withholding Certificate further undertakes to deliver to Borrower and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrower or Agent. Notwithstanding the submission of a Withholding Certificate claiming a reduced rate of or exemption from U.S. withholding tax, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under § 1.1441-7(b) of the Regulations. Further, Agent is indemnified under § 1.1461-1(e) of the Regulations against any claims and demands of any Lender or assignee or participant of a Lender for the amount of any tax it deducts and withholds in accordance with regulations under § 1441 of the Internal Revenue Code.

      11.17.2       <u>USA Patriot Act</u>.

      Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both: (a) an affiliate of a depository institution or foreign Lender that maintains a physical presence in the United states or foreign county, and (b) subject to supervision by a banking authority regulating such affiliated depository institution or foreign lender) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (i) within ten (10) days after the Closing Date, and (ii) at such other times as are required under the USA Patriot Act.

      11.18   <u>Joinder of Guarantors</u>.

      Any Subsidiary of Borrower which is required to join this Agreement as a Guarantor pursuant to Section 8.2.9 [Subsidiaries, Partnerships and Joint Ventures] shall execute and deliver to Agent: (a) either the Guaranty Agreement in substantially the form attached hereto as <u>Exhibit 1.1(G)(2)</u> or, after the date of the Guaranty Agreement, a Guarantor Joinder in substantially the form attached hereto as <u>Exhibit 1.1(G)(1)</u> pursuant to which it shall join as a Guarantor each of the documents to which Guarantors are parties; (b) documents in the forms described in Section 7.1 [First Loans] modified as appropriate to relate to such Subsidiary; and (c) documents necessary to grant and perfect Prior Security Interests to Agent for the benefit of Lenders in all Collateral held by such Subsidiary and in all of the issued and outstanding capital stock, partnership interests, member interests, or other equity interest of each such Subsidiary owned by any Loan Party. Loan Parties shall deliver such Guarantor Joinder and related documents to Agent within five (5) Business Days after the date of the filing of such Subsidiary's articles of incorporation if the Subsidiary is a corporation, the date of the filing of its certificate

of limited partnership if it is a limited partnership or the date of its organization if it is an entity other than a limited partnership or corporation.

**[SIGNATURE PAGE FOLLOWS]**

**[SIGNATURE PAGE - CREDIT AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, have executed this Agreement as of the day and year first above written.

ALARM ONE, INC.

By: _____
Name: Peter Maltby
Title:   Chief Executive Officer

FORTRESS CREDIT CORP., individually and as Agent

By: _____
Name: _____
Title: _____

**[SIGNATURE PAGE - CREDIT AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, have executed this Agreement as of the day and year first above written.

ALARM ONE, INC.

By: _____
Name: Peter Maltby
Title:   Chief Executive Officer

FORTRESS CREDIT CORP., individually and as Agent

By: _____
Name: _____ CONSTANTINE DAKOLIAS _____
Title: _____ CHIEF CREDIT OFFICER _____